Circuit Court for Wicomico County
Case No. C-22-CR-21-000030
Argued: March 2, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 24
September Term, 2022

_____

ROBERT L. FOOKS

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Fader, C.J.
    Watts, J., concurs.
    Gould, J., concurs.
    Biran, J., dissents.

_____

Filed: June 6, 2025

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Section 5-133(b)(2) of the Public Safety Article (2022 Repl.) prohibits a person from possessing certain firearms if the person has been convicted of a common law crime and received a sentence of more than two years in prison. We hold that § 5-133(b)(2) is, in substance, a law prohibiting the possession of firearms by felons and, as such, is consistent with the Second Amendment to the United States Constitution.[1]

Robert L. Fooks, the petitioner, was convicted by the Circuit Court for Wicomico County of violating § 5-133(b)(2). Mr. Fooks does not contest that he was subject to that prohibition based on his prior conviction and more than four-year sentence for the common law crime of constructive criminal contempt. He argues, however, that § 5-133(b)(2) cannot survive Second Amendment scrutiny, and that his convictions must be overturned.

The framework applicable to Second Amendment challenges has evolved over the course of four decisions issued by the United States Supreme Court in the last 17 years, along with the efforts of lower courts to implement those decisions. In 2008, the Court determined that the right to keep and bear arms codified in the Second Amendment is an individual right, unconstrained by the reference in its prefatory clause to militia service, and that a District of Columbia ban on the possession of handguns for home self-defense violated that right. *See District of Columbia v. Heller*, 554 U.S. 570, 595, 598-99, 635-36 (2008). In doing so, the Court engaged in a review of the text of the Second Amendment, the historical understanding of the right to keep and bear arms before and contemporaneous

---

[1] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

with the ratification of the amendment, the historical understanding of the right following ratification through the end of the 19th century, and precedent. *Id.* at 576-625. In 2010, the Court held that the Second Amendment right recognized in *Heller* applies to the States by operation of the Fourteenth Amendment to the United States Constitution, and that handgun bans by two municipalities therefore also violated that right. *See McDonald v. City of Chicago*, 561 U.S. 742, 750, 778, 791 (2010).

In 2022, the Supreme Court concluded that the Second Amendment right applies outside of the home, and that a New York state statute requiring applicants for public carry licenses to demonstrate a "special need for self-protection" also violated that right. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-14 (2022) (citation omitted). In *Bruen*, the Court also expressly rejected a two-part framework for assessing Second Amendment claims that had been nearly universally adopted by lower courts attempting to apply *Heller* and *McDonald*. *Id.* at 17-19. In its place, the Court adopted a new test for Second Amendment challenges, which it described as follows:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Last year, the Court held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the

2

Second Amendment." *United States v. Rahimi*, 602 U.S. 680, 702 (2024). In doing so, the Court clarified the *Bruen* test, which lower courts had struggled to apply. The Court explained that to survive Second Amendment scrutiny, a challenged law "must comport with the principles underlying the Second Amendment" and be "consistent with the principles that underpin our regulatory tradition." *Id.* at 692. That requires courts to determine whether a challenged law is "relevantly similar" to "laws that our tradition is understood to permit[.]" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29). The Court left open a determination of the level of generality at which courts should examine the regulatory tradition, but the historical laws the Court deemed sufficient to support the law under review in *Rahimi* are instructive.

Section 5-133(b)(2) is, in substance, a prohibition on the possession of firearms by felons. In *Heller*, the Court identified such laws as "presumptively lawful regulatory measures," 554 U.S. at 626-27, 627 n.26, a statement it has subsequently repeated and bolstered in majority and concurring opinions, *see, e.g.*, *Rahimi*, 602 U.S. at 699; *Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 80-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.). That assurance is consistent with the Court's identification of the Second Amendment right as applying to law-abiding individuals, *see, e.g.*, *Bruen*, 597 U.S. at 8-10 (identifying the right recognized in *Heller* and *McDonald* as "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"), as well as the Court's confirmation in *Rahimi* that its jurisprudence contains no suggestion that "the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," 602 U.S. at 698.

3

The Court's repeated assurances of the lawfulness of bans on the possession of firearms by felons and the principles revealed by our Nation's historical tradition of firearms regulation both support the constitutionality of § 5-133(b)(2). We will therefore affirm the judgment of the Appellate Court of Maryland upholding the constitutionality of § 5-133(b)(2).

## BACKGROUND

### A.    Maryland Legal Framework

Section 5-133(b) of the Public Safety Article identifies 15[2] categories of individuals who are prohibited from possessing a "regulated firearm," a term that includes all handguns and a list of "specific assault weapons or their copies[.]" *See* Pub. Safety §§ 5-101(r), 5-133(b) (2024 Supp.). The category at issue here includes individuals who "ha[ve] been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years[.]" *Id.* § 5-133(b)(2).

Constructive criminal contempt is a common law offense in Maryland that is not characterized as either a felony or a misdemeanor. Like other common law offenses, there is no minimum or maximum sentence applicable to constructive criminal contempt. *Evans v. State*, 420 Md. 391, 397 n.7 (2011) ("[W]here the Legislature fails to provide a penalty for a common law offense . . . the sentence is left to the 'sound discretion of the trial court,

---

[2] At the time of the facts underlying Mr. Fooks's conviction, § 5-133(b) listed 13 categories of prohibited individuals. In 2023, the General Assembly added two additional categories: (1) individuals convicted of violating § 4-104 of the Criminal Law Article under certain circumstances, 2023 Md. Laws, Ch. 858; and (2) individuals on supervised probation after being convicted of certain offenses, 2023 Md. Laws, Ch. 651.

subject only to the constitutional prohibition against cruel and unusual punishment.'" (quoting *Street v. State*, 307 Md. 262, 267 (1986))).

### B. Background

In 2016, Mr. Fooks was convicted of constructive criminal contempt for his willful failure to pay child support, for which he received a sentence of imprisonment for four years and six months. The record does not identify how much of his sentence he served.

In 2020, based on records of pawn transactions, officers determined that Mr. Fooks was in possession of one handgun on November 30, 2019 and another on February 6, 2020.

A grand jury issued a 14-count indictment against Mr. Fooks, including 13 firearms-related counts and one count of theft. Mr. Fooks moved to dismiss the firearms-related counts on the ground that the underlying statutes violated his Second Amendment rights. The circuit court denied his motion. Mr. Fooks and the State then entered a plea agreement pursuant to which Mr. Fooks entered a conditional guilty plea to two of the firearms-related counts. The State agreed not to proceed with the remaining 12 counts. The circuit court accepted the plea.[3]

Mr. Fooks appealed to the Appellate Court, where he argued that § 5-133(b)(2) violates the Second Amendment. In a reported opinion, the Appellate Court disagreed. *Fooks v. State*, 255 Md. App. 75 (2022). The intermediate appellate court held that

---

[3] The court imposed the sentence the State had agreed to recommend in the plea agreement, including consecutive five-year sentences on each count suspending all but time served, two years of supervised probation, and restitution of $9,949 to be paid to a Marilyn Murray-Artis. The transcript of the plea hearing does not explain Ms. Murray-Artis's role.

5

§ 5-133(b)(2) is neither facially unconstitutional nor unconstitutional as applied to Mr. Fooks, and therefore affirmed Mr. Fooks's convictions. *Id.* at 81, 106. Mr. Fooks then filed a petition for writ of certiorari in this Court, which we granted to address three issues: (1) the proper framework for analyzing Second Amendment challenges post-*Bruen*; (2) whether the Appellate Court properly applied that framework; and (3) the constitutionality of § 5-133(b)(2). *Fooks v. State*, 482 Md. 141 (2022). After oral argument but before a decision was released, the Supreme Court of the United States granted certiorari in *Rahimi*. At the request of the parties, this Court entered a stay pending the decision in *Rahimi*. After the Supreme Court handed down its decision, we allowed for further briefing on the application of that case to this one. We now affirm.

## DISCUSSION

I. **THE EVOLUTION OF THE FRAMEWORK FOR ANALYZING SECOND AMENDMENT CHALLENGES**

A. ***Heller* and *McDonald***

In the United States Supreme Court's landmark decision in *Heller*, the Court engaged in its first extensive examination of the Second Amendment right in deciding a challenge to a District of Columbia ban on the possession of usable handguns within the home. 554 U.S. at 573. In analyzing whether the Second Amendment right is individual or collective, the Court focused first on the amendment's text and then turned to history.

First, the Court analyzed the Second Amendment's text to discern the "normal and ordinary" meaning of its terms. *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). Based on its analysis of "textual elements," the Court concluded that the

Second Amendment's operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Second, the Court turned to the "historical background of the Second Amendment," which the Court concluded "strongly confirmed" its textual analysis. *Id.* The Court did so, it asserted, "because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Id.* Focusing on the analogous provision of the 1689 English Bill of Rights, "long . . . understood to be the predecessor to our Second Amendment," *id.* at 592-93, the Court declared there to be "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms," *id.* at 595.

Third, the Court turned to other historical sources for further confirmation. The Court first analyzed "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," which it concluded confirmed its interpretation of the text. *Id.* at 600-05. The Court then engaged in an extensive review of historical sources reflecting how the Second Amendment was interpreted "from immediately after its ratification through the end of the 19th century." *Id.* at 605. The Court defended its use of such sources as relevant to "determin[ing] *the public understanding* of [the Second Amendment] in the period after its enactment or ratification," which the Court deemed "a critical tool of constitutional interpretation." *Id.* The most recent source cited by the Court as authority concerning its interpretation of the Second Amendment was from 1891. *Id.* at 619 (citing and quoting J. Ordronaux, *Constitutional Legislation in the United States* 241-42 (1891)).

Fourth, the Court determined that its own precedents did not "foreclose[] [its] adoption of the original understanding of the Second Amendment." *Id.* at 619-26.

After concluding that analytical exercise, the Court emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. In a passage that has played a critical role in Second Amendment jurisprudence ever since, and will be important to our resolution of this appeal, the Court provided the following assurance:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In a footnote, the Court explained that it "identif[ied] these presumptively lawful regulatory measures only as examples," and that the "list does not purport to be exhaustive." *Id.* at 627 n.26. The Court then recognized "another important limitation on the right to keep and carry arms," which was that it protected only weapons "in common use at the time." *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

Applying its interpretation of the Second Amendment to the District of Columbia law under review, the Court held that the law could not survive "any of the standards of scrutiny that we have applied to enumerated constitutional rights[.]" *Id.* at 628-29. The Court therefore declined to identify which standard of scrutiny would apply to Second Amendment claims, although it rejected out-of-hand a "freestanding 'interest-balancing' approach" suggested by Justice Breyer. *Id.* at 634. It also rejected any test that would have resulted in upholding the District of Columbia law under review because, the Court stated,

"whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

Notably for our purposes, the Court referred back to its list of "presumptively lawful regulatory measures" at least five times in the remainder of the opinion, each time characterizing those measures as limitations on or exceptions to the Second Amendment right, rather than as open issues left for future consideration. First, the Court described the "in common use" limitation as "*another* important limitation on the right," implying that the presumptively lawful regulatory measures were themselves limitations on the right. *Id.* at 627 (emphasis added). Second, in responding to a criticism from one of the dissenters, the Court characterized the measures as "those regulations of the right that we describe as permissible," not possibly permissible. *Id.* at 635. Third, in defending its identification of those measures without providing a supporting rationale, the Court stated that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."[4] *Id.* Fourth, in describing the

---

[4] This passage contains some ambiguity. On the one hand, the Court contemplates that the "exceptions" may at some future date "come before" it, perhaps suggesting some lack of finality. On the other hand, the Court describes the measures as "exceptions," not "potential" or "possible" exceptions, and states that it will set forth the historical justifications for them when the time comes, not that it will explore whether such justifications exist. Considering the extensive historical analysis the Court performed in *Heller*—and the certainty the Court conveyed in the correctness of its interpretation of the historical record—it is unsurprising that the Court would feel confident in stating that it would be able to set forth historical justifications for the presumptively lawful regulatory measures, even while not feeling compelled to set those justifications forth in an opinion in which they were not at issue.

9

implications of its holding, the Court said that Mr. Heller would be able to register his handgun and obtain a carry license "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights," *id.* at 635, which the Court previously recognized would be the case "if he is not a felon and is not insane," *id.* at 631. And fifth, the Court observed that "[t]he Constitution leaves the District of Columbia a variety of tools for combating [the] problem [of handgun violence], including some measures regulating handguns[.]" *Id.* at 636. The Court followed that passage immediately with a cross-reference to the pages on which the presumptively lawful regulatory measures are identified. *Id.*

Notably, all five passages refer to the identified presumptively lawful regulatory measures as either limitations on the Second Amendment right or, in the case of the final reference, as options available to governments to combat gun violence. The Court thus implied that although its explanation for *how* it identified those measures to be lawful would be delayed, it had already determined that they were.

Two years later, in *McDonald*, the Court held "that the Second Amendment right is fully applicable to the States." 561 U.S. at 750. The Court determined that the critical question in determining whether the Second Amendment is incorporated against the States via the Due Process Clause of the Fourteenth Amendment is "whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, or as we have said in a related context, whether this right is 'deeply rooted in this Nation's history and tradition.'" *Id.* at 767 (citation omitted) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). That, the Court observed, was settled in *Heller*. *Id.* at 767-68. In reviewing the historical

10

record, the Court once again focused primarily on sources covering periods beginning with the 1689 English Bill of Rights and ending in the 19th century. *See id.* at 768-70.

After an extensive reiteration of applicable history and precedent, the Court observed that the Second Amendment right "is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values." *Id.* at 785. In responding to arguments of the respondents and their *amici*, the Court emphasized that it had

> made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

*Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27). To emphasize the point, the Court took the unusual step of following its approving quotations of the relevant passages from *Heller* with an express statement of re-adoption: "We repeat those assurances here." *Id.* at 786.

## B. Lower Court Case Law Between *McDonald* and *Bruen*

Following *Heller* and *McDonald*, lower courts across the country struggled to reconcile the Supreme Court's focus on text and history in explaining its interpretation of the scope of the Second Amendment right with the Court's identification of presumptively lawful measures. *See, e.g.*, *United States v. Chester*, 628 F.3d 673, 678, 680 (4th Cir. 2010) (discussing *Heller* and ultimately concluding that "it appears to us that the Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter"); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (stating that among the issues *Heller* did not resolve is "the standards for determining when and

11

how the [Second Amendment] right can be regulated by a government"); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) ("The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree."); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("*Heller* did not set forth an analytical framework with which to evaluate firearms regulations in future cases."); *United States v. Skoien*, 587 F.3d 803, 808 (7th Cir. 2009) ("The Court [in *Heller*] . . . conspicuously declined to set a standard of review. We take all this to mean that gun laws—other than those like the categorically invalid one in *Heller* itself—must be independently justified. But by what kind of justification? . . . [T]he language about presumptive exceptions makes for some analytical difficulty[.]" (citation omitted)).

Some courts additionally observed that although the Court appeared to ground its interpretation of the Second Amendment in an exploration of text and history that focused on the ratification period through the end of the 19th century, the Court also identified categories of acknowledged limitations on the right that, by and large, were not formally enacted until after that period.[5]   *See, e.g.*, *Chester*, 628 F.3d at 679 (observing that "[f]ederal felon dispossession laws . . . were not on the books until the twentieth century"); *Kachalsky*, 701 F.3d at 90 n.11 (observing that the measures identified as presumptively lawful in *Heller* "were not enacted until the early twentieth century" (citing Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*  District of Columbia v. Heller *and Judicial*

---

[5] As we discuss below, 18th and 19th century felons were often disarmed in more final ways, including through real or civil death.  *See* discussion below at 42-47.

*Ipse Dixit*, 60 Hastings L.J. 1371, 1374-79 (2009))); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (observing that the measures identified as presumptively lawful in *Heller* "are of 20th Century vintage"); *Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1263-64 (N.D. Fla. 2021) (observing that three of the four "longstanding" regulations listed in *Heller*—all but restrictions on carry in sensitive places—"arose in the early-[]to mid-twentieth century"); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698-713 (2009) (surveying the history of state laws limiting felon entitlement to possess firearms); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 273-75 (2020) (discussing early state and federal disarmament statutes); Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1592 (2022) ("[T]he original 1938 federal firearm disqualification statute was the first federal law that banned gun sales to and firearm possession by any felons and misdemeanants convicted of a statutorily defined 'crime of violence.'" (citing Federal Firearms Act, Pub. L. No. 75-785, §§ 1(6), 2(d)-2(f), 52 Stat. 1250, 1250-51 (1938))).

Lower courts also observed that the Supreme Court had analogized its treatment of the Second Amendment to the First Amendment and so looked to First Amendment jurisprudence for guidance. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) ("Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."); *United States v.*

13

*Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("*Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. . . . We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment."). In doing so, those courts were informed by First Amendment jurisprudence that looks to history to determine whether certain types of speech have historically been excluded from the scope of the First Amendment's protection and, if not, applies an applicable standard of scrutiny, generally either intermediate or strict depending on how closely the abridgment comes to the core right. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468, 472 (2010) (declining to add "depictions of animal cruelty" to the list of "historic and traditional categories" of speech exempted from the First Amendment's general prohibition of content-based restrictions on speech); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444, 446 (2015) (applying strict scrutiny and observing that "a history and tradition of regulation are important factors in determining whether to recognize 'new categories of unprotected speech'" (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 791 (2011))); *Brown*, 564 U.S. at 799 (applying strict scrutiny to a restriction on the content of protected speech); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661-62 (1994) (applying intermediate scrutiny to a content-neutral regulation).

Ultimately, lower courts almost universally adopted a two-step analytical framework for addressing Second Amendment claims that closely mirrored the framework applied to First Amendment free speech claims. Under that approach,

> [t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue

14

was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.

*Woollard v. Gallagher*, 712 F.3d 865, 875 (4th Cir. 2013) (quoting *Chester*, 628 F.3d at 680); *see also, e.g.*, *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *Marzzarella*, 614 F.3d at 89; *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 194; *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell*, 651 F.3d at 703-04; *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011).

## C. *Bruen*

In *Bruen*, the Supreme Court expressly disavowed the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." 597 U.S. at 17. The Court acknowledged that federal intermediate appellate courts interpreting *Heller* and *McDonald* had "coalesced around" that framework, *id.* at 17, 19 n.4, but held that the two steps the framework required were "one step too many," *id.* at 19. The Court considered the first of those steps to be consistent with *Heller*, "which demands a test rooted in the Second Amendment's text, as informed by history," but decided that means-end scrutiny analysis has no place when considering Second Amendment challenges. *Id.* In place of that framework, the Court adopted a new one:

15

[W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg*, 366 U.S. at 50 n.10).

In explaining its new standard, the Court stated that it "accords with how we protect other constitutional rights," focusing specifically on "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 24. The Court observed that "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Id.* (alteration in *Bruen*) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000)).

In further explicating its new standard, the Court in *Bruen* explained that the standard "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. Where a challenged regulation seeks to address "a general societal problem" that has existed since 1791, the Court observed, "the lack of a distinctly similar historical regulation" would be evidence of an incompatibility with the Second Amendment. *Id.* The inquiry will not necessarily be so straightforward in "cases implicating unprecedented societal concerns or dramatic technological changes[, which] may require a more nuanced approach." *Id.* at 27. In those cases, the Court observed, courts will need to conduct historical inquiries involving

reasoning by analogy, including considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

The Court added two further pieces of guidance in applying its new standard. First, although examining the comparability of the burdens of regulations and the justifications for those burdens was part of the required "analogical inquiry," the Court cautioned that such comparability did "not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 29 n.7. In other words, courts are to examine the burdens of and justifications for modern firearms regulations only to assist in determining whether they are analogous to potentially relevant historical regulations, not to conduct a balancing inquiry. Second, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. As an example, the Court observed that "*new* and analogous sensitive places" might be added to the "settled" list of those "where arms carrying could be prohibited consistent with the Second Amendment." *Id.*

The Court then turned to the statute before it, under which New York banned the carry of handguns in public by those who could not prove that they had "proper cause" to do so. *Id.* at 31. The Court found the first part of its new standard—whether the text of the Second Amendment covers the conduct at issue—to be easily satisfied because: (1) the petitioners, as "two ordinary, law-abiding, adult citizens," were "part of 'the people' whom the Second Amendment protects"; and (2) the conduct in which they sought to engage, "carrying handguns publicly for self-defense," is protected by the Second Amendment. *Id.* at 31-32.

17

Having crossed that hurdle, the Court engaged in a detailed analysis of whether New York had carried its burden to demonstrate that its "proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33-34. In doing so, the Court reviewed historical evidence extending from "English history and custom before the founding," *id.* at 37-47, through "the late-19th century," *id.* at 64-70. Although the respondents and their *amici* also proffered 20th-century historical evidence, the Court rejected it, and declined even to discuss it, on the ground that it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."[6] *Id.* at 66 n.28.

Based on its extensive review of these historical sources, the Court concluded that public carry had "traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms," but found little evidence of a tradition of broadly prohibiting public carry of common weapons for self-defense or of "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 38. Absent any such historical tradition, the Court concluded that New York had not borne its burden, and that its proper cause requirement was unconstitutional.[7] *Id.* at 38-39.

---

[6] In stating that historical evidence after the turn of the 20th century lacks value as part of the relevant inquiry "when it contradicts earlier evidence," *Bruen*, 597 U.S. at 66 n.28, the Court seemingly left open the possibility that such evidence may be worthy of consideration if it *aligns* with the Court's interpretation of earlier historical evidence. It is unclear how such a dichotomy might be employed in practice.

[7] In dicta, the Court provided assurance that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'"

Four of the six Justices in the majority wrote or signed onto concurrences, two of which are particularly notable for our purposes. First, Justice Alito joined the majority opinion "in full" but wrote separately to respond to the dissent, primarily to emphasize what he viewed as the narrowness of the majority opinion. *Id.* at 71-79 (Alito, J., concurring). According to Justice Alito, the majority opinion decided only that New York could not enforce a law "that effectively prevents its law-abiding residents from carrying a gun" "to defend themselves." *Id.* at 71-72. That "holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun," nor "the kinds of weapons that people may possess." *Id.* at 72. Nor, he confirmed, "have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.*

Second, Justice Kavanaugh wrote separately for himself and Chief Justice Roberts "to underscore two important points about the limits of the Court's decision." *Id.* at 79 (Kavanaugh, J., concurring). Justice Kavanaugh first emphasized that the majority opinion

---

*Bruen*, 597 U.S. at 38 n.9 (alteration in *Bruen*) (quoting *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)). The Court explained that "[b]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* (quoting *Heller*, 554 U.S. at 635). Instead, those "regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* The Court did not explain how it squared its explanation for its approval of shall-issue licensing regimes—that they do not "prevent" exercise of the Second Amendment right, present only a minimal burden in exchange for identifying who is able to enjoy the Second Amendment right, and are based on objective criteria—with either its adoption of a general standard based exclusively on text and history or its rejection of means-end scrutiny. *Id.*

19

"does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense," such as the "shall-issue" regimes referenced by the majority.[8] *Id.* Those regimes, he stated, "are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Id.* at 80. Justice Kavanaugh next emphasized that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* (quoting *Heller*, 554 U.S. at 636). To prove the point, without any additional comment or explanation, Justice Kavanaugh block quoted the paragraphs from *Heller*, reiterated in *McDonald*, and quoted above, concerning presumptively lawful regulations and the right being limited to weapons in common use. *Id.* at 81.

In dissent, three Justices would have upheld the constitutionality of the New York law's proper cause requirement. *Id.* at 83-133 (Breyer, J., dissenting, joined by Sotomayor & Kagan, JJ.).

### D.     Post-*Bruen*

Lower courts across the country struggled to apply the new *Bruen* test. That point is illustrated well by three decisions issued by federal intermediate appellate courts in cases challenging restrictions found in federal law.

---

[8] Like the majority, *see* footnote 7 above, Justice Kavanaugh did not point to any historical analogues to justify the burden placed on the Second Amendment right by shall-issue licensing regimes. *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring). Instead, also like the majority, his explanation focused on the relatively light burden and objective nature of such regimes. *See id.*

In *Range v. Attorney General*, a panel of the United States Court of Appeals for the Third Circuit reviewed an as-applied challenge to the federal felon dispossession statute, 18 U.S.C. § 922(g)(1). 53 F.4th 266, 266 (3d Cir. 2022) (per curiam). The challenger, who had pleaded guilty to the nonviolent crime of making false statements about his income to obtain food stamp assistance, contended that his disarmament was inconsistent with the text and history of the Second Amendment and was therefore unconstitutional under *Bruen*. *Id.* The panel disagreed, holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent," fell outside the protection of the Second Amendment and that laws disarming such individuals were consistent with the Nation's historical tradition. *Id.* The Third Circuit panel also observed that none of *Bruen*, *McDonald*, or *Heller* "cast[] doubt on § 922(g)(1)," *id.* at 272, and highlighted that the Court repeatedly described "prohibitions on the possession of firearms by felons" as "longstanding" and "presumptively lawful," *id.* (quoting *Heller*, 554 U.S. at 626-27, 627 n.26).

A majority of the entire Third Circuit reversed. *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc). The court held that felons were among "the people" protected by the Second Amendment, and that the government had failed to carry its burden of identifying a historical tradition of prohibiting possession of firearms by an individual in Mr. Range's circumstance. *Id.* at 103. The court considered the federal felon dispossession statute to be too new to benefit from the assurances in *Heller* and rejected the other historical regulations on which the government relied as insufficiently analogous. *Id.* at

21

103-04. The Supreme Court later vacated the Third Circuit's decision and remanded the case for further consideration in light of *Rahimi*. *Garland v. Range*, 144 S. Ct. 2706, 2706-07 (2024). The Third Circuit, again sitting *en banc*, released a revised decision reaching the same conclusion for largely the same reasons on December 23, 2024. *Range v. Att'y Gen.*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*").

In *United States v. Rahimi*, the Fifth Circuit took a similar approach to the Third Circuit's *en banc* decision in regard to 18 U.S.C. § 922(g)(8), a statute that prohibits the possession of firearms by persons subject to domestic violence restraining orders. 61 F.4th 443, 448 (5th Cir. 2023). There, the Fifth Circuit first held that the defendant was among "the people" whose rights were protected by the Second Amendment because individuals subject to domestic violence restraining orders had not "historically been stripped of their Second Amendment rights[.]" *Id.* at 452-53. The court then rejected as insufficiently analogous three sets of laws the government proffered as historical analogues to § 922(g)(8), including surety laws and "going armed" laws, *id.* at 456-61, both of which we will discuss further below. The Supreme Court granted certiorari in *Rahimi* and, as we discuss in the next section, reversed.

In *United States v. Jackson*, the Eighth Circuit came to a conclusion similar to that of the panel in *Range* in upholding the constitutionality of § 922(g)(1) as applied to a defendant with a prior conviction for the sale of a controlled substance. 69 F.4th 495 (8th Cir. 2023). Relying on the assurances provided by the Supreme Court in *Heller*, *McDonald*, and *Bruen*, "and the history that supports them," the court "conclude[d] that there is no need for felony-by-felony litigation regarding the constitutionality of

22

§ 922(g)(1)." *Id.* at 502. Reviewing historical sources, *id.* at 502-04, the court ultimately concluded that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1)," *id.* at 505. The Supreme Court later vacated the Eighth Circuit's decision and remanded the case for further consideration in light of *Rahimi*. *Jackson v. United States*, 144 S. Ct. 2710 (2024). The Eighth Circuit vacated its panel decision, *United States v. Jackson*, 2024 WL 3768055 (8th Cir. Aug. 8, 2024), and issued a new decision reaching the same result, *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024).

## E. *Rahimi*

In *United States v. Rahimi*, the Supreme Court upheld the constitutionality of 18 U.S.C. § 922(g)(8) against a facial challenge, concluding that an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." 602 U.S. 680, 702 (2024). In doing so, the Court clarified that the history and tradition test was not meant to trap the law "in amber." *Id.* at 691. Rather, gun regulations should be "consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added). As such, to survive Second Amendment scrutiny, the Court reiterated that a challenged regulation does not need to be a "historical twin," *id.* (quoting *Bruen*, 597 U.S. at 30), or even a close analogue to a specific law or type of law that was prevalent at the time of the founding, *see id.* Instead, the test aims to

23

ascertain whether a new law is "relevantly similar" to the "balance struck by the founding generation to modern circumstances." *Id.* (quoting *Bruen*, 597 U.S. at 29).

Applying its clarified test, the Court concluded that founding-era surety laws and "going armed" laws were sufficiently analogous to uphold modern regulations temporarily disarming persons found to pose a credible threat to the safety of another. *See id.* at 697-701. Surety laws required that persons as to whom there was "a probable ground to suspect of future misbehavior" could be required to post a bond, which would be forfeited if the public peace was, in fact, disturbed. *Id.* at 693-97 (quoting 4 William Blackstone, Commentaries on the Laws of England 251 (10th ed. 1787)). While not addressed only to firearms, some surety laws "also targeted the misuse of firearms." *Id.* at 696. Going armed laws, derived from the 13th century English Statute of Northampton, "prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.'" *Id.* at 697 (alteration in *Rahimi*) (quoting 4 Blackstone at 149). A violation could lead to a "forfeiture of the arms . . . and imprisonment." *Id.* (omission in *Rahimi*) (quoting 4 Blackstone at 149).

Although the Supreme Court did not describe the level of specificity at which its history and tradition analysis should be performed, its use of surety and going armed laws to uphold § 922(g)(8) is instructive. Perhaps the most notable common feature of those laws for our purposes is that neither type disarmed individuals based on a determination that they posed a credible threat to the safety of another. Rather, surety laws required an individual believed to constitute a possible threat to post a bond—as a disincentive to engage in misbehavior—but did not disarm anyone. And the only disarmament associated

24

with the going armed laws was "forfeiture of the arms" as criminal punishment for violating the statute.[9] *Id.* at 697. Those laws regulated the conduct of persons believed to pose a potential threat to public safety in a way the people of the time believed would make such threats less likely to materialize. Although neither disarmed anyone before proof of a criminal offense, they were nonetheless deemed to support the proposition that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. That principle, in turn, was sufficient to sustain the facial constitutionality of § 922(g)(8), even as the Court acknowledged that it was "by no means identical to these founding era regimes[.]" *Id.* Indeed, the Court characterized § 922(g)(8) as "fit[ting] neatly within the tradition the surety and going armed laws represent." *Id.*

Two additional points about the majority opinion in *Rahimi* are particularly notable for our purposes. First, although the Court "note[d] that Section 922(g)(8) applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another," it emphasized that it was "not suggest[ing] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]" *Id.* at 698-99 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). Second, in making that point, the Court cited the page in *Heller* in which it identified presumptively lawful regulatory measures, *id.* at 698 (citing *Heller*,

---

[9] Of course, both surety and going armed laws allowed for disarmament in another manner common to many other offenses at the time, which was by imprisonment. Surety laws provided for imprisonment of an individual who refused to post a bond, *Rahimi*, 602 U.S. at 695, and going armed laws provided for imprisonment of those convicted of violating the law, *id.* at 697.

25

554 U.S. at 626), including "prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626. The Court then cited that same passage from *Heller* again on the following page, stating: "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26).

Eight of the Court's nine Justices joined the majority opinion in *Rahimi*. Five of them penned separate concurrences to discuss issues of constitutional interpretation and application, some of which are relevant to our analysis. They fit roughly into three categories.

First, two opinions on behalf of three Justices expressed continued opposition to the Court's strict focus on history for evaluating Second Amendment claims, but nonetheless favored the majority's clarification of the test as focusing on principles. Justice Sotomayor, joined by Justice Kagan, reiterated her opposition to the history and tradition test, stating: "History has a role to play in Second Amendment analysis, but a rigid adherence to history, (particularly history predating the inclusion of women and people of color as full members of the polity), impoverishes constitutional interpretation and hamstrings our democracy." *See id.* at 706 (Sotomayor, J., concurring, joined by Kagan, J.). Justice Sotomayor remained "troubled by *Bruen*'s myopic focus on history and tradition" and its inability to give "full consideration to the real and present stakes of the problems facing our society today," *id.*, but found it worth repeating that the task for courts applying the *Bruen* test

going forward will be to consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," *id.* at 703-04 (quoting the majority opinion at 692). Justice Jackson, who was not on the Court when *Bruen* was decided, wrote separately to explain that although she would have voted with the dissenters in *Bruen*, she agreed with the majority's opinion interpreting it. *Id.* at 741 (Jackson, J., concurring). She also highlighted many of the difficulties lower courts were having as they grappled with *Bruen*'s focus on "history *to the exclusion of all else*," requiring courts and legislators alike to be something for which they are ill-equipped: amateur historians. *Id.* at 744.

Second, in separate concurrences, Justices Kavanaugh and Barrett explained their approaches to the history and tradition analysis and why those approaches support the majority's clarification of the test articulated in *Bruen*. Each offers a different rationale for taking a broader approach to the test than the way *Bruen* had been interpreted. Justice Kavanaugh emphasized the primacy of the constitutional text, followed by pre-ratification history, and, if those sources prove "elusive or inconclusive," "post-ratification history."[10] *Id.* at 723 (Kavanaugh, J., concurring). He argued that post-ratification history, on which the Court has relied in interpreting constitutional amendments for "more than two centuries," can be helpful to contemporary judges because it represents the "collective

---

[10] Justice Kavanaugh stated in a footnote that "[t]he historical approach applies when the text is vague. But the text of the Constitution always controls. So history contrary to clear text is not to be followed." *Rahimi*, 602 U.S. at 718 n.2 (Kavanaugh, J., concurring). Elsewhere, however, he acknowledged that the individual rights amendments have never been read literally, because "American law has long recognized, as a matter of original understanding and original meaning, that constitutional rights generally come with exceptions." *Id.* at 716. It is not entirely clear to us how the tension in those statements is resolved.

understanding of Americans who, over time, have interpreted and applied the broadly worded constitutional text[.]"[11]  *Id.* at 723-24.

Justice Barrett concurred to "identify the basic premises of originalism."  *Id.* at 737 (Barrett, J., concurring).  According to Justice Barrett, originalism is "built on two core principles:  that the meaning of constitutional text is fixed at the time of its ratification and that the 'discoverable historical meaning . . . has legal significance and is authoritative in most circumstances.'"  *Id.* (quoting Keith E. Whittington, *Originalism: A Critical Introduction*, 82 Fordham L. Rev. 375, 378 (2013)).  But for Justice Barrett, the history that matters is that immediately surrounding ratification, not the history that significantly post-dates ratification.  *Rahimi*, 602 U.S. at 737-38 (Barrett, J., concurring).  Justice Barrett then addressed what she viewed as the source of lower courts' struggle with *Bruen*'s use of history, stating that to survive Second Amendment scrutiny, a regulatory measure must be "*consistent* with historical limits, . . . not . . . an updated model of a historical counterpart."  *Id.* at 739.  She describes two significant problems with requiring overly specific historical analogues to justify modern regulations.  The first is that it limits modern policymakers "to follow late-18th-century policy choices," thus trapping the law "in amber."  *Id.*  The second is that "it assumes that founding-era legislatures maximally

---

[11] Justice Kavanaugh noted James Madison's explanation in The Federalist No. 37 "that the meaning of vague text would be 'liquidated and ascertained by a series of particular discussions and adjudications.'"  *Rahimi*, 602 U.S. at 725 (Kavanaugh, J., concurring) (quoting The Federalist No. 37, at 229 (James Madison)).  Justice Kavanaugh interpreted that as an endorsement of the use of post-ratification history as "a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text."  *Id.*

exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them."[12] *Id.* at 739-40. Thus, she concluded, analogical reasoning under *Bruen* "demands a wider lens: Historical regulations reveal a principle, not a mold." *Id.* at 740.

Third, Justice Gorsuch argued that the directives of the Constitution are, in fact, "trapped in amber." *Id.* at 709 (Gorsuch, J., concurring). Although Justice Gorsuch's explication of the history and tradition test is stricter than that articulated by the majority or any other of the concurring Justices, he nonetheless agreed with the majority that the surety and going armed laws provide a strong analogue to § 922(g)(8). *Id.* at 710-13.

---

[12] The second of these points strikes us as particularly supportive of the Court's overall pivot to focusing on principles derived from the types of laws that existed at the time of ratification rather than searching for modern updates of specific founding-era laws. Justice Sotomayor's concurring opinion makes a similar point in criticizing the dissent's approach as constraining "the legislatures of today . . . not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary." *Rahimi*, 602 U.S. at 705-06 (Sotomayor, J., concurring).

The Dissent interprets Justice Barrett's statement differently, viewing it through the lens of Justice Thomas's statement in *Bruen* requiring the identification of "a distinctly similar historical regulation" to uphold a modern regulation addressing societal problems that existed (in at least some form) at the time of the founding. *See* Dissenting Op. of Biran, J. at 59-61 (quoting *Bruen*, 597 U.S. at 26). However, that statement is not referenced anywhere in Justice Barrett's concurrence—or, indeed, in any other *Rahimi* opinion other than Justice Thomas's dissent. *See Rahimi*, 602 U.S. at 750 (Thomas, J., dissenting). As discussed, the *Rahimi* majority refocused that test on principles. In grounding its analysis on the conclusion that "[f]ounding-era lawmakers chose not to disarm such citizens," i.e., felons, Dissenting Op. of Biran, J. at 54, the Dissent mistakes the decisions founding-era legislatures made based on the concerns and exigencies of the era, including those related to militia service, with conclusions about the extent of their power to act.

Justice Thomas, the author of *Bruen*, dissented. He addressed what he saw as major differences between § 922(g)(8) and the surety and going armed laws. He observed that the surety laws had a "common justification with § 922(g)(8)," but concluded that they "imposed a materially different burden" that, critically, "did not alter an individual's right to keep and bear arms." *Id.* at 764 (Thomas, J., dissenting). And he noted that the going armed laws did not prohibit "carrying firearms at home or even public carry generally." *Id.* at 769. Instead, they prohibited only carry combined with circumstances that would terrify people, and only in certain places, whereas § 922(g)(8) is a complete prohibition on possession by those it affects. *Id.* at 768-71. He further noted that those were criminal laws, subject to a heightened burden of proof and guarantees of due process, in contrast to the civil proceedings that give rise to a prohibition under § 922(g)(8). *See id.* at 770-71. Fundamentally, Justice Thomas's test requires a narrow harmony between a modern firearm regulation and a historical regulation, including as to purpose, mechanism, and burden.

## II.    APPLICATION TO MR. FOOKS'S CHALLENGE

Mr. Fooks first asks us to identify the correct standard to apply to his Second Amendment challenge and to ascertain whether the Appellate Court properly applied that standard.[13] He contends that the appropriate standard is the general standard the Supreme Court set forth in *Bruen*:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify

---

[13] For purposes of this opinion, we assume that the first part of the *Bruen* test—whether the text of the Second Amendment covers the conduct at issue—is satisfied. That

its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

597 U.S. at 17.

Mr. Fooks does not believe *Rahimi* impacts this analysis, save to demonstrate that Second Amendment restrictions may apply when an individual is found to pose "a credible threat to the physical safety of others." *See* 602 U.S. at 700. The State agrees with this general standard but argues that, after *Rahimi*, modern regulations need only be analogues to principles found in our history and tradition of firearms regulation to survive Second Amendment review. The State is correct. In *Rahimi*, the Court clarified that the "appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" and the "principles underlying the Second Amendment." *Id.* at 693.

The State further argues that we cannot ignore the statement, originated in *Heller*, affirmed in *McDonald*, and expressly re-avowed by three of the six Justices in the majority in *Bruen* and again by the majority in *Rahimi*, that "prohibitions on the possession of firearms by felons" are presumptively lawful. Mr. Fooks contends that such language is inapposite here because he is not a felon. Our first task is therefore to determine whether § 5-133(b)(2) of the Public Safety Article is a law falling within the category of those establishing "prohibitions on the possession of firearms by felons" and, if so, what the implications of that are for Mr. Fooks's appeal.

---

is, we assume that Mr. Fooks, notwithstanding his conviction, is "part of 'the people' whom the Second Amendment protects" and that the purpose for which he seeks to own a firearm is to engage in conduct that is constitutionally protected. *See Bruen*, 597 U.S. at 31-32.

**A.**     **Section 5-133(b)(2) Is, in Purpose and Effect, a Prohibition on the Possession of Firearms by Felons.**

Section 5-133(b) of the Public Safety Article identifies categories of individuals who are prohibited from possessing a regulated firearm. Section 5-133(b)(1) prohibits such possession by individuals convicted of a "disqualifying crime," which includes (1) "a crime of violence," (2) "a violation classified as a felony in the State," and (3) "a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years." Pub. Safety § 5-101(g). Section 5-133(b)(2) then prohibits possession by an individual who "has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years[.]" Collectively, § 5-133(b)(1) and (2) thus prohibit possession of regulated firearms by individuals convicted of any crime of violence and any other crime serious enough to be classified as a felony or punishable by more than two years' imprisonment.[14]

The underlying crime of which Mr. Fooks was convicted is constructive criminal contempt, a common law crime for which he received a sentence of imprisonment for more than four years. In Maryland, constructive criminal contempt is not expressly classified as a felony or a misdemeanor. Instead, constructive criminal contempt is an unclassified

---

[14] Other categories of prohibited individuals include fugitives from justice, individuals who are addicted to controlled dangerous substances, individuals suffering from a mental disorder and having a history of violent behavior, individuals who have been found not criminally responsible or incompetent to stand trial, individuals who have been voluntarily admitted to a mental health facility for more than 30 days or who have been involuntarily admitted to such a facility, individuals for whom a court has appointed a guardian, and individuals who are subject to a current civil protective order. *See* Pub. Safety § 5-133(b)(5), (7)-(15).

common law crime. But Mr. Fooks argues that because constructive criminal contempt is not classified as a felony, he is not a felon and therefore § 5-133(b)(2) is not presumptively lawful as to him. That argument misapprehends the scope of what constitutes a "prohibition[] on the possession of firearms by felons" as used in *Heller* and its progeny.

As an initial matter, in referring generally to felon dispossession statutes in *Heller*, *McDonald*, *Bruen*, and *Rahimi*, the Supreme Court was obviously not focused on Maryland's relatively unique system of classification—or, as more appropriate here, non-classification—of certain common law criminal offenses. Indeed, the federal felon dispossession statute, 18 U.S.C. § 922(g)(1), does not even use the words felon or felony, instead prohibiting the possession of firearms by anyone "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year."[15] Federal law separately defines "felony" to mean "an offense punishable by a maximum term of imprisonment of more than one year[.]" 18 U.S.C. § 3156. It is thus the seriousness of the crime, gauged by the length of the possible sentence, that defines whether a conviction will result in a prohibition against firearm possession for purposes of § 922(g)(1).

---

[15] Under 18 U.S.C. § 3559, an offense that is not otherwise classified is classified as a felony or misdemeanor (and further by class within each of those classifications) based on the maximum term of imprisonment. In that system, the dividing line between a felony and a misdemeanor is a maximum term of one year of imprisonment. *See id.* § 3559(a)(5), (6) (classifying an offense with a maximum term of imprisonment "less than five years but more than one year, as a Class E felony" and an offense with a maximum term of "one year or less but more than six months, as a Class A misdemeanor").

Similarly, 21 of our sister states classify as felonies crimes bearing a maximum sentence of either one year or more than one year,[16] and 17 others classify as a felony any criminal offense that would subject an individual to incarceration in the state correctional system.[17]   Other states have other ways of classifying crimes as felonies or misdemeanors.[18]  As a general matter, however, the federal government and states that classify offenses as either felonies or misdemeanors reserve the felony classification for more serious offenses, generally identified by the availability of a significant term or type

---

[16] Most states in this category define "felony" as a crime for which a sentence to a term of imprisonment in excess of one year is authorized.  *See* Ala. Code § 13A-1-2(8); Alaska Stat. Ann. § 11.81.900(b)(26); Conn. Gen. Stat. Ann. § 53a-25(a); Fla. Stat. Ann. § 775.08(1); Ga. Code Ann. § 16-1-3(5); Haw. Rev. Stat. Ann. § 701-107(2); Ind. Code Ann. § 35-50-2-1(b); Mo. Ann. Stat. § 556.061(26); Mont. Code Ann. § 45-2-101(23); N.H. Rev. Stat. Ann. § 625:9, III; N.Y. Penal Law § 10.00(5); Ohio Rev. Code Ann. § 2901.02(E); Or. Rev. Stat. Ann. § 161.525; 11 R.I. Gen. Laws Ann. § 11-1-2; Wash. Rev. Code Ann. § 9A.04.040(2); Wyo. Stat. Ann. § 6-10-101.  Others define "felony" as a crime for which a sentence to a term of imprisonment of one year or more is authorized.  *See* 720 Ill. Comp. Stat. Ann. 5/2-7; Ky. Rev. Stat. Ann. § 500.080(5); N.M. Stat. Ann. § 30-1-6(A); Minn. Stat. Ann. § 609.02, subdiv. 2; Tenn. Code Ann. § 39-11-110.

[17] *See* Ariz. Rev. Stat. Ann. § 13-105(18); Cal. Penal Code § 17(a); Colo. Const. art. XVIII, § 4; Idaho Code Ann. § 18-111; Kan. Stat. Ann. § 21-5102(a); Mass. Gen. Laws Ann. ch. 274, § 1; Mich. Comp. Laws Ann. § 750.7; Miss. Code Ann. § 1-3-11; Nev. Rev. Stat. Ann. § 193.120(2); N.C. Gen. Stat. Ann. § 14-1; Okla. Stat. Ann. tit. 21, § 5; S.D. Codified Laws § 22-1-4; Tex. Penal Code Ann. § 1.07(a)(23); Va. Code Ann. § 18.2-8; W. Va. Code Ann. § 61-11-1; Wis. Stat. Ann. § 939.60; *cf.* La. Stat. Ann. § 14:2(4) (defining "felony" as "any crime for which an offender may be sentenced to death or imprisonment at hard labor").

[18] Several states use a classification system in which offenses are explicitly designated as a "felony" or otherwise, some with different degrees of felonies.  *See* Ark. Code Ann. § 5-1-106(a); Del. Code Ann. tit. 11, § 233(c); Iowa Code Ann. § 701.7; Mo. Ann. Stat. § 557.016; Neb. Rev. Stat. Ann. § 28-105(1); N.D. Cent. Code Ann. § 12.1-32-01; 18 Pa. Stat. and Cons. Stat. § 106; S.C. Code Ann. § 16-1-10; Utah Code Ann. § 76-3-103.   Maine and New Jersey do not classify crimes as felonies or misdemeanors, but instead have divided crimes into five classes, Me. Rev. Stat. Ann. tit. 17-A, § 4, and four classes, N.J. Stat. Ann. § 2C:1-4, respectively.

of imprisonment. Of those, only Vermont defines felonies by reference to a maximum term of imprisonment longer than a year and one day. *See* Vt. Stat. Ann. tit. 13, § 1 ("[A]ny offense whose maximum term of imprisonment is more than two years, for life, or which may be punished by death is a felony."). We have not found any jurisdiction in which the maximum term of imprisonment qualifying an offense as a felony is greater than two years and one day.

The common thread among felon dispossession statutes is thus not any magic afforded to the use of the word "felony" but a general intent to prohibit the possession of firearms by individuals who have committed offenses the respective legislative body has deemed serious enough to be eligible for a significant term of imprisonment. Section 5-133(b)(2) fits squarely within that framework. Although constructive criminal contempt does not carry any specific maximum penalty, Mr. Fooks was sentenced to a term of imprisonment of more than four years. That is a greater sentence than that necessary to qualify as a felony under federal law or under the laws of any state that classifies felonies based on the length of the maximum available sentence.

In sum, we agree with the State that § 5-133(b)(2) is the equivalent of a "prohibition[] on the possession of firearms by felons," as that phrase has been employed by the Supreme Court. *See Heller*, 554 U.S. at 626. We next turn to considering the import of that conclusion.

### B.    Public Safety § 5-133(b)(2) Is Constitutional on Its Face.

Having determined that § 5-133(b)(2) is the equivalent of a felon dispossession statute, we must acknowledge that we are not writing on a clean slate. The Supreme Court

has reiterated on multiple occasions, albeit in dicta, that such statutes are at least presumptively constitutional. We will first address the implications of that considered dicta here. We will then turn to an independent application of whether § 5-133(b)(2) is consistent with our country's historical tradition of firearm regulation. The answer in both cases will be that § 5-133(b)(2) is constitutional on its face.

### 1. The United States Supreme Court Has Identified Felon Dispossession Statutes as Presumptively Lawful.

The United States Supreme Court's identification of a set of presumptively lawful regulatory measures, along with its subsequent characterizations of that set of measures, could arguably be subject to different and conflicting interpretations. It could be posited that the Supreme Court provided those assurances to avoid a rush to judgment that its rulings in *Heller*, *McDonald*, and *Bruen* spelled the end of all firearms regulations. Under that theory, its identification of certain measures as presumptively lawful was not intended to signal that it had reached any conclusions, even preliminarily, as to the constitutionality of those measures. That theory is perhaps best supported by the fact that the majority opinions in *Bruen* and *Rahimi* did not identify any express exceptions to the text-and-history standard the Court has set forth for evaluating Second Amendment challenges.

Conversely, several passages in *Heller*, *McDonald*, two of the *Bruen* concurrences, and the majority opinion in *Rahimi* strongly suggest that the Court already has determined that the categories of measures it describes as presumptively lawful are constitutional, "subject of course to an as-applied challenge" if a measure "does not operate in that manner in practice." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). First, as set forth above,

36

*Heller* itself contains at least five passages describing or referring to the measures it identifies as actual, rather than just possible, limitations on the Second Amendment right. *See* discussion above at 6-11. Any one of those could perhaps be excused individually as imprecise language—although such imprecision in an opinion emphasizing the importance of the constitutional text would carry some irony—but in combination, they reflect that the Court had reached a conclusion, albeit one that it was not yet prepared to explain or justify. *See* Cass R. Sunstein, *Second Amendment Minimalism:* Heller *as* Griswold, 122 Harv. L. Rev. 246, 267-68 (2008) (writing that *Heller*'s "disclaimers" did not leave "the nature of the right unclear," and that "[t]hey trim, rather than refuse to decide").

Second, in *McDonald*, issued two years after *Heller* and premised in part on a close reading of *Heller*, the Court did not identify or clarify any imprecision in language concerning the presumptively lawful regulations. To the contrary, the Court quoted the relevant passage from *Heller* and expressly affirmed it. *McDonald*, 561 U.S. at 786.

Third, in *Bruen*, which also was premised in part on a close reading of *Heller*, the Court did not disavow any aspect of that opinion's treatment of the presumptively lawful regulatory measures. And although the majority opinion does not repeat the assurances the Court previously had made concerning those measures, two concurring opinions joined by three of the Justices in the majority do. Notably, the statements made in those two opinions were hardly passing references. Justice Kavanaugh's concurring opinion, joined by Chief Justice Roberts, addressed only two points, one of which was to emphasize the ongoing validity of those specific assurances. *Bruen*, 597 U.S. at 79-81 (Kavanaugh, J., concurring). And the primary point of Justice Alito's concurrence was to emphasize the

narrowness of the majority's holding, including by pointing out that it did not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that *may be* imposed on the possession or carrying of guns."[19] *Id.* at 72 (Alito, J., concurring) (emphasis added). When considering the views of the three Justices in the dissent, it appears that a majority of the Court at the time continued to view those measures as lawful.

Fourth, in *Rahimi*, the Court once again reaffirmed the validity of the categories of presumptively lawful regulations, noting with approval its statement in *Heller* "that many . . . prohibitions[ applicable to firearm possession in the home], like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *See Rahimi*, 602 U.S. 699 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26). Justice Kavanaugh's concurrence also separately quoted from the same passage. *Id.* at 735 (Kavanaugh, J., concurring).

On balance, we conclude that in *Heller*, the Supreme Court identified categories of firearms regulations that it determined are generally consistent with the right to keep and bear arms codified in the Second Amendment. In context, the Court's identification of such measures as "presumptively" lawful was simply an acknowledgment that regulations that deviate from the generally accepted contours of the categories such that they do not operate in the same way remain subject to an "as-applied challenge" on that basis.[20] *Bruen*,

---

[19] Justice Alito's characterization of *Heller* and *McDonald* as identifying "restrictions that may be imposed" is similar to the passages from *Bruen*, discussed above, that treat *Heller* as having decided the basic constitutionality of the presumptively lawful regulatory measures, not as having identified them for future consideration of their constitutionality.

[20] For example, a term-of-imprisonment-based felon dispossession statute would presumably fall outside the generally accepted contours of such statutes if a state were to increase to two years the term of imprisonment for minor crimes, such as the jaywalking

597 U.S. at 80 (Kavanaugh, J., concurring). That understanding was confirmed by the Court's decisions in *McDonald*, *Bruen*, and most recently, *Rahimi*.

In arguing against reliance on these repeated statements from the Supreme Court, Mr. Fooks contends that prohibitions on the possession of firearms by individuals with felony criminal convictions are, "[a]t best," constitutional only to the extent they are premised on dangerousness. As support, Mr. Fooks points to a handful of pre-*Bruen* concurring and dissenting opinions that he contends "demonstrate[] that the historical focus of . . . restrictions [on felon possession] was on *dangerousness*."[21] He also argues that the decision in *Rahimi* was narrow and focused on people who "pose a credible threat to the physical safety of another." Mr. Fooks contends that, viewed in that light, § 5-133(b)(2) is overly broad because it disqualifies individuals based on criminal conduct that is not suggestive of dangerousness.

Mr. Fooks's contention is inconsistent with our interpretation of *Heller*, *Bruen*, and *Rahimi*. The Supreme Court has repeatedly identified prohibitions on the possession of firearms "by felons" as presumptively lawful regulatory measures and permissible limitations on the Second Amendment right. The Court has not limited those statements to prohibitions on possession of firearms by violent felons or by individuals who have

---

and speeding examples posited by the Dissent. *See* Dissenting Op. of Biran, J. at 62. In that case, the available term of imprisonment would no longer constitute an appropriate measure of the perceived seriousness of the offenses.

[21] Mr. Fooks cites *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (Hardiman, J., concurring in part); *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) (Barrett, J., dissenting); and *Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020) (Bibas, J., dissenting).

committed crimes of violence or by individuals found to be dangerous.[22] Equally notable,

as discussed above, prohibitions on the possession of firearms by felons generally apply to

all felons or to all individuals convicted of crimes eligible for a term of imprisonment of a

certain length.[23] We will not assume that justices of the Supreme Court—in six opinions

authored by four different Justices in four different cases decided over the span of 16

years—were mistaken either in their descriptions of the categories of regulatory measures

of which they were expressing presumptive approval or of their understanding of the

ordinary provisions of such measures.[24]

---

[22] By contrast, there are other categories of restrictions, not mentioned by the Supreme Court in *Heller* or *Bruen*, that *are* based on the violent nature of an individual's offense. Public Safety § 5-133(b)(1), for example, prohibits the possession of a regulated firearm by an individual convicted of a "disqualifying crime." "Disqualifying crime" is then defined in Public Safety § 5-101(g) to include three categories of offenses, one of which is "a crime of violence" and another of which is a felony conviction. The Supreme Court identified prohibitions on possession by individuals falling into the latter category, not the former, as presumptively lawful. That is not, of course, to suggest any constitutional defect in a prohibition that is premised on conviction for a crime of violence; we merely point out that that is not the category identified by the Supreme Court in *Heller*, *McDonald*, *Bruen*, and *Rahimi*.

[23] We also find it noteworthy that the general standard for compliance with the Second Amendment identified in *Bruen* is historical pedigree. Although dangerousness would presumably have been at the heart of the inquiry under a means-end scrutiny analysis examining the governmental interest in a regulatory measure and its burden on the Second Amendment right, the test under *Bruen* is focused on searching for historical analogues.

[24] To that extent, it bears mentioning that a majority of felony crimes are not violent:

> The most recent available annual data show that only 18.2 percent of felony convictions in state courts and 4.2 percent of federal felony convictions were for "violent offenses." Sean Rosenmerkel et al., *Felony Sentences in State Courts, 2006 – Statistical Tables* 3 tbl.1.1 (revised Nov. 2010), https://bjs.ojp.gov/content/pub/pdf/fssc06st.pdf; Mark

Mr. Fooks also contends that § 5-133(b)(2) is fatally flawed because it shifts the burden of proving disqualification from the State to the individual. He believes that by conclusively foreclosing an individual from the right to possess a firearm based on a sentence the individual received, which may be based on factors having nothing to do with whether an individual should be precluded from exercising the Second Amendment right, § 5-133(b)(2) absolves the State from its burden of having to show that the individual should be disqualified. That contention, as well, is inconsistent with the Supreme Court's identification of categories of presumptively lawful regulatory measures. If anything, a law that premises disqualification on the length of a sentence *received* for an offense, rather than the length of a sentence that may theoretically be imposed for the offense, is more, not less, tailored to the defendant's individual circumstances and the severity of the underlying conduct.

Based on our conclusion that § 5-133(b)(2) is the equivalent of a prohibition on the possession of firearms by felons, and the United States Supreme Court's repeated references to such prohibitions as presumptively constitutional, we conclude that it satisfies Second Amendment scrutiny and is facially constitutional. *Cf. United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) ("*Jackson II*") ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).").

---

Motivans, *Federal Justice Statistics, 2022*, at 12 tbl.7 (Jan. 2024), https://uat.bjs.ojp.gov/document/fjs22.pdf.

*United States v. Jackson*, 110 F.4th 1120, 1125 n.2 (8th Cir. 2024) ("*Jackson II*").

### 2. Felon Dispossession Laws Like § 5-133(b)(2) Are Consistent with Our Nation's Historical Tradition of Firearm Regulation.

We also hold that felon dispossession laws like § 5-133(b)(2) are consistent with our Nation's historical tradition of firearm regulation.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Although phrased in absolute terms, the right has never been understood to be absolute. *Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."). Indeed, as recognized in *Rahimi*, the Supreme Court has never suggested that the Second Amendment "prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]" 602 U.S. at 698.

Surrounding the ratification of the Second Amendment, the right to keep and bear arms was not viewed as inconsistent with the prohibition of the possession of firearms by categories of individuals thought to present a special danger unrelated to whether they had previously engaged in or demonstrated a propensity for violence. Although the bases chosen for that determination were often abhorrent—including prohibitions based on race and religion that are now prohibited by other constitutional amendments—what is relevant to the Second Amendment analysis is whether the categorical disarmament of individual

members of those groups for reasons other than demonstrated dangerousness was viewed as consistent with the right.[25]  It was.

Both in England and the United States leading up to and surrounding the ratification of the Bill of Rights, distrusted religious minorities were sometimes categorically disarmed

---

[25] We acknowledge significant discomfort in finding support for our holding in historical laws and practices that overtly discriminated based on race, ethnicity, and religion, among other factors.  *See Rahimi*, 602 U.S. at 706 (Sotomayor, J., concurring) ("History has a role to play in Second Amendment analysis, but a rigid adherence to history, (particularly history predating the inclusion of women and people of color as full members of the polity), impoverishes constitutional interpretation and hamstrings our democracy.").  Given the text, history, and tradition test adopted by the United States Supreme Court for Second Amendment challenges, however, those laws are relevant.  *See Jackson II*, 110 F.4th at 1127 ("While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms."); *United States v. Hunt*, 123 F.4th 697, 706-07 (4th Cir. 2024) (noting the same).  It is, of course, the fact that disarming categories of distrusted individuals was viewed as consistent with the right to keep and bear arms that is most relevant, not necessarily the categories themselves.  But when looking back at historical periods in which most Americans were excluded from the protection of many or all basic constitutional rights, and most recorded views reflecting an understanding of those rights were those of a small, relatively homogenous minority, it can be difficult to disentangle repugnant (and now constitutionally prohibited) purposes from constitutionally valid ones in identifying principles underlying regulations.  *See* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 537 (2022) ("[T]he history of racist gun laws will complicate the emergent Second Amendment test that looks to 'text, history, and tradition' to determine the scope of the Second Amendment. . . . [S]ome of the antecedents courts will be required to consider were at least partially motivated by racism or reflected racist attitudes."); Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 165 (2023) ("These problems can be mitigated by asking *why* earlier generations disarmed certain groups of people, rather than asking only *whom* they disarmed."); Jamal Greene, *Originalism's Race Problem*, 88 Denv. U. L. Rev. 517, 522 (2011) ("A racially[ ]sensitive constitutionalism must always . . . hold out the possibility of legitimate dissent from history."); Thurgood Marshall, *The Constitution's Bicentennial: Commemorating the Wrong Document?*, 40 Vand. L. Rev. 1337 (1987) (explaining that racism played a fundamental role in the founding-era constitutional system).  We have nonetheless endeavored to do so here.

based solely on their religion or, in England, their refusal to submit to a different religion.[26]

States also disarmed racial minorities[27] and those who refused to declare an oath of

loyalty.[28] *See Jackson II*, 110 F.4th at 1126-28.

---

[26] In the late 1600s, England "disarmed non-Anglican Protestants who refused to participate in the Church of England[.]" *Jackson II*, 110 F.4th at 1126 (citing Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 45 (1994)). The 1689 English Bill of Rights, the most direct forerunner to the Second Amendment, *Heller*, 554 U.S. at 593, provided that Protestants, but not Catholics, "may have Arms for their Defence suitable to their Conditions," and even then, only "as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, *in* 3 Eng. Stat. at Large 441). Here in Maryland, as well as the neighboring Commonwealths of Virginia and Pennsylvania, Catholics were also disarmed. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 574 (1998); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

[27] In early America, there were restrictions on selling arms to Native Americans and prohibitions on Native American firearm possession. Bellesiles, cited above in footnote 26, at 578-79; Angela R. Riley, *Indians and Guns*, 100 Geo. L.J. 1675, 1683, 1687 (2012); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 72 (2017). Between 1791 and 1868, several states passed laws prohibiting Black people from obtaining arms. *See, e.g.*, Michael J. Klarman, Unfinished Business; Racial Equality in American History 14 (2007); Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 28-29 (2006); Spitzer, cited above, at 79; Winkler, cited above in footnote 25, at 537.

[28] Greenlee, cited above in footnote 26, at 263-64; *see also* 4 Journals of the Continental Congress, 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906); Act of Mar. 14, 1776, ch. 21, 1775-1776 Mass. Acts 479, at 31-32, 35; Act of May 1777, ch. III, *in* 9 Hening's Statutes at Large 281, 281-82 (1821); Being a Collection of all the Laws of Virginia 281-82 (1821); Act of June 13, 1777, ch. 756, §§ 2-4, 1777 Pa. Laws 110, 111-13; Act of June 1776, 7 Records of the Colony of Rhode Island and Providence Plantations in New England 566-67 (1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. 40, 1777 N.J. Laws 90.

In *United States v. Williams*, the Sixth Circuit acknowledged that "governments in England and colonial America long disarmed groups that they deemed to be dangerous," but stated that "[e]ach time, however, individuals could demonstrate that their particular possession of a weapon posed no danger to peace." 113 F.4th 637, 657 (6th Cir. 2024). We do not share that interpretation of the historical sources. For example, we are not aware of a legal avenue by which disarmed Native Americans or enslaved persons could petition

Most importantly, while statutes specifically disarming felons did not appear until the 20th century, felons did not historically enjoy the right to keep and bear arms.[29] Nor was the right to keep and bear arms the only right that could be denied felons in the founding era. For example, felons could be stripped of property rights and banned from

_____

for exceptions and offer proof that they were not dangerous. And although some states chose to permit loyalists to prove they were not dangerous, others did not. *See, e.g.*, Act of June 13, 1777, ch. 756, §§ 2-4, 1777 Pa. Laws 110, 111-13 (disarming loyalists without any reference to an exception for non-dangerousness); An Act to Amend an Act Declaring What Crimes and Practices against the State Shall Be Treason, ch. 6, § 9, 1777 N.C. Sess. Laws 41, 43-44 (James Davis 1778) (providing the same). Other laws the Sixth Circuit cites as permitting exceptions did so based not on dangerousness but on the need of the individual. *Williams*, 113 F.4th at 654 (citing Massachusetts and Rhode Island laws allowing exceptions for "satisfactory reasons" for needing weapons or "by the order" of colonial committees). In both cases, it appears that disarmament laws permitting exceptions did so as a policy choice, not based on a belief that the right compelled it. *Cf. Rahimi*, 602 U.S. at 739-40 (Barrett, J. concurring) (warning that requiring overly specific historical analogues to justify modern regulations incorrectly "assumes that founding-era legislatures maximally exercised their power to regulate").

[29] *See* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) ("Thus, felons . . . were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise[.]"); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms."); Thomas Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 57 (7th ed. 1903) (writing that felons were "almost universally excluded" from the franchise and that the "people" were synonymous with qualified voters); Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation*, 2001 Utah L. Rev. 889, 895 (2001) (noting that "felons have never had a Second Amendment right to own guns"); Robert Dowlut & Janet A. Knoop, *State Constitutions and the Right to Keep and Bear Arms*, 7 Okla. City U. L. Rev. 177, 191 (1982) ("Felons, persons of tender years, idiots and lunatics are classes that have almost universally been excluded from the arms guarantee.").

voting,[30] rights that were seen as connected to the right to keep and bear arms.[31] And in

many jurisdictions, committing a long list of felonies could result in capital punishment.

*See, e.g., Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) ("[D]eath was 'the standard

penalty for all serious crimes' at the time of the founding." (quoting Stuart Banner, The

Death Penalty: An American History 23 (2002))); *Tennessee v. Garner*, 471 U.S. 1, 13

(1985) ("[V]irtually all felonies were punishable by death."); *United States v. Blake*, 89 F.

Supp. 2d 328, 342 (E.D.N.Y. 2000) ("At the end of the eighteenth century, New York had

---

[30] *See, e.g., Bond's Lessee v. Swearingen*, 1 Ohio 395, 396 (1824) ("In England there are many cases where the commission of crimes operated a forfeiture of estates. Such laws, too, have prevailed in some of the states of this Union[.]"); *Rankin's Heirs v. Rankin's Ex'rs*, 22 Ky. 531, 536 (1828) (explaining that forfeiture of estate was permitted, but it was limited to the lifetime of the offender); *White v. Fort*, 10 N.C. 251, 265 (1824) (opinion of Hall, J.) (explaining that "[i]t cannot be denied but that forfeiture for felony was part of the laws of England; and that the law in that respect . . . has not been altered by the laws of this state" while also caveating that North Carolina had not "availed herself of the right which accrued by forfeiture"); Nathaniel F. Cantor, Crime, Criminals and Criminal Justice 373 (1932) (writing that one convicted of a felony at common law was given a civil death and "deprived of all civil rights"); Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045, 1062 (2002) ("Many constitutions disqualified felons explicitly, or directed their legislatures to do so: between 1776 and 1821, eleven state constitutions disqualified criminals from voting."); Ohio Const. art. IV, § 4 (1802) ("The Legislature shall have full power to exclude from the privilege of electing, or being elected, any person convicted of bribery, perjury, or any other infamous crime."). Although some states, including Maryland, limited or eliminated forfeiture of estate upon the commission of felonies, *see* Md. Const. Decl. of Rts. Art. 24 (1776) (providing that "there ought to be no forfeiture of any part of the estate of any person for any crime except murder, or treason against the state, and then only on conviction and attainder"), other attributes of "civil death" were undisturbed.

[31] *See* Reynolds, cited above in footnote 29, at 480 (observing that "the franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers"); Akhil Reed Amar & Les Adams, The Bill of Rights Primer: A Citizen's Guidebook to the American Bill of Rights 87-88 (2013) (explaining that the right to bear arms was linked with other political rights not granted to the entire citizenry).

an extremely long list of capital crimes including housebreaking and malicious mischief[.]"); *A Digest of the Laws of Maryland* 255-56 (1799) (providing that persons "shall suffer death" for crimes of forgery). State legislatures thus "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." *Jackson II*, 110 F.4th at 1127; *see also United States v. Duarte*, 2025 WL 1352411, at \*9 (9th Cir. May 9, 2025) (en banc) ("[T]hese punishments were not limited to violent felonies[.]"); *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."); *cf. Rahimi*, 602 U.S. at 699 (concluding that because "going armed laws provided for imprisonment," the lesser restriction of temporary disarmament must also be permissible).

Based on many of these same sources, the Eighth Circuit concluded that "[t]his historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence."[32] *Jackson II*, 110 F.4th at 1127; *see also id.* (concluding that "history supports the authority of [a legislature] to prohibit possession of firearms by persons who have

---

[32] The Eighth Circuit observed that its conclusion was "bolstered by the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson II*, 110 F.4th at 1127 (quoting *Bruen*, 597 U.S. at 8, 15, 26, 29-31, 33 n.8, 38, 60, 70).

demonstrated disrespect for legal norms of society").[33]  The Ninth Circuit has similarly observed that the "historical record reveals a host of regulations that disarmed those whom the legislature deemed dangerous on a categorical basis."  *Duarte*, 2025 WL 1352411, at *12.  We agree.  Based on largely the same evidence, the Eighth Circuit also concluded that the historical record suggests that "[l]egislatures historically prohibited possession by [the same] categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."  *Jackson II*, 110 F.4th at 1128; *see also Duarte*, 2025 WL 1352411, at *12-13 (stating that "through the late 1800s states continued to promulgate categorical restrictions on the possession of firearms by certain groups of people" thought to "present[] a danger to the community if armed").  We again agree.  We are aware of no historical support for the proposition that a legislature lacks authority to impose a ban on firearm possession by a category of individuals characterized by their

---

[33] The Dissent, using our quotation of these sentences in *Jackson II* as a strawman, refutes a non-existent conclusion that there is a historical tradition of permitting disarmament for any deviation from any legal norm, no matter how small or unconnected to dangerousness.  Dissenting Op. of Biran, J. at 2, 51-53, 60 n.21, 62.  To the contrary, the historical tradition referenced in *Jackson II* was of the dispossession of categories of people possessing firearms to "address a danger of misuse" of those firearms, based on the belief that the particular deviations gave rise to such a danger.  *Jackson II*, 110 F.4th at 1127.  In other words, the perceived deviations gave rise to the perception of danger; they were not disassociated from it.  In line with that historical tradition, the Maryland General Assembly has determined that there is a danger of misuse of firearms by the category of individuals who have been convicted of common law crimes based on conduct so severe that a judge imposed a sentence of more than two years of imprisonment for it.  That determination echoes those of the United States Congress and state legislatures in laws dispossessing categories of individuals from owning firearms based on the severity of sentences available or imposed for crimes they committed.  It is that determination we are reviewing today, not a counter-factual, strawman determination that anyone who violates a legal norm or jaywalks may be dispossessed from future ownership of firearms.

48

disrespect for and unwillingness to follow the law—to such an extent that they have received significant sentences of incarceration—in the absence of an individualized determination of dangerousness.[34]

These historical regulations and practices are even more closely tied to felon dispossession laws than the historical regulations on which the Court relied in *Rahimi* were

---

[34] The Third Circuit, sitting *en banc*, recently reaffirmed its contrary conclusion. *Range v. Att'y Gen.*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*"). In that opinion, the court held that the federal government had not carried its burden of showing that applying the federal felon dispossession statute, 18 U.S.C. § 922(g)(1), to Mr. Range was consistent with the historical tradition of firearm regulation. *Id.* at 228. That holding was based largely on the court's determinations that: (1) felon dispossession laws, as such, are not sufficiently longstanding to be part of the relevant historical tradition, *id.* at 228-31; and (2) the other historical examples of bans on possession by other groups relied on by the government are not "relevantly similar" to the law applicable to Mr. Range, *id.* at 231. In our view, although the Third Circuit acknowledged the Supreme Court's intervening decision in *Rahimi*, its analysis did not take into account the Court's focus in that decision on principles rather than a search for a historical twin. *See, e.g.*, *id.* at 229 (stating that the fact that "Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today"); *see also id.* at 252 (Kraus, J. concurring) (criticizing the majority opinion for "treat[ing] the Supreme Court's remand as essentially pro forma and fil[ing] an opinion today that is largely unchanged").

The Third Circuit's holding in *Range* was also based on the specific circumstances of Mr. Range's case, which are different from those here. In 1995, Mr. Range pleaded guilty to one count of making a false statement to obtain food stamps based on signing an application prepared by his wife that understated their income. *Id.* at 222-23. At the time, they were struggling financially and raising three young children. *Id.* at 223. Mr. Range accepted full responsibility for his crime, received no jail time, and paid in full his restitution, costs, and fine. *Id.* He had no record of subsequent criminal conduct aside from minor traffic offenses and complied with the ban on his firearm possession once he learned of it. *Id.* Given all of that, the Third Circuit found no "basis to fear that Range is disloyal to his country." *Id.* at 230. As discussed in this opinion, even if we were to agree with the Third Circuit concerning the level of specificity required to identify a match with historical firearm restrictions, the same cannot be said of Mr. Fooks's much more recent and serious history of willful disregard of his legal obligations and court orders.

tied to 18 U.S.C. § 922(g)(8). As discussed, neither the surety laws nor the going armed laws permitted the disarming of an individual before the individual had committed a criminal offense, but the principle underlying those laws was nonetheless considered sufficient to support a modern regulation that did just that. In this case, legislatures extending to before the founding era and ever since have had the authority to preclude firearm ownership by categories of individuals who were perceived to present a special danger to society for reasons other than an individualized determination of dangerousness, including a demonstrated willingness to break the law. Because § 5-133(b)(2) precludes firearm possession only by people who have demonstrated a willingness to break the law by committing a criminal offense for which they received a sentence of at least two years' imprisonment, it falls comfortably within our Nation's historical tradition of firearm regulation.

Mr. Fooks interprets *Rahimi* differently, continuing to argue that his conviction cannot disqualify him from firearms ownership absent what amounts to a close historical analogue that expressly disenfranchised individuals found in criminal contempt for failing to pay child support. Mr. Fooks also contends that the State's focus on whether he is a "law-abiding, responsible citizen" is an approach that *Rahimi* rejected. To the contrary, although the Court in *Rahimi* stepped back from an approach to Second Amendment claims focused on whether an individual is a "responsible" citizen, which the Court found to be "vague" and "unclear," 602 U.S. at 701-02, the Court neither disavowed nor confirmed the significance of its prior use of the term "law-abiding." Regardless, our analysis is not premised on the Court's repeated use of the term "law-abiding" in *Bruen* but on its analysis

50

in that case, as clarified in *Rahimi*, and its repeated and consistent characterization of "prohibitions on the possession of firearms by felons" as "presumptively lawful."

### C. Public Safety § 5-133(b)(2) Is Constitutional as Applied to Mr. Fooks.

In the alternative, Mr. Fooks contends that even if § 5-133(b)(2) is facially constitutional, it is not constitutional as applied to him because "his was not [a] violent or dangerous crime, and he is not a violent or dangerous person." In essence, Mr. Fooks contends that if the purpose of § 5-133(b)(2) is to "prohibit violent or dangerous persons from possessing a firearm," it cannot be constitutionally applied to someone like him, who was convicted of a non-violent crime and is not alleged to be a violent or dangerous person.

Mr. Fooks's alternative, as-applied argument is simply the flip side of his argument that § 5-133(b)(2) is overly broad to the extent it applies to individuals convicted of non-violent offenses. We therefore reject it for the reasons already discussed. Moreover, although Mr. Fooks attempts to trivialize his misconduct, the crime of which he was convicted reflects a particularly egregious flouting of legal requirements.[35] Mr. Fooks was found in contempt of court for refusing to pay court-ordered child support in circumstances so egregious that he was ordered to serve a sentence of incarceration of more than four

---

[35] The Dissent suggests a lack of clarity concerning the dividing line between when an offense is and is not serious enough to warrant disqualification, arguing that there is no way to distinguish Mr. Fooks's offense from more minor violations. *See* Dissenting Op. of Biran, J. at 62. The answer, however, is the distinguishing criterion drawn in those "longstanding prohibitions on the possession of firearms . . . by felons" repeatedly referenced by the Supreme Court, *see* discussion above at 36-41, which is whether the offenses have been deemed serious enough to warrant punishment by a lengthy period of incarceration, *see* discussion above at 32-35.

years.[36] A parent's obligation to provide support for a child is a "fundamental obligation." *Carroll County Dept. of Soc. Servs. v. Edelmann*, 320 Md. 150, 171 (1990). As a result, when imposed, the legal obligation to pay child support is subject to robust enforcement mechanisms that often extend well beyond other obligations.[37] And, in the most extreme cases, that obligation can be enforced through criminal penalties, including imprisonment. Md. Code Ann., Fam. Law § 10-203(c) (2019 Repl.) (providing potential imprisonment for

---

[36] Since the founding era, contemnors have been subject to significant possible punishment. *See, e.g.*, *United States v. More*, 7 U.S. 159, 167 (1805) ("By the act of 1801, the justices of the peace are to have the same powers, in all matters, civil and criminal, as were exercised by the justices of the peace in Maryland. In resorting to the Maryland code of laws, we find a very early act of assembly, which gives to justices of the peace the power of punishing contempts in their presence. Indeed, they possess a vast accumulation of powers. They may inflict whipping, imprisonment, and fine as high as 500 pounds of tobacco.").

[37] *See, e.g.*, 11 U.S.C. 362(b)(1), (2)(ii) (providing that bankruptcy stay does not extend to child support payments nor prohibit criminal contempt of court for failure to pay child support); Md. Code Ann., Fam. Law § 10-140(a) (2019 Repl.) (establishing that an unpaid child support obligation constitutes a lien on all real and personal property); §§ 13-101, 13-102 (requiring child support to persist past the age of majority if the "adult child" cannot support themselves due to mental or physical infirmity); *Stambaugh v. Child Support Enf't Admin.*, 323 Md. 106, 111 (1991) (holding that Maryland public policy dictates that "the duty to support one's minor children may not be bargained away or waived"); 42 U.S.C. § 666(a)(13) (requiring states to record social security numbers on applications for professional, driver's, occupational, or recreational licenses in order to better effectuate child support payments); Md. Code Ann., Transp. § 16-203 (2020 Repl.) (outlining a statutory regime for the suspension and restriction of licenses for child support arrearages); *Motor Vehicle Admin. v. Geppert*, 470 Md. 28, 37 n.5 (2020) (explaining that Maryland law matches federal law in requiring social security numbers for licenses "for the purpose of enforcing child support obligations"); *Montgomery County Off. of Child Support Enf't ex rel Cohen v. Cohen*, 238 Md. App. 315, 327-30, 342 (2018) (reviewing federal and Maryland laws and regulations providing that passports may be denied or held due to child support arrearages); *cf. Attorney Grievance Comm'n v. Whitted*, 487 Md. 501, 510-12 (2024) (indefinitely suspending an attorney for his failure to pay child support and related dishonesty).

willful failure to pay child support); *Ashford v. State*, 358 Md. 552, 556-57, 565-68, 572 (2000) (discussing common law criminal contempt for failure to pay child support). Mr. Fooks's sentence of more than four years' imprisonment for criminal contempt is attributable to an egregious refusal to comply with a court order concerning one of society's most basic obligations, betraying a disrespect for the law and the legitimacy of the courts that enforce it. Precluding firearm possession by individuals convicted of such an offense and sentenced to a term of imprisonment of more than two years is well within our Nation's historical regulation of firearms.

The General Assembly, like the United States Congress and other state legislatures around the country, has concluded that individuals convicted of serious criminal offenses should not be permitted to possess firearms, regardless of whether the particular offenses they previously committed are themselves violent. Without carving out any exceptions, on four occasions over the course of 16 years, Justices constituting a majority of the Supreme Court of the United States have identified laws like § 5-133(b)(2) as presumptively lawful. We will not presume that to have been a mistake.[38]

## CONCLUSION

In sum, we affirm the Appellate Court of Maryland and hold that § 5-133(b)(2) is the equivalent of a felon dispossession statute, satisfies Second Amendment review as set

---

[38] The State further contends that Mr. Fooks's conduct was not protected by the Second Amendment because the firearms he was convicted of possessing were stolen and the purpose for which he possessed them was to illegally pawn them. The record suggests that very well may be the case, especially Mr. Fooks's agreement to pay restitution and that the statement of facts in support of Mr. Fooks's guilty plea reflects that the finding that he was in possession of two handguns on two specific dates resulted from "a RAPID[]

53

forth in *Heller*, *Bruen*, and *Rahimi*, and is constitutional on its face and as applied to

Mr. Fooks.

                                        **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

---

search." "RAPID" stands for the Regional Automated Property Information Database, which contains information about pawn transactions. *See, e.g.*, Transaction Filing - Secondhand Precious Metal Objects Dealers & Pawnbrokers, Md. Dep't of Lab., *available at* https://www.dllr.state.md.us/license/pm/pmtrans.shtml [https://perma.cc/2T5E-XJNK]. On the other hand: (1) the circuit court did not find Mr. Fooks guilty of theft or possession of stolen property; (2) Mr. Fooks did not admit to theft or possession of stolen property; (3) the basis for Mr. Fooks's restitution obligation was not identified on the record; (4) the parties agreed that Mr. Fooks's obligation to pay restitution would turn on the success of his appeal of the two firearms charges of which he was convicted; and (5) the court appeared somewhat uncertain of the facts relevant to the theft allegations, lamenting that the individual to whom restitution was ordered "isn't here to clarify the situation either for the State's behalf or for [Mr. Fooks's] behalf." In light of the state of the record, as well as our disposition of Mr. Fooks's appeal on other grounds, we decline to reach that issue.

Circuit Court for Wicomico County
Case No. C-22-CR-21-000030

Argued: March 2, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 24

September Term, 2022

_____

ROBERT L. FOOKS

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: June 6, 2025

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I concur. I agree with the Majority that Md. Code Ann., Pub. Safety (2003, 2018 Repl. Vol.) ("PS") § 5-133(b)(2) is the equivalent of a law prohibiting the possession of firearms by an individual convicted of a felony, and that the Supreme Court of the United States would uphold its constitutionality. See Maj. Slip Op. at 1, 3-4. I also would affirm Mr. Fooks's convictions.

But, because I would hold that Mr. Fooks's conduct of possessing and pawning stolen firearms falls outside of the protections of the Second Amendment, I would not reach the issue of how to apply the Supreme Court's decisions in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022), and United States v. Rahimi, 602 U.S. 680 (2024). In my view, Mr. Fooks had no Second Amendment right to possess the firearms in this case, because his unsanctioned possession of firearms belonging to another person was not lawful conduct and his possession of firearms was not consistent with the Supreme Court of the United States' description of the Second Amendment Right as applying to law-abiding people. See Bruen, 597 U.S. at 8-10.

On January 26, 2021, in the Circuit Court for Wicomico County, the State charged Mr. Fooks with one count of theft, ten counts of illegal possession of a rifle or shotgun, and three counts of illegal possession of a regulated firearm. The State accused Mr. Fooks of stealing several firearms from a relative and selling them at pawn shops. Mr. Fooks faced the firearms possession charges under PS § 5-133(b)(2) and § 5-205(b)(2) because of his 2017 conviction for constructive criminal contempt, a common law crime for which he received a sentence of four years of incarceration. On February 1, 2021, Mr. Fooks, via counsel, filed a motion to dismiss the thirteen firearms-related counts, contending that

PS §§ 5-133 and 5-205 were unconstitutional under the Second Amendment of the United States Constitution. In its response, the State argued that Mr. Fooks's conduct was not protected by the Second Amendment, stating: "In the case *sub judice*, the guns were not the Defendant's, and he sold the guns at a local pawn shop. The conduct by the Defendant removes his conduct from being within the protected right of law-abiding, responsible citizens to use arms in defense of hearth and home." After holding a hearing on Mr. Fooks's motion, and receiving supplemental briefing from Mr. Fooks and the State, the circuit court issued an order denying the motion to dismiss the firearms possession charges "for the reasons stated in the State's Response."

Subsequently, the State and Mr. Fooks reached a plea agreement. The written agreement, which Mr. Fooks and defense counsel signed, provided that Mr. Fooks would conditionally plead guilty to two charges under PS § 5-133(b)(2), reserving his right to appeal on the issue of the statutes' constitutionality. In the written plea agreement, Mr. Fooks agreed that he would pay restitution in the amount of $9,949[1] to Marilyn Murray-Artis. In exchange, the State agreed to nol pros the theft charge and the remaining unlawful possession of firearms charges as well. The State also agreed to make a recommendation at sentencing of the statutory maximum for each charge, five years incarceration, to run consecutively, with service of the sentence suspended.[2] Under the agreement, Mr. Fooks

---

[1]The amount of restitution that Mr. Fooks agreed to pay reflects the total value of the 13 firearms that the State alleged Mr. Fooks had stolen and sold to pawn shops, as reflected in the State's response to Mr. Fooks's demand for a bill of particulars.

[2]The theft charge carried the same maximum penalty. See Md. Code Ann., Crim. Law (2002, 2021 Repl. Vol.) 7-104(g)(1)(i).

was entitled to argue for a lesser sentence.

On April 27, 2021, the circuit court conducted a guilty plea proceeding. The circuit court confirmed the details of the bargain with Mr. Fooks during the proceeding:

> THE COURT: The plea agreement contemplates that the State is going to enter a nol pros as to count 14 [the theft charge], and the parties are in agreement that on appeal they agree that the motion to dismiss would be dispositive of the entire case, if you were to win on an appeal; you understand that?
>
> THE DEFENDANT: Yes, sir, Your Honor.
>
> THE COURT: But the bargain that's entered here is the State's agreeing to that on your part and you're agreeing to enter this conditional plea of guilt to count four, illegal possession of a regulated firearm, which carries a maximum penalty of five years incarceration and a $10,000 fine -- and/or a $10,000 fine. And a conditional plea of guilt to count seven, illegal possession of a regulated firearm, also carrying a maximum penalty of five years incarceration and/or a $10,000 fine. At the time of sentencing the State's going to make a recommendation of five years on both counts, both counts completely suspended, but run consecutive to each other. So basically it's ten years all suspended. You understand that?
>
> THE DEFENDANT: Yes, sir, Your Honor.

After noting that Mr. Fooks would be entitled to argue for a different sentence, the circuit court recounted the term of the plea bargain pertaining to Mr. Fooks' agreement to pay restitution:

> THE COURT: Pursuant to the bargain that's been [reached] between the two sides it also contemplates that you would pay restitution in the amount $9,949 to Marilyn Murray-Artis, and you're agreeing to pay that even though you're not entering a guilty plea to the theft charge; you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: But that's part of the contemplation of the plea agreement, you understand that?

THE DEFENDANT: Yes, sir.

Both defense counsel and the State agreed that the foregoing was "a fair recitation of the plea agreement" by the court.

After ascertaining that Mr. Fooks was knowingly, willingly, and voluntarily entering into the plea agreement, the circuit court asked the State to read the agreed-to statement of facts:

> Your Honor, had this matter proceeded to trial the State would have produced testimony and evidence that on July 18, 2020, Officer Culver, Sergeant Jackson and Officer Swanger of the Fruitland Police Department responded to 503 St. Luke's Road, Fruitland, Maryland, 21826. An investigation of that address led Sergeant Jackson to conduct a RAPIDS search that found that Mr. Fooks, who would be identified as the individual seated to the left of defense counsel today, was in possession of a Smith and Wesson 19-4 .357 caliber handgun, as well as a Smith and Wesson 10-6 .38 special handgun on the dates of November 30, 2019, and February 6, 2020, respectively.
>
> With this information Officer Culver conducted a followup investigation which determined that Mr. Fooks is prohibited from possessing firearms based on a 2017 conviction for constructive criminal contempt, a common law crime in which he received a sentence of more than two years of incarceration.

All events did occur in Wicomico County, Maryland.

The "RAPIDS search" refers to "the Regional Automated Property Information Database ('RAPID')" that "tracks pawn shop sales[.]" Gross v. State, 229 Md. App. 24, 28, 142 A.3d 692, 695 (2016). This database was created after the General Assembly required pawn shops to submit electronically their daily records of purchases and sales of certain items, including firearms, which they are mandated to provide to local law enforcement. See 2009 Md. Laws 3162 (Vol. IV, Ch. 562, S.B. 597); see also Md. Code Ann., Bus. Reg.

(1992, 2015 Repl. Vol.) §§ 12-301 to 12-304. In January 2012, the Governor's Office of Crime Control and Prevention described the development of the system:

> On October 1, 2009, SB 597 took effect requiring pawnbrokers and secondhand precious metal dealers to electronically report daily transactions to law enforcement. In order to manage this information and make it accessible to all law enforcement around the state, the Regional Automated Property Information Database (RAPID) was created: a central repository for all transaction data of pawn, secondhand precious metal, and automotive dismantler transition records in the state. RAPID has quickly become a favorite crime fighting tool to reduce property crime, both in Maryland and its bordering states, and is currently used as an investigative tool by over 2,000 users in 130 agencies[.]

Governor's Off. of Crime Control and Prevention, Fact Sheet: Reg'l Automated Prop. Info. Database (RAPID) (January 2012), https://mdstatedocs.slrc.info/digital/api/collection/ mdgov/id/7190/download [https://perma.cc/NXJ5-XMFZ]. In this case, according to the agreed upon statement of facts, Sergeant Jackson conducted a RAPID search that found that Mr. Fooks was in possession of, *i.e.*, had sold to a pawn shop, a Smith and Wesson 19-4 .357 handgun and a Smith and Wesson 10-6 .38 special handgun on two different dates, November 30, 2019, and February 6, 2020, respectively.

Although in the written plea agreement, Mr. Fooks specifically reserved the right to appeal the constitutionality of PS § 5-133(b)(2) and § 5-205(b)(2) and although the information about the guns would have been available to the prosecutor and Mr. Fooks's counsel, conspicuously, the agreed statement of facts did not mention the purported owner of the guns, the location at which the guns were found/recovered, or that the guns were reported to have been stolen by Mr. Fooks.

The statement of charges for the theft count signed by an Assistant State's Attorney

and filed in the circuit court stated that Mr. Fooks "did steal firearms property of Johnnie Artis having a value of at least $1,500 but less than $25,000, in [] violation of CR 7-104 of the Annotated Code of Maryland[.]" In its Answer to Defendant's Motion for Separate Trials (Mr. Fooks's motion), the State explained:

> On July 18, 2020, officers from the Fruitland Police Department responded to 503 St. Lukes Rd. Fruitland, Md. Upon arrival, officers met with the victim who reported that his guns had been stolen from his garage. The victim reported to officers that in March of 2020, he asked an individual by the name of Robert Fooks, to move some guns to the shed for him because of the extermination of the house. Following the extermination, the victim asked Mr. Fooks to retrieve the guns and bring them in the house. Mr. Fooks stated that he could not retrieve the guns, at which point the victim called the police.
>
> Taking this information from the victim, Ofc. Weldon, of the Fruitland Police Department ran a RAPDS [sic] check which revealed that Mr. Fooks had pawned 13 firearms since November 12, 2018. The victim was able to identify the 13 pawned firearms as ones missing and belonging to him.

Ms. Murray-Artis was clearly connected by a spousal or familial relationship to Mr. Artis, the complaining victim, who was likely deceased when Mr. Fooks entered his guilty plea, given that she became the restitution payee.[3]

At the plea proceeding, prior to imposing a sentence, the circuit court asked Mr. Fooks if there was anything he would like to say, and Mr. Fooks responded:

> I put myself in a situation that is kind of a little awkward, trying to protect, and not realizing my previous conviction for child support. I don't have a

---

[3]Under Md. Code Ann., Crim. Proc. (2001, 2008 Repl. Vol.) ("CP") § 11-601(j), for the purposes of restitution, the "victim" to whom restitution is owed is defined as "(1) a person who suffered death, personal injury, or property damage or loss as a direct result of a crime or delinquent act; or, (2) if the person is deceased, the personal representative of the estate of the person." (Line break omitted).

- 6 -

common practice of dealing with firearms at all in regards it's not my thing, but I kind of put myself—but I wanted to thank and apologize to the Court for taking up your time.

Afterwards, the circuit court stated:

I appreciate it. The facts aren't, you know, they're not the worst set of facts I have ever seen. Unfortunately, you know, Mr. Artis isn't here to clarify the situation either for the State's behalf or for your behalf. And so I think this is probably a pretty fair resolution. As long as you stay out of trouble it will take care of itself.

As a result of his plea of guilty to the firearms offenses but not to the theft offense, the circuit court sentenced Mr. Fooks to two consecutive five-year terms of imprisonment, suspending all but time served (73 days), with two years of supervised probation, and ordered Mr. Fooks to pay restitution of $9,949 to Ms. Murray-Artis.

After Mr. Fooks appealed to the Appellate Court of Maryland, but before that Court issued its decision, the Supreme Court of the United States decided Bruen. See Fooks v. State, 255 Md. App. 75, 90, 278 A.3d 208, 217 (2022). In Bruen, 597 U.S. at 9, the Supreme Court concluded "that ordinary, law-abiding citizens have a [] right to carry handguns publicly for their self-defense" pursuant to the Second Amendment. The Supreme Court struck as unconstitutional New York's licensing scheme for carrying a firearm in public, which required applicants to show "a special need for self-protection distinguishable from that of the general community," id. at 12 (cleaned up), because "it prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms[,]" id. at 71.

Significantly, in Bruen, 597 U.S. at 9, 15, 26, 29-31, 33 n.8, 38 & n.9, 60, 70, the

Supreme Court used variations of the phrase "law-abiding citizens" consistently[4] when referring to the holders of Second Amendment rights. The Supreme Court focused its historical analysis on "how and why [firearms] regulations burden a law-abiding citizen's right to armed self-defense," id. at 29, and repeatedly characterized the challengers to the New York law as "law-abiding, adult citizens[,]" id. at 15, 31-32. In addition, the Supreme Court described presumptively constitutional "shall-issue" licensing regimes as "designed to ensure [] that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" Id. at 38 n.9 (quoting District of Columbia v. Heller, 554 U.S. 570, 635 (2008)).

This was not new language, but rather a pattern consistent with the word choice of the Supreme Court in earlier decisions in Heller, 554 U.S. 570, and McDonald v. Chicago, 561 U.S. 742 (2010), both cases invalidating firearms licensing laws that restricted "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." Bruen, 597 U.S. at 8-9. In Heller, 554 U.S. at 625, 628, the Supreme Court made clear that the scope of the Second Amendment's protection is limited to possession of firearms for "lawful purposes." The Supreme Court stated that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635. In McDonald, 561 U.S. at 780, the Supreme Court declared that Heller's "central holding" was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."

---

[4]By my count, holders of Second Amendment rights were described as "law-abiding" 14 times in the majority opinion and 7 more times in two concurring opinions by Justices who joined in the majority opinion.

The Supreme Court reiterated the connection between the Second Amendment and the "lawful purpose" of self-defense.[5] McDonald, 561 U.S. at 767-68.

The Supreme Court's emphasis on "law-abiding citizens" and "lawful conduct" shows that "the right secured by the Second Amendment is not unlimited" and does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626 (citations omitted). For all of the confusion resulting from the language in Bruen and its concurrences and McDonald and Heller, as aptly discussed by the Majority, this much is clear: the Second Amendment does not protect firearms possession for criminal purposes. See Maj. Slip Op. at 2, 18-20.

Recently in Rahimi, 602 U.S. at 701-02, the Supreme Court concluded that citizens are not deprived of Second Amendment protections simply because they are not "responsible." Although the Supreme Court stated that the term "responsible" is a vague term and that it does not dictate the Second Amendment's applicability, the Court did not disavow or discredit the premise that individuals who are not law abiding are excluded from Second Amendment protection. Id.

In Rahimi, id. at 684, 690, 693, 700-01, the Supreme Court upheld the

---

[5]The Fourth, Sixth, and Second Circuits have held that possession of firearms believed to be stolen, see United States v. Pruess, 703 F.3d 242 (4th Cir. 2012), or in connection with trafficking in controlled substances (even for self-defense in such a context), see United States v. Greeno, 679 F.3d 510, 520-21 (6th Cir. 2012) abrogated on other grounds by Bruen, 597 U.S. 1, United States v. Bryant, 711 F.3d 364 (2d Cir. 2013), falls outside the protections of the Second Amendment. To conclude otherwise "would suggest that the Second Amendment protects an individual's right to possess a weapon for criminal purposes." Greeno, 679 F.3d at 520.

constitutionality of a federal statute, 18 U.S.C. 922(g)(8), that prohibited an individual subject to a domestic violence restraining order from possessing a firearm as applied to the defendant. In doing so, the Supreme Court explained:

> "Like most rights," though, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In *Heller*, this Court held that the right applied to ordinary citizens within the home. Even as we did so, however, we recognized that the right was never thought to sweep indiscriminately. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid.*

Rahimi, 602 U.S. at 690-91. Elaborating on its holding in Bruen, the Supreme Court stated that the appropriate analysis of a challenged regulation involves "considering whether the [] regulation is consistent with the principles that underpin our regulatory tradition" and that "the Government must show that the restriction is consistent with the Nation's historical tradition of firearm regulation." Rahimi, 602 U.S. at 689, 692 (cleaned up). Courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." Id. at 692 (cleaned up).

In holding that 18 U.S.C. § 922(g)(8) was constitutional as applied, the Supreme Court rejected the government's argument that Rahimi could be disarmed merely because he was not "responsible." Rahimi, 602 U.S. at 701. The Court explained that, in Heller and Bruen, the term "responsible" was used to describe a class of citizens who undoubtedly enjoyed a Second Amendment right but that those decisions did not define the term and

- 10 -

did not address the status of citizens who are not responsible. Rahimi, 602 U.S. at 701-02. As the Court put it, "the question was simply not presented." Id. at 702. To be sure, in Rahimi, there is no indication that the government contended that Rahimi was not law abiding or that he had engaged in conduct that was not law abiding other than violating 18 U.S.C. § 922(g)(8) in connection with his possession of the gun at issue.[6] Nonetheless, it is significant that while rejecting the government's argument that Second Amendment protection applies only to responsible citizens, the Supreme Court did not contradict the often-mentioned principle that it is "ordinary, law-abiding citizens" who have a right to possess handguns pursuant to the Second Amendment.[7] See Bruen, 597 U.S. at 8-9; Heller, 554 U.S. at 625, 635; McDonald, 561 U.S. at 780.

In Range v. Attorney General, 69 F.4th 96, 103 (3d Cir. 2023) (en banc), after determining that Range was one of the "people" entitled to Second Amendment protection but prior to assessing whether the challenged law had a historical analogue, the Third Circuit considered what it referred to as the "easy question" of whether the statute at issue,

---

[6]The gun in question was recovered from Rahimi's home pursuant to a search warrant. See Rahimi, 602 U.S. at 688. At the time that the search warrant was executed and the gun recovered, there was no indication that Rahimi was currently engaged in a crime other than the unlawful possession of the weapon. See id.

[7]In Rahimi, the majority and concurring opinions do not reference "law-abiding citizen" or "lawful conduct" at all. The only instance in which the phrase "law-abiding citizen" is mentioned is in Justice Thomas's dissenting opinion, in which he now claims that the Second Amendment applies to "the people," not just law-abiding citizens, and that the phrase "ordinary, law-abiding citizens" in Bruen simply described "those who were unable to publicly carry a firearm in New York." Rahimi, 602 U.S. at 773-74 & n.7 (Thomas, J., dissenting) (cleaned up).

- 11 -

8 U.S.C.A. § 922(g)(1), regulated Second Amendment conduct and concluded that it did because "Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller*." (Citation omitted). In 1995, Range pleaded guilty to one count of making a false statement to obtain food stamps in violation of Pennsylvania law and was sentenced to three years' probation, which he successfully completed. <u>See</u> <u>id.</u> at 98. Later, Range learned that he was barred from buying a firearm under 18 U.S.C. § 922 (g)(1) because of his 1995 conviction. <u>See</u> <u>id.</u> at 99. Range sought a declaratory judgment in the United District Court for the Eastern District of Pennsylvania that 18 U.S.C. § 922(g)(1) violated the Second Amendment as applied to him. <u>See</u> <u>id.</u> Only after reaching the conclusion that Range was engaged in lawful conduct in possessing guns after his conviction did the Third Circuit undertake the analysis that resulted in its conclusion that the law in question was unconstitutional as applied to Range. <u>See</u> <u>id.</u> at 103-06.

The Supreme Court vacated the Third Circuit's decision and remanded the case for further consideration in light of <u>Rahimi</u>. <u>See</u> <u>Garland v. Range</u>, 144 S. Ct. 2706 (2024). On December 23, 2024, the Third Circuit issued its opinion on remand. <u>See</u> <u>Range v. Attorney General United States</u>, 124 F.4th 218 (3d Cir. 2024) (en banc). The Third Circuit stated that it "agree[s] with Range that, despite his false statement conviction, he remains among 'the people' protected by the Second Amendment. And because the Government did not carry its burden of showing that the principles underlying our Nation's history and tradition of firearm regulation support disarming Range, we will reverse and remand." <u>Id.</u>

at 222. The Third Circuit stated that "[a]t root, the Government's claim [is] that felons are not among the people protected by the Second Amendment[.]" Id. at 228 (cleaned up). The Third Circuit rejected this approach, concluding that "such extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." Id. (cleaned up).

Neither Range nor any of the cases discussed above are like this one. Mr. Fooks's conduct that led to his unlawful possession of a firearm conviction involved stealing or possessing stolen guns, pawning the guns without permission, and agreeing as part of a guilty plea to pay restitution to the owner of the guns. Separate and apart from the question of whether, based on his prior conviction, PS § 5-133(b)(2) is constitutional as applied to him, Mr. Fooks engaged in unlawful conduct in possessing the firearms at issue. For this reason, I would hold that Mr. Fooks's challenge in this case must fail before even reaching the issue of the constitutionality of the statute in question. This is so because Mr. Fooks's conduct in possessing stolen firearms placed him outside of the protection of the Second Amendment. Using the approach set forth in Bruen and Heller leads to the conclusion that Mr. Fook's conduct is not protected by the Second Amendment.

The agreed upon statement of facts and the circumstances of Mr. Fooks's guilty plea demonstrated that Mr. Fooks did not possess the firearms for a lawful purpose, see Heller, 554 U.S. at 620, 624-25, much less the purpose of self-defense that is the "core lawful purpose" protected by the Second Amendment, see id. at 630. As much as is unknown about where precisely the limits of this "not unlimited" right may lay, I am confident that

- 13 -

when the Supreme Court stated that the Second Amendment "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," possession of a stolen firearm was not among the rights intended to be protected. See Heller, 554 U.S. at 626.[8]

In addition to falling outside the scope of "lawful purpose," Mr. Fooks's unlawful possession of the firearms also places him outside of the category of the "law-abiding,

---

[8]Citing Sullivan v. Louisiana, 508 U.S. 275, 280 (1993), Justice Biran concludes that whether a citizen's possession of a firearm is not protected under the Second Amendment is a matter that the State must prove and should not be the subject of appellate speculation. See Dissenting Slip Op. at 17-18 n.6 (Biran, J., dissenting). For Justice Biran, Mr. Fooks's agreement to pay restitution is not proof of unlawful conduct. These conclusions are faulty for at least three reasons. First, not every case concerning the Second Amendment right to possess a firearm will involve an underlying criminal case in which the State will have an opportunity to prove unlawful conduct or a trier of fact will be called upon to make an express finding of guilt. None of the conduct at issue in Bruen Heller, and McDonald arose in the context of a criminal case involving the State or a prosecuting authority. Yet, even where there has been no dispute as to whether a party was law abiding or sought to possess a firearm for an unlawful purpose, the Supreme Court of the United States has made clear that the scope of the Second Amendment's protection is limited to law-abiding people and lawful purposes. See Bruen, 597 U.S. at 9, 71; Heller, 554 U.S. at 625, 628, 635; McDonald, 561 U.S. at 780. Second, comparing the circumstances of Mr. Fooks's case to a capital murder case in which a constitutionally deficient reasonable doubt instruction was given and the issue before the federal appellate court and the Supreme Court of the United States involved what a jury might have found if the correct instruction had been given, see Sullivan, 508 U.S. at 276-77, 280, is not instructive for determining how an appellate court should assess lawful or unlawful conduct in determining the scope of Second Amendment coverage. Third, stating that neither Mr. Fooks's agreement to pay restitution or the trial court's order that Mr. Fooks pay restitution is proof that Mr. Fooks stole the firearms overlooks the circumstance that Mr. Fooks agreed to pay restitution in the context of resolving a criminal case that charged both theft and possession of stolen property. In addition, case law of the Supreme Court cannot be read to require that an actual conviction of a crime is a prerequisite for a determination that a person's possession of a firearm is not protected under the Second Amendment.

responsible citizen" that the Supreme Court has repeatedly invoked in discussing Second Amendment rights. Whatever else that phrase might mean, at the very least it must require that the person asserting the right be "law-abiding" in the moment of possession. An exhaustive historical analysis is unnecessary to conclude that no one in the Founding Era would have believed that the Second Amendment protected a person's right to possess a firearm for the purpose of, or in the course of, committing a crime.

The conduct that places Mr. Fooks outside of the "lawful purposes" and "law-abiding citizen" categories is not just his possession of a firearm in violation of PS § 5-133(b)(2), a statute regulating gun possession. As a threshold matter, it is his possession of firearms that were stolen and fenced at a pawn shop, and for which he agreed to pay restitution to the owner in lieu of pleading guilty to theft, that places his conduct beyond the scope of the Second Amendment. That Mr. Fooks did not plead guilty to the theft charge does not require a different result. The State agreed to not prosecute the theft charge as part of the plea bargain. Nonetheless, the facts of the plea agreement and the record of the plea proceedings demonstrate that Mr. Fooks unlawfully possessed firearms, that were sold to a pawn shop, and that he paid restitution to a victim of his crime to compensate for the theft of the firearms.

The circumstances of the case demonstrate that Mr. Fooks unlawfully possessed, *i.e.*, stole or possessed as stolen property, the firearms at issue and agreed to pay restitution to Ms. Murray-Artis for the firearms. Merriam-Webster's Dictionary defines "restitution" as "an act of restoring or a condition of being restored: such as [] a restoration of something

to its rightful owner [or] a making good of or giving an equivalent for some injury" or as "a legal action serving to cause restoration of a previous state." *Restitution*, Merriam-Webster (2023), https://www.merriam-webster.com/dictionary/restitution [https://perma.cc/2VHW-JAHB]. Black's Law Dictionary defines "restitution" as "[c]ompensation for loss; esp., full or partial compensation paid by a criminal to a victim, not awarded in a civil trial for tort, but ordered as part of a criminal sentence or as a condition of probation." *Restitution*, Black's Law Dictionary (11th ed. 2019).

Likewise, in Maryland, restitution is a criminal sanction, that may be ordered as part of a sentence, and "serves to recompense the victim, [and] also to punish and rehabilitate the criminal." State v. Stachowski, 440 Md. 504, 512, 103 A.3d 618, 623 (2014) (citing Pete v. State, 384 Md. 47, 55, 862 A.2d 419, 423 (2004)). The Criminal Procedure Article, Md. Code Ann., Crim. Proc. (2001, 2008 Repl. Vol.) ("CP") Title 11, Subtitle 6,[9] establishes the requirements for restitution:

> A trial court may order restitution, in the sound exercise of its discretion, when, "*as a direct result* of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased . . . ." CP § 11-603(a)(1) (emphasis added). Medical and funeral expenses, direct out-of-pocket loss, loss of earnings, and certain government expenses may provide the basis for restitution. *See* CP § 11-603(a). The term "victim" is defined as "a person who suffered death, personal injury, or property damage or loss as a direct result of a crime or delinquent act; or, if the person is deceased, the personal representative [of] the estate of the person." CP § 11-601(j).

Stachowski, 440 Md. at 512-13, 103 A.3d at 623 (footnote omitted).

---

[9]Changes made to these statutes since Stachkowski have not affected this language.

Our case law elaborates that "[d]etermining whether an injury is a 'direct result' of the criminal conduct is central traditionally to mapping the outer limits of a trial court's discretion in ordering restitution in most cases." Stachowski, 440 Md. at 513, 103 A.3d at 623. Further, "restitution may be compelled only where the injury results from the actions that made the defendant's conduct criminal." Id. at 513, 103 A.3d at 623. However, restitution can be proper if "ordered for charged crimes for which no conviction ensued . . . as the result of a plea agreement as to the crime for which a conviction was entered" and the defendant explicitly agreed, such as paying restitution to the victim of a theft even though the defendant does not plead guilty to theft. Id. at 513-16, 103 A.3d at 623-25.

Here, Mr. Fooks explicitly agreed to pay restitution to the victim, Ms. Murray-Artis, "even though [Mr. Fooks was] not entering a guilty plea to the theft charge[.]" Under our case law, restitution by Mr. Fooks was appropriate not only as a punishment for his crimes, *i.e.*, theft of the firearms as charged or possession of the stolen firearms, but also to recompense Ms. Murray-Artis because "as a direct result of" his crime she must have "suffered . . . a direct out-of-pocket loss[.]" Id. at 512-13, 103 A.3d at 623. Mr. Fooks's unlawful possession of stolen firearms and the sale of the firearms at a pawn shop were established in the agreed-upon statement of facts via information about the RAPIDS search that led to the discovery of Mr. Fooks's possession of the guns, as well as his agreement to pay restitution as part of the plea bargain. Ms. Murray-Artis's status as the victim of his crime, *i.e.*, the owner of the firearms, was established by Mr. Fooks's agreement to pay her restitution of $9,949.

Mr. Fooks's agreement to pay Ms. Murray-Artis a not insignificant amount in restitution was an act of "giving an equivalent for some injury" and "compensation for a loss." Such injury and loss could not have resulted from Mr. Fooks's legitimate possession of the firearms. In other words, the firearms must have belonged to Mr. Artis (or his estate of which Ms. Murray-Artis was personal representative) or there would have been no reason for the restitution. All that was missing was the formality of the plea to the theft charge.[10] Having agreed to pay restitution for his conduct of possessing stolen firearms, that the plea hearing transcript established was uncovered via an investigation of property at a pawn shop, the only conclusion is that Mr. Fooks's possession was some form of theft, and therefore criminal, not lawful, conduct. If Mr. Fooks had not "stolen, . . . converted, or unlawfully obtained" the "property of the victim," *i.e.*, the firearms, there would have been no need for restitution. Stachowski, 440 Md. at 512-13, 103 A.3d at 623 (cleaned up).[11]

In light of the textual and historical emphasis of Heller, McDonald, Bruen, and Rahimi, it is impossible to imagine that the Framers would have meant for the Second

---

[10]If Mr. Fooks, like the defendant in Lee v. State, 307 Md. 74, 76, 512 A.2d 372, 373 (1986), had assented to the factual basis for the nol-prossed theft charge, there would be no question that his possession of the firearms was unlawful. Nonetheless, the record here establishes sufficient facts to reach the same conclusion. As we stated in Stachowski, 440 Md. at 520, 103 A.3d at 627, "allowing a defendant to consent to pay restitution for his or her other crimes in addition to the crime for which he or she stands convicted, as the result of a plea agreement, is consistent with the goals and purposes of Maryland's restitution statute."

[11]Further, CR § 7-104(g)(1)(i)(2) requires a person convicted of theft under that statute to "restore the property taken to the owner or pay the owner the value of the property or services[.]"

Amendment to protect Mr. Fooks's criminal possession of firearms. Having at a minimum possessed stolen firearms and fenced the firearms in question, Mr. Fooks was not a "law-abiding citizen" nor was he engaged in "lawful conduct" and therefore his conduct was outside the bounds of the Second Amendment, apart from any question concerning his prior felony-like conviction under PS § 5-133(b)(2).

In my view, this case also serves as a cautionary tale to trial courts to be watchful for conditional plea agreements that may obscure the unlawful or criminal nature of the possession of firearms and reserve the right to appeal where a defendant enters a plea to a firearms offense. For instance, if a defendant were charged with assault for unjustifiably shooting someone with his own unregistered gun, but ultimately reached a plea agreement only to an unlawful possession of a firearm charge, it would be incongruous to allow a challenge to the constitutionality of the firearm statute, because of the nature of the underlying conduct. At the very least an inquiry should be made on the record to determine whether the State is in possession of sufficient evidence to establish the other criminal offense(s) at issue even though a plea agreement may have been reached that does not require the defendant to plead guilty to an offense that would demonstrate that the possession of a firearm was not under lawful purposes.

With the advent of the Supreme Court's holdings in Bruen and Rahimi and the renewed interest in challenging the constitutionality of gun statutes, prosecutors and trial courts alike must be on the lookout for potential plea agreements that obscure the fact that a case involves the possession of a firearm during a criminal act or for unlawful purposes.

In ruling on motions to dismiss, trial courts must be careful to determine as a threshold matter whether the defendant has a Second Amendment right to possess the firearm at issue before assessing the merits of a challenge to the constitutionality of a firearms statute. In this case, a review of the agreed statement of facts in support of the plea agreement, the charged but nol-prossed theft offense in the plea agreement, and Mr. Fooks's agreement to pay restitution for the firearms at issue leads to the conclusion that in addition to the prohibition in PS § 5-133(b)(2) against him possessing a firearm, Mr. Fooks possessed stolen firearms, and did not have a Second Amendment right to possess the firearms. It appears that we have assessed the constitutionality of PS § 5-133(b)(2) where no Second Amendment right existed.[12]

For the above reasons, respectfully, I concur.

---

[12]The Majority notes that the State contended that Mr. Fooks's conduct was not protected by the Second Amendment because the firearms were stolen and illegally pawned, but "decline[s] to reach that issue." Maj. Slip Op. at 53-54 n.38. I see the issue, though, as a threshold question that must be addressed because the Supreme Court has described the Second Amendment as protecting the "right to keep and bear arms for lawful purposes[.]" See McDonald, 561 U.S. at 780. The first step of the Bruen inquiry requires ascertaining whether "the Second Amendment's plain text covers an individual's conduct[.]" Bruen, 597 U.S. at 17. Necessarily, this requires ascertaining whether the challenger's conduct at issue was lawful.

Circuit Court for Wicomico County
Case No. C-22-CR-21-000030
Argued: March 2, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 24

September Term, 2022

_____

ROBERT L. FOOKS

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Concurring Opinion by Gould, J.

_____

Filed: June 6, 2025

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

I concur in the judgment reached by the Majority, but I take a different path in reaching that conclusion. Applying *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), to a state felon-in-possession statute is like forcing a square peg into a round hole. The issue here, as I see it, is whether the State's felon-in-possession statute is a proper exercise of the State's police power. And since Mr. Fooks makes no claim that section 5-133(b)(2) of the Public Safety Article is not a proper exercise of the State's police power, I would affirm the judgment of the Appellate Court of Maryland on that ground. *See* MD. CODE ANN., Pub. Safety § 5-133(b)(2) (2022 Repl.).

The primary evidence that the *Bruen* test was not intended to apply to state felon-in-possession statutes comes directly from the Supreme Court's own words in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and in *Bruen*. In *Heller*, the Court said:

> Like most rights, the right secured by the Second Amendment is not unlimited. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27. And in footnote 26, the Court said: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Thus, in *Heller*, the Supreme Court identified a class of regulations— including state felon-in-possession laws—that are presumptively constitutional.

In *Bruen*, the Supreme Court did not call into question any aspect of its opinion in *Heller*; to the contrary, the Supreme Court instead plainly intended to build upon the

foundation laid by *Heller*. *Bruen*, 597 U.S. at 8-10, 17-20, 22-24, 31-33. In doing so, the Court articulated this test:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

So, under *Heller*, state felon-in-possession laws are *presumptively* constitutional, and under *Bruen*, state felon-in-possession statutes are *presumptively* unconstitutional. Both cannot be true. The only way to square that circle is to conclude that *Bruen*'s test does not apply to state felon-in-possession laws.

The Second Amendment did not create the right to keep and bear arms; rather, it enshrined the right to keep and bear arms that existed when the Constitution was written and ratified. *See Heller*, 554 U.S. at 598-600. By its own terms, the *Bruen* test purports to apply to a specific question: whether an individual's "conduct" falls within or "outside" the scope of the Second Amendment. *Bruen*, 597 U.S. at 24; *id.* at 19 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that *delimits the outer bounds* of the right to keep and bear arms." (emphasis added)); *id.* at 21 ("[W]e also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right."); *id.* at 22 (stating that in "suggesting the *outer limits* of the right, . . . *Heller* relied on text and history" (emphasis added)).

2

The *Bruen* test does not, however, purport to address the scope of a state's authority to impose consequences—here, the forfeiture of Second Amendment rights—for a violation of that state's criminal code. That question implicates a different constitutional question altogether, namely, the nature and scope of a state's police power under the federalist principles embedded in the United States Constitution.

Indeed, applying *Bruen* to a state felon-in-possession statute is a *non sequitur* because, as the Court in *Heller* stated, the Second Amendment was originally understood to apply "only to the Federal Government." 554 U.S. at 620 n.23. The Second Amendment was made applicable to the states through the Fourteenth Amendment, ratified in 1868. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 777 (2010). Whether states historically exercised their police power to punish criminal conduct with a forfeiture of Second Amendment rights tells us nothing about whether people—at the time of the country's founding or in 1868—believed that the state had the power to do so under its police powers.

The State's police power includes the power to establish a criminal code and impose consequences for criminal conduct. *Gonzales v. Raich*, 545 U.S. 1, 42 (2005) (O'Connor, J., dissenting) ("The States' core police powers have always included authority to define criminal law and to protect the health, safety, and welfare of their citizens."); *Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law."); *Argersinger v. Hamlin*, 407 U.S. 25, 38 (1972) ("How crimes should be classified is largely a state matter.").

This same principle is firmly embedded in Maryland's jurisprudence. *Rice v. State*, 311 Md. 116, 126 (1987) ("The legislature has broad power to define what acts shall

constitute criminal offenses."); *Dawson v. State*, 329 Md. 275, 283 (1993) ("[T]he General Assembly has broad authority, under the exercise of the State's police power, to criminalize certain conduct and to decide what penalties to impose for the commission of crimes.").

That doesn't mean that the State's police power is unlimited. As this Court stated almost 80 years ago:

> Necessarily there are limits to the valid exercise of the police power of the State. Otherwise[,] the State Legislature would have unbounded power and the Fourteenth Amendment would be ineffective, for then it would be enough to say that any piece of legislation was enacted for the purpose of conserving the health, morals or welfare of the people. If, therefore, a statute designed for the promotion of the public health, morals, or welfare has no real or substantial relation to those objects, or is a manifest invasion of rights secured by the fundamental law, it is the duty of the court to adjudge accordingly, and thereby give effect to the Constitution.

> But the police power is broad in scope, and the Legislature is vested with large discretion to determine not only what is injurious to the health, morals or welfare of the people, but also what measures are necessary or appropriate for the protection of those interests. The exercise of the police power may inconvenience individual citizens, increase their labor, or decrease the value of their property. The courts will not interfere with the exercise of the power except where the regulations are arbitrary, oppressive or unreasonable. The wisdom or expediency of the regulations is not subject to judicial review. Of course, the police power is subject to the limitations imposed by the State and Federal Constitutions upon every power of government, and the Legislature will not be allowed to invade the fundamental liberties of the citizen. But unless regulations are so utterly unreasonable and extravagant in their nature and purpose that the personal and property rights of the citizen are interfered with or destroyed unnecessarily and in a wholly arbitrary manner without due process of law, they do not extend beyond the power of the Legislature to enact, and they form no subject for interference by the Court on the ground of violation of the Fourteenth Amendment.

*Davis v. State*, 183 Md. 385, 396-98 (1944) (citations omitted).

In my view, *United States v. Rahimi*, 602 U.S. 680 (2024), on which the Majority relies, is of little help here. *Rahimi* addressed the constitutionality of a federal felon-in-

possession statute, *id.* at 684-86, not a state statute. The relationship between the federal government's lawmaking power and the Second Amendment differs substantially from the relationship between states and the Second Amendment. The federal government's lawmaking power is limited to the powers enumerated in Article I, Section 8 of the Constitution. *United States v. Lopez*, 514 U.S. 549, 552 (1995). Contrasting the powers of the federal and state governments, James Madison said:

> The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.... The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.

*Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (alteration in original) (quoting THE FEDERALIST NO. 45, at 292-93 (James Madison) (Clinton Rossiter ed., 1961)). Thus, in my view, any analysis of a state felon-in-possession statute under the Second Amendment that does not account for the allocation of power between the federal government and the states in our constitutional order will miss the mark.

As I stated above, Mr. Fooks does not appear to be arguing that section 5-133(b)(2) of the Public Safety Article violates the due process limitations imposed on the State's police power; instead, he argues that this statute fails *Bruen*'s historical test. The closest he gets to a due process argument is with his as-applied challenge, but there too, he merely argues that historically, any limits on a felon's Second Amendment right had to be premised on dangerousness. Mr. Fooks doesn't argue that stripping the Second Amendment rights of an individual whose violation of court orders resulted in a lawful,

5

four-year period of incarceration is "so utterly unreasonable and extravagant" that the interference with such rights is "wholly arbitrary" or inconsistent with "due process of law" under *Davis*.

Accordingly, I concur in the judgment.

Circuit Court for Wicomico County
Case No. C-22-CR-21-000030
Argued: March 2, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 24

September Term, 2022
_____

ROBERT L. FOOKS

v.

STATE OF MARYLAND
_____

Fader, C.J.,
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.
_____

Dissenting Opinion by Biran, J.
_____

Filed: June 6, 2025

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Imagine that a burglar breaks into a home in a Maryland town in 1795. The homeowner confronts the burglar, brandishing a rifle. The burglar flees. He then proceeds down the road and breaks into the next house he comes to. The owner of that house is a newspaper editor who, two years earlier, had been convicted of criminal contempt of court. He served 30 days in jail for that offense, after which he returned to his home and resumed his work as a journalist. Under Maryland law at the time, because the man was convicted of a crime for which he could have been sentenced to more than one year of imprisonment, he was required to turn all his firearms into local authorities and was permanently prohibited from obtaining any more firearms. Because the man has obeyed the law, he is unarmed when the burglar enters his house. When he confronts the burglar, the burglar beats him and robs him.

This hypothetical situation would not have occurred in Maryland or anywhere else in the United States in 1795. At the time of the Second Amendment's ratification, and continuing well into the twentieth century, no jurisdiction in the United States permanently disarmed individuals who had served a sentence for a nonviolent offense and been released back into society. Nor has the State shown that Americans at the time of the Second Amendment's ratification endorsed a principle that would have justified the enactment of such a law. Based on the United States Supreme Court's recent Second Amendment cases, it should follow that the prosecution of Petitioner Robert Fooks under Maryland Code, Pub. Safety ("PS") § 5-133(b)(2) (2003, 2018 Repl. Vol.), predicated on a prior conviction for a nonviolent felony-equivalent offense, is unconstitutional.

The Majority reaches its contrary conclusion on two grounds. First, the Majority concludes that dicta in the Supreme Court's Second Amendment cases referring to felon disqualification statutes as "presumptively lawful" demonstrate that PS § 5-133(b)(2) passes constitutional muster. Second, the Majority determines that the State has met its burden to demonstrate that Mr. Fooks's disqualification as a felon-equivalent is consistent with the Nation's historical tradition of firearm regulation. According to the Majority, legislatures have "traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms[.]" Maj. Op. at 47 (internal quotation marks and citation omitted).

It seems likely that, sometime soon, the Supreme Court will take up a Second Amendment challenge to a felon (or felon-equivalent) disqualification statute as applied to a person who previously was convicted of a nonviolent crime. Until that happens, none of us can know for sure whether a broadly worded disqualification statute like PS § 5-133(b)(2) comports with the Second Amendment as applied to a nonviolent felon or felon-equivalent. Although the Majority opinion is well written and its conclusions may be proven to be correct after the Supreme Court decides a case like this one, for now I am unconvinced. While the Supreme Court has said that felon disqualification statutes are presumptively lawful, that does not mean that every such statute is immune to a Second Amendment challenge in all of its applications. When a legislature classifies many different types of offenses as felonies (or felony-equivalents) and then makes convictions of all those offenses predicates for application of a firearms disqualification statute, it runs the risk that some applications of the statute will violate the Second Amendment.

Further, the historical record does not support the Majority's conclusion that PS § 5-133(b)(2) survives Mr. Fooks's as-applied challenge. History shows that founding-era legislatures only disarmed individuals who were considered to be threats to public safety, either because they had demonstrated their dangerousness, or because they were members of groups who were viewed as threats to engage in insurrection or rebellion. Before and after the founding, individuals who were convicted of nonviolent crimes were neither permanently disarmed after serving their sentences nor excluded from militia service. Indeed, militia laws required militia members to obtain and possess firearms individually. Thus, it was understood that all militia members – including those with criminal convictions – would keep and bear arms for all lawful purposes. When applied to disqualify a nonviolent felon-equivalent like Mr. Fooks from possessing a firearm for a lawful purpose, PS § 5-133(b)(2) is inconsistent with this historical tradition and therefore violates the Second Amendment. Accordingly, I respectfully dissent.

**I**

The State charged Mr. Fooks in a 14-count Criminal Information. The first 13 counts charged firearms-related offenses. Counts 4, 7, and 8 charged Mr. Fooks with violating PS § 5-133(b)(2) by possessing a regulated firearm after having received a sentence of more than two years of imprisonment for conviction of a violation classified as a common law crime.[1] Count 14 charged Mr. Fooks with theft, in violation of Maryland Code, Crim. Law § 7-104 (2002, 2021 Repl. Vol.). That count alleged that Mr. Fooks stole "firearms property

---

[1] The other 10 firearms counts charged Mr. Fooks with illegal possession of a rifle or shotgun, in violation of PS § 5-205(b).

of Johnnie Artis having a value of at least $1,500 but less than $25,000[.]" After the circuit court denied Mr. Fooks's motion to dismiss the firearms-related counts on Second Amendment grounds, Mr. Fooks entered a conditional guilty plea to two of the § 5-133(b)(2) charges (Counts 4 and 7).[2] The stipulated factual basis for the plea was that: (1) officers conducted a search of a database of pawn shop records, which revealed that Mr. Fooks "was in possession of" two handguns on separate dates in 2019 and 2020; and (2) Mr. Fooks was convicted in 2017 of constructive criminal contempt, a common law crime, for which he received a sentence of more than two years of incarceration.

As part of the agreement, Mr. Fooks agreed to pay restitution of $9,949 to Marilyn Murray-Artis. The State agreed not to proceed with the remaining 12 counts. The State further agreed that, if Mr. Fooks prevailed in an appeal of his convictions on Counts 4 and 7, it would not seek to revive the theft count on remand. The circuit court accepted the plea, and Mr. Fooks appealed his convictions on the two firearms counts.

## II

I begin my analysis by summarizing the Supreme Court's modern Second Amendment jurisprudence.

### A. *Heller* and *McDonald*

In the groundbreaking case of *District of Columbia v. Heller*, the Supreme Court recognized that the Second Amendment guarantees an individual right to keep and bear

---

[2] Maryland Rule 4-242(d) provides that, "[w]ith the consent of the court and the State, a defendant may enter a conditional plea of guilty" under which "the defendant may reserve the right to appeal one or more issues specified in the plea[.]"

arms. 554 U.S. 570, 583-84 (2008). Enforcing this right, the Court held unconstitutional a District of Columbia law that essentially rendered firearms inoperable inside the home. *Id.* at 630. Although the Court did not apply means-ends scrutiny, the Court noted that the law would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628. In dicta, the *Heller* Court also stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of firearms.

*Id.* at 626-27. In a footnote that immediately followed this dictum, the Court added: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.6. The Court stated that it would "expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635.

Two years after *Heller*, the Supreme Court revisited the Second Amendment in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). At issue were local laws that made private ownership of handguns virtually impossible in Chicago and Oak Park, Illinois. *Id.* at 750. The Court in *McDonald* held that the Second Amendment applies to the states through the Fourteenth Amendment. *Id.* In the course of its analysis, the Court stated:

> We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

*Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27). The Court continued: "We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." *Id.*

In the aftermath of *Heller* and *McDonald*, courts around the nation coalesced around a two-step approach to evaluate the constitutionality of firearms regulations. The first step required courts to determine whether the challenged law fell within the scope of the Second Amendment. If it did, the second step required courts to apply some form of means-ends scrutiny. *See* Sam Zuidema, *Raising Heller: Constitutional Scrutiny in a New Age of Second Amendment Rights*, 2018 U. ILL. L. REV. 813, 824-25 (2018).

## B. *Bruen* and *Rahimi*

Another seismic shift in Second Amendment jurisprudence occurred when the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). A New York statute required a license to carry a concealed pistol or revolver outside one's home or place of business for self-defense. *Id.* at 12. An applicant was required to prove that "proper cause exist[ed]" to issue such a license, which entailed demonstrating a "special need for self-protection distinguishable from that of the general community." *Id.* (internal quotation marks and citation omitted). This type of firearm licensing regime was referred to as "may-issue" because the State retained discretion to determine who met the "proper cause" requirement (unlike a "shall-issue" system, in which the applicant is guaranteed to receive a license once certain requirements are met). *See id.* at 13-14.

The Supreme Court in *Bruen* explained that lower courts had mistakenly evaluated challenged regulations under tiers of scrutiny. *Id.* at 19-24; *see also Range v. Attorney General of the United States*, 124 F.4th 218, 225 (3d Cir. 2024) (en banc) (noting that "[m]any courts around the country … overread [*Heller*'s] passing comment" that the law at issue in *Heller* would be unconstitutional under any of the standards of scrutiny the Supreme Court has applied to enumerated constitutional rights, and therefore had mistakenly interpreted *Heller* to contemplate the use of means-end scrutiny). The Court clarified that, in keeping with *Heller*,

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). The Court observed that, in some cases, determining "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding … will be fairly straightforward." *Id.* at 26. "For instance," the Court continued, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* And, "if earlier generations addressed the societal problem, but did so

through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26-27.

The Court recognized that, while historical analogies can be "relatively simple to draw," cases "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. Still, the Court made plain that "history guide[s] our consideration of modern regulations that were unimaginable at the founding." *Id.* at 28. The Court explained that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* at 28-29 (cleaned up). The "relevantly similar" analysis focuses on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" *Id.* at 29.

Under this approach, New York was unable to establish a proper historical analogue to support its may-issue licensing regime. *See id.* at 70 ("Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense.").

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court upheld Zackey Rahimi's prosecution under 18 U.S.C. § 922(g)(8) for possessing a firearm while subject to a domestic violence restraining order. *Id.* at 690. The court that issued the restraining order had found that Mr. Rahimi committed "family violence," that the violence was "likely to occur again," and that Mr. Rahimi posed "a credible threat" to the "physical safety" of others. *Id.* at 687.

- 8 -

The *Rahimi* Court clarified the *Bruen* test to assess the constitutionality of firearms regulations. The Court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. This focus on principles allows the law not to become "trapped in amber." *Id.* at 691. In ascertaining whether a new law "is 'relevantly similar' to laws that our tradition is understood to permit," a court must apply "'faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* For example, the Court explained,

> if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." … The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Id.* (quoting *Bruen*, 597 U.S. at 30).

Applying this approach, the Court reviewed the relevant historical record and distilled the principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. Critical to the Court's analysis were the surety and "going armed" laws that were commonplace in eighteenth century America. *See id.* at 695-98. Surety laws, which could be invoked to prevent all forms of violence, including spousal abuse, "targeted the misuse of firearms" by

"authorizing the imposition of bonds from individuals '[who went] armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon.'" *Id.* at 696 (quoting reference to an early surety statute in Mass. Rev. Stat., ch. 134, § 16).

"Going armed" laws, the Court explained, were "a particular subset of the ancient common-law prohibition on affrays." *Id.* at 697. Such laws "prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.'" *Id.* (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 149 (10th ed. 1787)) ("BLACKSTONE") (emphasis deleted by the Court). The law "punished these acts with 'forfeiture of the arms … and imprisonment.'" *Id.* (quoting BLACKSTONE at 149). The Court noted that, "[i]n some instances, prohibitions on going armed … were incorporated into American jurisprudence through the common law." *Id.* Several early states also codified prohibitions on going armed. *Id.* at 698.

The Court determined that 18 U.S.C. § 922(g)(8) passed constitutional muster, despite not being "identical to these founding era regimes[.]" *Id.* The Court reasoned that the federal statute's "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* Although the Court was careful not to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," *id.* (citing *Heller*, 554 U.S. at 626), the Court observed that § 922(g)(8) applies only after "a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 699 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). That "match[ed] the surety and going armed laws,

which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* The Court also emphasized the temporary nature of § 922(g)(8)'s burden on the Second Amendment. *Id.* ("[L]ike surety bonds of limited duration, [§] 922(g)(8)'s restriction was temporary as applied to Rahimi."); *see also id.* ("The going armed laws provided for imprisonment … and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that [§] 922(g)(8) imposes is also permissible.").

In sum, the *Bruen-Rahimi* framework for evaluating whether a regulation comports with the Second Amendment can be described as the following two-part inquiry. A reviewing court first must determine whether the regulated conduct falls within the scope of the Second Amendment. If it does, then the court must next determine whether the regulation is consistent with the historical tradition of firearm regulation in the United States. If the answer to that question is yes, then the challenged regulation is consistent with the Second Amendment.

### III

I now turn to the application of the *Bruen-Rahimi* framework to this case, and first consider whether Mr. Fooks's conduct falls within the scope of the Second Amendment. It does.[3]

---

[3] The Majority assumes without deciding that the first part of the *Bruen-Rahimi* test – whether the Second Amendment covers Mr. Fooks's conduct – is satisfied here. *See* Maj. Op. at 30-31 n.13. However, the Majority elsewhere seems to suggest that felons are not

The *Bruen* Court considered three questions in determining whether the first part of the test was met with respect to the conduct of the individual petitioners: (1) whether the petitioners were part of "the people" whom the Second Amendment protects; (2) whether the handguns the petitioners sought to possess are weapons "in common use" today for self-defense; and (3) whether the plain text of the Second Amendment protects the petitioners' proposed course of conduct, *i.e.*, carrying handguns publicly for self-defense. 597 U.S. at 31-32.

Here, I would hold that: (1) Mr. Fooks, as a member of the national community, falls within "the people" protected by the Second Amendment; (2) the firearms he possessed are "Arms" protected by the Second Amendment;[4] and (3) Mr. Fooks's conduct of possessing firearms falls within the right to "keep and bear" arms, and therefore is protected under the plain text of the Second Amendment.

---

part of "the people" who have Second Amendment rights because they are not "law-abiding individuals," Maj. Op. at 3, or because they "did not historically enjoy the right to keep and bear arms." Maj. Op. at 45; *see also* Maj. Op. at 45 n.29 (quoting, among other sources, a pre-*Heller* law review article for the proposition that "[f]elons simply did not fall within the benefits of the common law right to possess arms") & 47 (quoting a pre-*Bruen* D.C. Circuit case for the proposition that "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms"). In any event, because I disagree with the Majority's conclusion that PS § 5-133(b)(2), as applied to Mr. Fooks, is consistent with the Nation's historical tradition of firearm regulation, I must consider whether the plain text of the Second Amendment covers Mr. Fooks's conduct.

[4] As the State does not dispute that the firearms Mr. Fooks was convicted of possessing constitute "Arms" for Second Amendment purposes, I will not address that point further.

**A. Mr. Fooks Is Part of "the People," Despite His Felony-Equivalent Conviction.**

The State argues that felons are not included within "the people," as that phrase is used in the Second Amendment. For several reasons, I conclude that Mr. Fooks is part of "the people," despite his prior felony-equivalent conviction.

First, the State's interpretation of "the people" is inconsistent with *Heller*'s analysis. The *Heller* Court stated that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). In *United States v. Verdugo-Urquidez*, the Supreme Court observed that "the people" "seems to have been a term of art employed in select parts of the Constitution," and "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265. Mr. Fooks's felony-equivalent conviction did not strip him of his United States citizenship or otherwise sever his connection with this country.

Second, a felons-are-not-part-of-"the people" approach means that a citizen is automatically deprived of Second Amendment liberties at the moment their status changes from non-felon to felon. In her dissent in a pre-*Bruen* case, Judge (now Justice) Barrett explained that this would be "analytically awkward[.]" *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). Although "[a]rms and activities would always be in or out[,] … a person could be in one day and out the next: the moment he was convicted of a violent crime …, his rights would be stripped as a self-executing consequence of his

new status. No state action would be required." *Id.* at 452. Judge Barrett considered a self-executing Second Amendment disqualification troubling because "[i]n other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id.* at 452-53. Comparing Second Amendment rights to felon voting rights, Judge Barrett observed that

> a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected. So too with the right to keep and bear arms: a state can disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes *eligible* to lose it.

*Id.* at 453 (footnote omitted).

Third, the State's approach would lead to different treatment of "the people" under the Second Amendment compared with the beneficiaries of other individual constitutional rights. The scope of those other rights depends upon the circumstances (*e.g.*, with respect to the First Amendment, the type of speech used and the place where the speech is made). No class of persons physically located within the United States is constitutionally lacking in all protection under the First Amendment, as well as several other constitutional provisions. *See, e.g., Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam) (observing that the Fifth Amendment entitles noncitizens to due process in the context of removal proceedings) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (holding that any person, including an undocumented immigrant within U.S. territorial jurisdiction, is entitled to Fifth and Sixth

- 14 -

Amendment protections); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (holding that noncitizens within U.S. territorial jurisdiction are entitled to due process of law under the Fourteenth Amendment); *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding that a noncitizen with a valid work permit had Fourth Amendment rights); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (explaining that resident noncitizens have First Amendment rights).

Thus, to hold as the State suggests would be contrary to ordinary principles of statutory and constitutional construction. "A word or phrase is presumed to bear the same meaning throughout a text." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012); *see also Range*, 124 F.4th at 226 (declining to adopt a reading of "the people" in the Second Amendment that would be inconsistent with how "the people" is interpreted with respect to the First and Fourth Amendments).

Finally, the State's approach would create troubling implications for standing. A felon lacking constitutional protections under the Second Amendment presumably would not be able to point to a constitutional injury if they were deprived of the right to possess a firearm, as the felon had no entitlement to the gun in the first place. In this regard, then-Judge Barrett provided a helpful hypothetical in her *Kanter* dissent:

> [I]magine that a legislature disqualifies those convicted of crimes of domestic violence from possessing a gun for a period of ten years following release from prison…. After fifteen years pass, a domestic violence misdemeanant challenges a handgun ban identical to the one that the Court held unconstitutional in *Heller*. Despite the legislative judgment that such a person could safely possess a gun after ten years, a court would still have to determine whether the person had standing to assert a Second Amendment claim. If the justification for the initial deprivation is that the person falls outside the protection of the Second Amendment, it doesn't matter if the

statutory disqualification expires. If domestic violence misdemeanants are out, they're out.

919 F.3d at 452 (Barrett, J., dissenting).

In sum, felons and felon-equivalents are part of the "national community" for the purpose of Second Amendment coverage. It follows that Mr. Fooks's prior felony-equivalent conviction is not a bar to finding that, at the time he possessed the firearms that led to his prosecution under PS § 5-133(b)(2), he was an "ordinary, law-abiding" member of the national community. *See Bruen*, 597 U.S. at 9 ("[O]rdinary, law-abiding citizens have a … right to carry handguns publicly for their self-defense."); *see also United States v. Duarte*, 137 F.4th 743, 755 (9th Cir. 2025) (holding that defendant's "status as a felon does not remove him from the ambit of the Second Amendment; he is one of 'the people' who enjoys Second Amendment rights").

The Supreme Court's reference to a "law-abiding" citizen for the purpose of identifying the nature of the Second Amendment right is properly understood to mean that the individual asserting the right must, as Justice Watts aptly puts it in her concurring opinion, "be 'law-abiding' in the moment of possession." Concurring Op. of Watts, J., at 15. The Second Amendment does not protect a person's knowing possession of a stolen firearm, nor does it apply to a person who possesses a firearm for an unlawful purpose. In other words, the focus with respect to law-abidingness is on the individual's conduct in possessing a firearm, not on their status at the time of such possession.[5] *But see United*

---

[5] In dicta, the *Bruen* Court stated that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under

- 16 -

*States v. Hunt*, 123 F.4th 697, 705-06 (4th Cir. 2024) (interpreting *Heller* to "instruct[] that the '*pre-existing* right' 'codified' in the Second Amendment protects firearms possession by the law-abiding, not by felons") (quoting *Heller*, 554 U.S. at 592).

Here, there was no judicial finding, nor did Mr. Fooks admit, that he stole the firearms in question. The State did not require Mr. Fooks to plead guilty to the theft charge, or to admit to facts that would substantiate a theft allegation, in order to secure the State's agreement to a conditional guilty plea. Thus, I cannot conclude on the record as it exists before us that Mr. Fooks was not law-abiding in the moment he possessed the firearms.[6]

---

which a general desire for self-defense is sufficient to obtain a permit." 597 U.S. at 38 n.9 (cleaned up). The Court explained that "[b]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* (quoting *Heller*, 554 U.S. at 635). Instead, these "regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* To the extent this *Bruen* dicta can be read to suggest that a "law-abiding" citizen is not someone whose background check would reveal a prior felony conviction, that suggestion is inconsistent with *Heller*'s broad definition of "the people" as including all in the national community.

[6] Justice Watts concludes from the circumstances of Mr. Fooks's guilty plea that Mr. Fooks stole the firearms in question. *See* Concurring Op. of Watts, J., at 15-18. Given the fundamental nature of the Second Amendment right, where the State contends that a citizen's possession of a firearm is not protected under the Second Amendment because the citizen was not law-abiding in the moment of possession, and the citizen disputes that contention, the State must prove the disputed point. Here, that would have entailed that the State prove Mr. Fooks possessed the firearms for an unlawful purpose or, as Justice Watts concludes, that he "stole or possessed [the firearms] as stolen property[.]" Concurring Op. of Watts, J., at 15. The State did not attempt to prove that Mr. Fooks stole the firearms he pled guilty to possessing. Nor does Mr. Fooks's agreement to pay restitution to Marilyn Murray-Artis or the trial court's order that Mr. Fooks pay restitution to Ms. Murray-Artis prove that Mr. Fooks stole the firearms. *Cf. Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993) ("The Sixth Amendment requires more than appellate speculation about a hypothetical

In sum, Mr. Fooks is part of the national community and therefore is part of "the people" afforded Second Amendment protections.

## B. To Keep and Bear

The conduct to which Mr. Fooks pled guilty was "possess[ing] a regulated firearm" after having been convicted of a disqualifying criminal offense. PS § 5-133(b)(2). The stipulated facts at the guilty plea hearing revealed that Mr. Fooks "was in possession of" two handguns on separate dates. As discussed above, there was no finding or admission that Mr. Fooks stole the handguns or that he possessed them for an unlawful purpose.

Possession of a firearm for lawful purposes is conduct that is protected by the Second Amendment. *See, e.g.*, *McDonald*, 561 U.S. at 780 (explaining that the "central holding in *Heller*" is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"); *Range*, 124 F.4th at 228 (possessing a rifle to hunt and a shotgun to defend oneself at home "tracks the constitutional right as defined by *Heller*").

-----

Because the plain text of the Second Amendment covers Mr. Fooks's conduct, I will analyze below whether application of PS § 5-133(b)(2) to Mr. Fooks is consistent with the Nation's historical tradition of firearm regulation. But first I will address the Majority's reliance on the "presumptively lawful" dicta in *Heller*.

---

jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.").

## IV

In *Heller*, after conducting an exhaustive analysis leading to the holding that the Second Amendment guarantees the individual right to keep and bear arms, the Court observed that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The Court went on to say that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and several other types of firearm regulations. *Id.* at 626-27. In a footnote, the Court added: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. The Court reiterated part of the *Heller* dicta in *McDonald*. 561 U.S. at 786.

As the Majority explains, in *Bruen*, a majority of the Justices in concurring or dissenting opinions explicitly or implicitly expressed their agreement with the idea that felon disqualification statutes are "presumptively lawful." *See* Maj. Op. at 36-38. And, in *Rahimi*, the Court cited *Heller*'s "presumptively lawful" language favorably. *Rahimi*, 602 U.S. at 699 (noting that *Heller* did not "establish[] a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home[,]" but rather "stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'") (quoting *Heller*, 554 U.S. at 626, 627 n.26).

The dicta concerning the presumptive lawfulness of "longstanding" firearms regulations has been the subject of controversy and debate since its debut in *Heller*. *See* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS U. L.J. 193, 214-28 (2017) (discussing various circuits' difficulties

- 19 -

in conceptualizing the phrase); *see also United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) ("The full significance of these pronouncements is far from self-evident."); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("We do not think it profitable to parse these passages of *Heller* as if they contained an answer to the question whether [18 U.S.C.] § 922(g)(9) is valid…. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition.").

The Majority recognizes the possibility that the various references to certain statutes (including felon disqualification statutes) as "presumptively lawful" represented an attempt by the Court and various Justices to allay concerns that the Court's "rulings in *Heller*, *McDonald*, and *Bruen* spelled the end of all firearms regulations." Maj. Op. at 36; *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 360 n.6 (3d Cir. 2016) (Hardiman, J., concurring) (agreeing with the view that "the *Heller* Court included this 'presumptively lawful' language to provide some assurance that its decision did not provide a basis for future litigants to upend any and all restrictions on the right to bear arms") (cleaned up). However, the Majority rejects that approach, and instead interprets the "presumptively lawful" language in *Heller* to mean that the Supreme Court has identified felon disqualification statutes and the other referenced regulatory measures as being "generally consistent with the right to keep and bear arms codified in the Second Amendment." Maj. Op. at 38. According to the Majority, the word "presumptively" in the phrase "presumptively lawful," as used in *Heller*, is "simply an acknowledgment that regulations that deviate from the generally accepted contours of the categories such that they do not operate in the same way

remain subject to an 'as-applied challenge' on that basis." Maj. Op. at 38 (citing *Bruen*, 579 U.S. at 80 (Kavanaugh, J., concurring)).

The Majority's reliance on Justice Kavanaugh's concurring opinion in *Bruen* as support for its interpretation of "presumptively" is misplaced. In discussing as-applied challenges to firearms regulations, Justice Kavanaugh was not referring to felon disqualification statutes or other regulations that categorically prohibit certain persons or groups of persons from possessing firearms. Rather, Justice Kavanaugh was referring in the cited passage to licensing statutes such as the one at issue in *Bruen*. *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (contrasting New York's may-issue licensing statute that provided "open-ended discretion to licensing officials" and that required a "showing of some special need apart from self-defense," with "objective shall-issue licensing regimes," and explaining that, although shall-issue provisions are constitutionally permissible, such a licensing regime is "subject of course to an as-applied challenge if [it] does not operate … in practice" as a shall-issue regime). It is easy to imagine a licensing regime operating on paper as a "shall-issue" system, but an inordinate delay in processing a required background check resulting in an impermissible burden on an applicant's Second Amendment right that could be the subject of an as-applied challenge. Indeed, the *Bruen* Majority made this very point. *See id.* at 38 n.9 ("[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."). However, I find it difficult to imagine how, based on the Majority's analysis and holding in this case, a felon

(or felon-equivalent[7]) disqualification statute would ever be the subject of a successful Second Amendment as-applied challenge. On the Majority's reasoning, once a legislature provides a maximum penalty of at least one year of imprisonment for a particular crime, the legislature may make a conviction for that offense the predicate for permanent firearms disqualification.[8]

---

[7] I agree with the Majority that, for the purpose of deciding this case, it is immaterial that Mr. Fooks's purportedly disqualifying conviction is for an offense that is not classified under Maryland law as a felony. *See* Maj. Op. at 32-35.

[8] It is not clear what the Majority means by "the generally accepted contours" of regulations that disqualify categories of people such as felons. Maj. Op. at 38. Regardless, under the Majority's analysis, there is no need for a legislature to stray from the "generally accepted contours" of felon (and/or felon-equivalent) disqualification statutes – whatever those contours may be – in order to permanently disarm someone who has been convicted of any criminal offense the legislature wishes to make the basis for disqualification, no matter how minor. That is because the Majority concludes there is a historical tradition that allows a legislature "to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence." Maj. Op. at 47 (quoting *Jackson v. United States*, 110 F.4th 1120, 1127 (8th Cir. 2024)). The Majority's suggestion that a decision by the General Assembly to make jaywalking and speeding predicates for permanent firearm disqualification would run afoul of the Second Amendment, *see* Maj. Op. at 38-39 n.20, is inconsistent with its own historical analysis. *See* Maj. Op. at 51 n.35 (in discussing "the dividing line between when an offense is and is not serious enough to warrant disqualification," stating that "[t]he answer … is the distinguishing criterion drawn in those 'longstanding prohibitions on the possession of firearms … by felons' repeatedly referenced by the Supreme Court, … which is whether the offenses have been deemed serious enough to warrant punishment by a lengthy period of incarceration") (citations omitted). If the General Assembly were to determine that jaywalkers and speeders pose a danger of misuse of firearms, under the Majority's reasoning, the General Assembly could add jaywalking and speeding to the list of offenses that serve as predicates for permanent firearm disqualification. One way to accomplish this would be to make the maximum penalty for those offenses more than one year of imprisonment and then add those offenses to the definition of "disqualifying crimes" in PS § 5-101(g). *See* PS § 5-133(b)(1) (providing that "a person may not possess a regulated firearm if the person … has been convicted of a disqualifying crime"). *See also* pages 62-63 below. The fact that an offense

The Majority's interpretation of "presumptively lawful" improperly turns a presumption into a safe harbor. The use of "presumptively" to qualify the lawfulness of felon disqualification statutes means that the *Heller* Court envisioned that some disqualification statutes actually would be invalidated under the Second Amendment, as applied to particular felons. *See Binderup*, 836 F.3d at 360 n.6 (Hardiman, J., concurring) (rejecting the view "that *Heller*'s incomplete list of 'presumptively lawful' firearm regulations *under any and all circumstances* do not offend the Second Amendment" and expressing doubt that the Court "couched its first definitive characterization of the nature of the Second Amendment right so as to completely immunize [the federal felon disqualification statute] from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is '*presumptively* lawful.'") (emphasis added by Judge Hardiman; internal quotation marks and citations omitted).

---

previously has not "been deemed serious enough to warrant punishment by a lengthy period of incarceration" does not mean a legislature lacks authority to increase the maximum penalty for that offense.

In addition, it is not clear on what basis the Majority believes a court would have the authority to rule that a legislatively determined maximum penalty of two years for jaywalking and speeding would not "constitute an appropriate measure of the perceived seriousness of the offenses[,]" Maj. Op. at 38-39 n.20, and therefore hold that jaywalking and speeding do not pass muster as predicate offenses for permanent firearm disqualification. It is the legislature's job, not this Court's, to determine what the maximum penalty for a criminal offense should be, based on the legislature's perception of its seriousness. It is equally unclear how a court should determine whether any particular nonviolent crime is appropriately perceived by the legislature to be serious enough to be a predicate offense for firearm disqualification. The Majority's *ipse dixit* pronouncement concerning jaywalking and speeding is of no assistance.

Moreover, "judicial opinions are not statutes, and we don't dissect them word-by-word as if they were." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *see also Skoien*, 614 F.3d at 640 ("Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration."). The Majority fails to heed this admonition. For instance, the Majority counts the number of times the *Heller* Court referenced its list of "presumptively lawful" regulations in its opinion (five times), and states that each time the Court described them "as limitations on or exceptions to the Second Amendment right, rather than as open issues left for future consideration." Maj. Op. at 9. But repetition cannot transform those measures from "presumptively" lawful to definitely lawful in every application.

Similarly, the Majority seizes on *Heller*'s discussion of weapons that were "in common use," noting that the Court described the "in common use" restriction as "*another* important limitation on" the Second Amendment, after having discussed the "presumptively lawful" regulatory measures of which felon disqualification statutes are one example. Maj. Op. at 9 (quoting *Heller*, 554 U.S. at 627) (emphasis added by the Majority). The Majority further emphasizes that the *Heller* Court described these measures as "permissible," and draws significance from the Court's choice not to qualify them as "possibly" permissible. Maj. Op. at 9.

Respectfully, by putting so much stock in the presence or absence of words like "another" and "possibly," the Majority undervalues the Second Amendment right. It is not the number of times a word is used in *Heller*, but rather the Second Amendment's plain text and the Nation's historical tradition of firearm regulation, that governs.

The Majority's approach is particularly problematic, given that the "presumptively lawful" language is dicta. Neither *Heller*, *McDonald*, *Bruen*, nor *Rahimi* involved a Second Amendment challenge to a felon disqualification statute. *See Gonzalez v. United States*, 553 U.S. 242, 256 (2008) (Scalia, J., concurring) (noting that "a formula repeated in dictum but never the basis for judgment is not owed *stare decisis* weight"); *see also Heller*, 554 U.S. at 625 n.25 ("It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon … a footnoted dictum in a case where the point was not at issue and was not argued.").

Further, the more time that goes by since *Heller*, the more likely that the unspecified "historical justifications" for the "presumptively lawful" regulations to which the *Heller* Court alluded, 554 U.S. at 635, will be viewed by some members of the Supreme Court in a different light. Only three Justices who were part of the *Heller* Majority (Chief Justice Roberts, Justice Thomas, and Justice Alito) remain on the Court. And, as scholars continue to delve into the history surrounding the adoption of the Second Amendment and publish their findings and theories, it seems likely that attorneys and judges will have the benefit of additional historical information that was not considered by the *Heller* Court. *See, e.g.*, Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y. Univ. L. Rev. 1518, 1535 (2003) (explaining that "historical arguments are rarely categorical" and that "[h]istorical explanations accentuate rather than smooth over complexity, working their way toward ever more subtle, often ambiguous, interpretations of the available evidence").

For all these reasons, it is far from a foregone conclusion that a majority of today's Supreme Court would conclude that all felony (and felony-equivalent) disqualification statutes, in all of their applications, are consistent with the Nation's historical tradition of firearm regulation. In my view, the Majority overreads *Heller*'s "presumptively lawful" dicta in the same way that courts misunderstood *Heller*'s passing comment concerning tiers of scrutiny, leading them (erroneously, it turned out) to apply means-end scrutiny when analyzing Second Amendment challenges. With these caveats in mind, I turn now to the second prong of the *Bruen-Rahimi* test.

**V**

**A. Historical Tradition**

In trying to appreciate the founders' understanding of the Second Amendment (including its limitations) and in trying to comprehend what members of the public at that time understood about the meaning of the Second Amendment, we look to history. Below I summarize the English common law foundations of firearm regulations in America. I next address the early American colonies' treatment of firearms and firearm regulations, the importance of arms and disarmament during the Revolutionary War, and the context surrounding the drafting of the Second Amendment. I also discuss the treatment of criminals during the founding era.

1.  <u>English Foundations</u>

"As Justice Harlan wrote, the 'liberty of the individual' in America was secured with 'regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke.'" Joseph G.S. Greenlee, *The Historical Justification for*

*Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 257-58 & n.42 (2020) ("Greenlee") (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). Thus, it is important to look back to this nation's English common law roots to isolate those traditions that the founders adopted and those traditions from which they broke away. *See United States v. Williams*, 113 F.4th 637, 650 (6th Cir. 2024) ("Because the Second Amendment codified a pre-existing right, we must begin our journey in pre-Founding England."); Priya Satia, *Who Had Guns in Eighteenth-Century Britain?, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 37 (Jennifer Tucker, Barton C. Hacker & Margaret Vining eds., Smithsonian Institution Scholarly Press 2019) ("This means that in Second Amendment cases, it is important to get the history of British gun regulation right.").

Many scholars of the Second Amendment's roots point first to England's 1328 Statute of Northampton, which codified a common law crime of riding or going about armed with dangerous weapons in the streets. JOSEPH BLOCHER & DARRELL A.H. MILLER, THE POSITIVE SECOND AMENDMENT 15 (Cambridge Univ. Press 2018) ("BLOCHER & MILLER") (explaining that the practice of "riding or going armed, with dangerous or unusual weapons" was traditionally treated under English common law as "a crime against the public peace, by terrifying the good people of the land" (quoting BLACKSTONE at 149)); *see also State v. Huntly*, 25 N.C. 418, 420-21 (1843) (Statute of Northampton "was made in affirmance of the common law"). The Tudor Monarchs "added to this ancient prohibition, concerned as they were with new lethal (and concealable) technology." BLOCHER & MILLER at 15.

Amid social and political strife in England and ongoing tensions between Catholics and Protestants, disarmament became a tool for suppressing rebellion. Throughout England, Catholics "were excluded from the right to arms because they were considered potentially disloyal and seditious, especially in light of the frequent efforts of the Pope and of the Catholic monarchs in France and Spain to overthrow the English Anglican kings." NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 139 (3d ed. 2022) ("JOHNSON"). For instance, in 1610, after numerous failed assassination attempts by Catholic sympathizers, King James I "ordered the seizure of any 'Armour, Gunpowder, and Munition' from 'Popish Recusants.'" Greenlee at 258 (quoting 1 STUART ROYAL PROCLAMATIONS: ROYAL PROCLAMATIONS OF KING JAMES I 1603-1625, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)). The regulations became more restrictive under Charles II, particularly in terms of the breadth of individuals who were disarmed. "It was not only Catholics that concerned the king. In 1660, the lords lieutenant were issued instructions for all 'disaffected persons [to be] watched and not allowed to assemble, and their arms seized.'" *Id.* at 259 (quoting 1 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF CHARLES II, 1660-1661, at 150 (1860)). Charles II viewed the poor as "disaffected," and they too were the subject of disarmament laws. Perhaps the most notorious such provision was the 1670 Game Act, which "deprived the great majority of the community of all legal right to have firearms." BLOCHER & MILLER at 17 (quoting

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 65 (1994) ("MALCOLM") (internal quotation marks omitted)).[9]

After the last Catholic English Monarch, James II, came to power in 1685, Protestants became the targets of disarmament efforts. Most famously, Sir James Knight was prosecuted in 1686 under the Statute of Northampton for having ridden through the streets of Bristol, armed with a sword and a gun, before entering an Anglican church. *Id.* at 14-15.

The disarmament of law-abiding citizens was "[h]igh on [the] agenda of outrages suffered" under James II. Joyce Lee Malcolm, *The Role of the Militia in the Development of the Englishman's Right to be Armed — Clarifying the Legacy*, 5 J. FIREARMS & PUB. POL'Y 139, 144 (1993). When Protestants William III and Mary II replaced James II and ascended the throne after the Glorious Revolution of 1689, they promised to respect the rights of Englishmen and created the English Bill of Rights. BLOCHER & MILLER at 18-19. This was an important precursor of the American Bill of Rights. *See Heller*, 554 U.S. at 593 (observing that the English Bill of Rights "has long been understood to be the predecessor to our Second Amendment"). The English Bill of Rights stated: "Subjects which are Protestants may have Arms for the Defence suitable to their Conditions and as

---

[9] Another law in this vein was the Black Act, passed 50 years later "nominally to prosecute poachers," but which was "actually designed to restrict the lower classes' ability to bear arms." BLOCHER & MILLER at 17 (citing E. P. THOMPSON, WHIGS AND HUNTERS: THE ORIGIN OF THE BLACK ACT (1975) and MALCOLM at 64-71 (describing the Black Act as "draconian" and "repressive")).

allowed by law." BLOCHER & MILLER at 19 (quoting 1 W & M, c. 2 § 7, *in* 3 ENG. STAT. AT LARGE 441 (1689)).

With Protestant monarchs in control, Catholics were again disarmed. In the first year of William and Mary's reign, a statute was enacted forbidding those who refused to declare themselves non-Catholic to "have or keepe in his House or elsewhere ... any Arms Weapons Gunpowder or Ammunition"; however, an exception allowed a Catholic to possess arms "for the defence of his House or person" with permission from the justice of the peace. *See* Greenlee at 260 (quoting 1 William & Mary ch. 15 (1688)); JOHNSON at 140.

William III called in 1699 for the disarming of "great numbers of papists and other disaffected persons, who disown his Majesty's government." Greenlee at 260 (quoting 5 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF WILLIAM III, 1699-1700, at 79-80 (1937)). In 1701, William "'charge[d] all lieutenants and deputy-lieutenants, within the several counties of [England] and Wales, that they cause search to be made for arms in the possession of any persons whom they judge dangerous.'" *Id.* (quoting 6 CALENDAR OF STATE PAPERS: DOMESTIC SERIES, OF THE REIGN OF WILLIAM III, 1700-1702, at 234 (1937)).

In 1715, "frequent rebellions and insurrections ... by the popish inhabitants" gave Great Britain "reason to apprehend, that the main body of papists ... may hereafter again endeavor to disturb the publick peace and tranquility." *Id.* (quoting 2 George I, ch. 9 (1715)). Thus, when adherents of James II revolted in 1715, "Parliament responded by forbidding many of those involved 'to have in his or their Custody, use or bear Broad

Sword, or Target, Poynard, Whingar, or Durk, Side-pistol, or Side-pistols, or Gun, or any other warlike Weapons' in various places beyond the home.'" *Id.* at 261 (quoting 1 George I, stat. 2, ch. 54 (1715)). Similar or supplemental acts were passed in 1724, 1746, and 1748. *Id.* (citing 11 George I, ch. 26 (1724), 19 George II, ch. 39 (1746), and 21 George II, ch. 34 (1748)). The 1746 Disarmament Act stated that the goal was to "prevent[] Rebellion and traiterous Attempts in Time to come, and the other Mischiefs arising from the Profession or Use of Arms, by lawless, wicked, and disaffected Persons." *Id.* (quoting 19 George II, ch. 39 (1746)).

This summary of the English practices regarding firearm regulations demonstrates that English rulers had no hesitation to disarm those they considered dangerous. "While the 'dangerous' group changed depending on who was in charge of government, the purpose of disarmament laws was usually to preclude armed insurrections." *Id.* at 259. Although there were instances of the poor being disarmed in the course of English history, particularly through game laws, those measures were controversial and over time became largely unenforced outside of the hunting context. *See* JOHNSON at 140-42.

2. Firearms in the American Colonies

Meanwhile, across the Atlantic, guns quickly became an essential part of early colonial life. *See* LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA 34-65 (Greenwood Press 1975) ("KENNETT & ANDERSON"); JOHNSON at 173-76 (describing arms rights in colonial charters). "Arms were essential to secure food, and of equal importance in providing security." KENNETT & ANDERSON at 43. There was an "omnipresent fear, real and imagined, of the American

Indian [that] compelled the colonists to maintain a constant guard over their homes and businesses. The carrying of a firearm became commonplace." *Id.*

In the first company in Virginia, approximately half of the 105 colonists were "gentlemen" with the right to possess firearms, but that concept was quickly discarded because there were not enough men to perform all the necessary tasks to establish the new colony. Within four years of arrival, Virginia's government armed every man. *Id.* at 45. Thus, a "settler became both a worker and a soldier." *Id*. In Massachusetts, this "new concept of civic responsibility," *id.*, also took hold. In 1631, the Massachusetts Court of Assistants ordered that every town enroll all men (except ministers and magistrates) in the militia; the men were to supply their own arms. *Id.* at 45-46. One year later, "all men were required to possess a firearm and those who did not were to be hired out as servants." *Id.* at 46. As additional colonies were founded, they similarly mandated arms possession. *See* JOHNSON at 173-87. For example, a Connecticut law of 1650 ordered "[t]hat all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms …; and every male person within this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fit for service[.]" *Id.* at 181 (quoting Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut 72-73 (Silus Andrus ed., 1822)). Eight colonies "required arms carrying in routine circumstances, such as farming, church, public assemblies, or journeys." *Id.* at 189.

As was the case in early Massachusetts, militiamen in eighteenth century colonial America were required to supply their own arms. *Id.* at 177. For example, New Hampshire's militia act of 1718, which required males between ages 16 and 60 to be part

of the militia, mandated that each enlistee possess "a well fixed musket" with a barrel at least three feet long. *See id.* at 181. The arms mandate applied not just to men, but also to every "Householder," such as an unmarried woman who lived alone. *Id.* The New Hampshire statute "reflected a common American practice. Whenever a small town was attacked, everybody who was able would fight as needed, including women, children, and the elderly." *Id.* at 181-82 (citing STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28-29 (2011)).

Notably, several colonies required that firearms be provided to indentured servants who completed their service as part of their "freedom dues." *Id.* at 192. For example, a 1699 Maryland statute required that discharged male servants receive "[o]ne Gun of Twenty Shillings Price, not above Four Foot by the barrel, nor less than Three and a Half[.]" *Id.* (citing 22 Archives of Maryland 548 (William Hand Browne ed., 1902)). Virginia's freedom dues statute described the custom as "good and laudable" and provided that freed male servants must be paid "ten bushels of indian corn, thirty shillings in money, … and one well fixed musket or fuzee, of the value of twenty shillings, at least[.]" WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 451 (R. & W. & G. Bartow 1823). Some of the individuals who immigrated to America under these conditions were transported criminals. JOHNSON at 192. I am aware of no colonial freedom dues law that contained an exception to providing firearms to former criminals upon the completion of their terms of service.

The American colonies "never experienced the pervasive attempts to disarm almost all the free population that took place in England during the seventeenth century under the Stuart kings." *Id.* at 197. That may have been due to the exigencies of colonial life, as well as to the fear that Native Americans might attack colonial towns and settlements. Nevertheless, the colonies imposed some restrictions on the possession and use of firearms. Some colonies adopted the content of the Statute of Northampton and, as discussed above, enacted "going armed" laws. *See* BLOCHER & MILLER at 20 (citing laws in Massachusetts, Virginia, North Carolina); *State v. Dawson*, 159 S.E.2d 1, 6-7 (N.C. 1968) (describing common law offense of "going armed with unusual and dangerous weapons to the terror of the people" and citing the Statute of Northampton and *Rex v. Knight*). Also as discussed above, surety laws provided governments with the ability to regulate conduct by individuals who were considered potentially dangerous. Other gun regulations during the colonial era included laws concerning the storage of firearms and ammunition, as well as safe storage of gunpowder. *See* BLOCHER & MILLER at 20 (citing Massachusetts law that "forbade the residents of Boston to 'take into' or 'receive into' 'any Dwelling-House, Stable, Barn, Out-house, Store, Ware-house, Shop or other Building' loaded firearms, and permitted the seizure of any loaded firearms that 'shall be found' there"); *Heller*, 554 U.S. at 631 (citing the Massachusetts law).

On occasion, religious or political dissidents, or persons suspected of disloyalty, were disarmed in the colonies, as was occurring in England. BLOCHER & MILLER at 20. For instance, in 1756, Pennsylvania confiscated "papist" arms in order to distribute them to the militia. 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 627

(Ray ed., 1898). Virginia also disarmed those who refused to take a loyalty oath. JOHNSON at 198. As the Majority explains, the colonies frequently prohibited African Americans and Native Americans from possessing firearms, *see* Maj. Op. at 42-44 & n.27, or at least placed severe restrictions on their ability to carry firearms. *See* JOHNSON at 194-95; SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 28-29 (Oxford U. Press 2006) ("CORNELL").

3. The Revolutionary War

"By the mid-1770s, tensions between the colonies and the Crown had boiled over to the point that royal officers sought to disarm the colonists." BLOCHER & MILLER at 21. The Battle of Lexington and Concord occurred after a group of nearly 700 British soldiers set out to seize munitions at Concord. News of this plan leaked and "Paul Revere … beg[a]n his famous ride." *Id.* When the British arrived in Lexington the following morning, they were greeted by armed colonists and "the first shots of the Revolution were fired." *Id.*; *see also* David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 285 (2012) (describing British disarmament efforts that contributed to the American Revolution: "the 1774 import ban on firearms and gun powder; the 1774-1775 confiscation of firearms and gun powder from individuals and from local governments; and the use of violence to effectuate the confiscations. It was these events which changed a situation of rising political tension into a shooting war.").

It would be too much to say that the Revolution was caused by British gun control regulations, but it can certainly be said that guns were very much a mechanism for political

might – so much so that they were the subject of the first armed dispute of the war. And, of course, access to firearms was a prerequisite to the continuation of the war for independence and to any hope that the American upstarts would be able to defeat the British. *See* KENNETT & ANDERSON at 65 (noting that the Americans' "ability with a rifle was an important asset"); DANIEL BOORSTIN, THE AMERICANS: THE COLONIAL EXPERIENCE 351 (1964) (quoting a Maryland Anglican minister who wrote in 1775 to a British correspondent that "[t]he great quantities of game, the many kinds, and the great privileges of killing making the Americans the best marksmen in the world …, one thousand of these riflemen would cut to pieces ten thousand of your best troops").

Thus, it is not surprising that, during the war, the Patriots sought to disarm those with British sympathies. "The concern was the same – that people opposed to those in power would join or support insurrections – but now the disaffected persons were those loyal to the British, because the Patriots were the ones creating the rules." Greenlee at 263-64; *see also* KENNETT & ANDERSON at 63 (observing that "the militia prevented any effective counter-revolution from developing").

Furthermore, while the fighting was ongoing, the colonists began to establish new governments. Using the English Bill of Rights as a guide, several colonies began to create Bills of Rights. For instance, George Mason, a prominent advocate for colonial independence, authored the Declaration of Rights of Virginia, which stated:

> That a well-regulated Militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State; that Standing Armies, in time of peace, should be avoided as dangerous to liberty; and that, in all cases, the military should be under the strict subordination to, and governed by, the civil power.

KENNETT & ANDERSON at 67-68 (quoting George Mason, *Final Draft of the Virginia Declaration of Rights 12 June 1776*, *in* THE PAPERS OF GEORGE MASON, Vol. I, at 288 (Robert A. Rutland ed., Univ. of N.C. Press, 1970)). Pennsylvania and Vermont expressly provided individuals with the right to bear arms "for the defence of themselves and the state." Pa. Decl. 1776, Art. XIII; Vt. Decl. 1777, Art. XV; *see generally* PETER J. GALIE ET AL., BILLS OF RIGHTS BEFORE THE BILL OF RIGHTS 67 n.78 (Palgrave Macmillan 2020). Additionally, the Massachusetts Constitution ensured a right "to keep and bear arms for the common defence." CORNELL at 23 (emphasis deleted).

Given this history, it stands to reason that firearms would be of central importance to the founders, who recognized the precariousness of the newly formed nation.

4. The Founding

Following the end of the war for independence, despite suggestions by Alexander Hamilton and George Washington to continue a small standing army for defensive purposes, "the Continental Army was allowed to collapse to less than 100 men[,]" and "the state militia again became the instrument on which local officials relied." KENNETT & ANDERSON at 69. In addition, the Articles of Confederation that governed the new American nation gave the Congress very little power to regulate domestic affairs and only limited authority to raise revenue. BLOCHER & MILLER at 23. One consequence of this governmental structure was that "debts to foreign nations and Revolutionary War soldiers remained outstanding nearly a decade after independence." *Id.* "Unpaid for their service,

yet subject to sometimes-oppressive taxation by their own states," some war veterans "found themselves caught in an economic whipsaw." *Id.*

This led, in early 1787, to what became known as Shays' Rebellion. Daniel Shays, a Massachusetts farmer who had fought for the Continental Army at Lexington, Concord, Bunker Hill, and Saratoga, led an armed uprising of thousands of men who marched toward the federal armory in Springfield, Massachusetts. *Id.* at 24. Constrained by the weakness of the Articles of Confederation, the federal government was essentially powerless to stop the marchers; however, Boston merchants hired a private militia, which managed to disperse Shays and his followers. *Id.* Notably, participants in Shays' Rebellion were required to "deliver up their arms" as part of their submission to authorities. However, the disarmament was not permanent. The law provided that after three years, if the rebels kept the peace and met certain conditions, they could receive a pardon and their firearms would be returned to them. *See* Massachusetts Acts & Laws, Jan. Sess. 1787, ch. VI, at 555, 556; Catie Carberry, *Miniseries, Part II – Disarmament of those Disaffected to the Cause of America*, DUKE CTR. FOR FIREARMS LAW (June 26, 2019) (discussing this law), available at https://perma.cc/V5BD-99YT.

Although Shays' Rebellion resulted in few casualties, it "helped solidify the sense that the Articles were inadequate, and that a stronger government was needed." BLOCHER & MILLER at 24. The Constitutional Convention met for the first time in May 1787 per the directive of the Continental Congress "to devise such further provisions as shall appear to them necessary to render the constitution of the Federal Government adequate to the

exigencies of the Union." *Id.* (quoting 1 JOHN VILE, THE CONSTITUTIONAL CONVENTION

OF 1787: A COMPREHENSIVE ENCYCLOPEDIA OF AMERICA'S FOUNDING 20 (2005)).

Importantly, "the very idea of the written Constitution was radical at the time, and

no provision more so than the one authorizing a standing federal army." *Id.* (citing 3

JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE

ADOPTION OF THE FEDERAL CONSTITUTION 401 (2d ed. 1836)) (including remarks from

Governor Edmund Randolph of Virginia who believed "[w]ith respect to a standing army

… there was not a member in the federal Convention, who did not feel indignation at such

an institution"). As one historian has explained:

> The men of the founding generation spent an inordinate amount of time
> debating the respective roles of citizens' militias and professional armies – a
> discussion which had been a major topic of political debate in the
> Anglophone world since the 1690s, when John Trenchard and Walter Moyle
> published *An Argument, Shewing that a Standing Army [is] Inconsistent with
> a Free Government*. Those ideas, though never dominant in England itself,
> found a welcoming audience in British North America. They were key to
> complaints about British soldiers' presence in the aftermath of the French
> and Indian War, then ramped up after the 1770 Boston Massacre and the
> fighting at Lexington and Concord, and were the source of Jefferson's
> complaint in the Declaration of Independence that England "has kept among
> us, in times of peace, standing armies, without the consent of our
> legislatures."

Noah Shusterman, *Why Heller is Such Bad History*, DUKE CTR. FOR FIREARMS LAW (Oct.

7, 2020), available at https://perma.cc/AT2L-UCSN.

The "existence of a federal standing army and the precarious place of the state

militia" were "central concerns for ratification opponents, the Anti-Federalists." BLOCHER

& MILLER at 25. George Mason, an Anti-Federalist, feared the "militia may be here

destroyed by that method which has been practised in other parts of the world before; that

is, by rendering them useless – by disarming them." THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS 286 (Neil H. Cogan ed., 2015) ("THE COMPLETE BILL OF RIGHTS").

Indeed, the "fear of standing armies – and therefore, the belief in the necessity of a citizens' militia – remained strong in the Revolution's aftermath. Everyone involved in the writing of the Constitution and the Bill of Rights considered a large standing army to be an inherent threat to liberty." Shusterman, *supra*; *see also* KENNETT & ANDERSON at 61 (noting that "[p]amphleteers and orators used historical examples to illustrate how despotic rulers had used standing, professional armies to subvert the liberties of the people").

The Second Amendment can be viewed as an attempt to assuage Anti-Federalists' fears over the Constitution's inclusion of a Militia Clause.[10] Upon the Constitution's ratification in 1788, several states submitted proposals for amendments aimed at addressing these fears. Virginia proposed, and North Carolina endorsed, the following amendment:

> That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural and safe defence of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that, in all cases, the military should be under strict subordination to, and be governed by, the civil power.

---

[10] Article I, Section 8, Clause 15, commonly referred to as the Militia Clause, gives Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions[.]" A straight line seemingly can be drawn from Shays' Rebellion to the Militia Clause. *See, e.g.*, Benjamin Daus, Note, *The Militia Clauses and the Original War Powers*, 11 J. OF NAT'L SEC. L. & POL'Y 489, 504 (2021) (observing that Shays' Rebellion, and the performance of the militia in quelling it, demonstrated that "[a]ny replacement to the Articles [of Confederation] would need to take the militia into account").

BLOCHER & MILLER at 26 (quoting Documents Illustrative of the Formation of the Union of the American States, H.R. Doc. No. 69-398, at 1036 (1927) (small caps omitted)). New York's proposal was practically identical. *Id.* at 26-27. Maryland's proposal was concerned, in part, that those who were "conscientiously scrupulous of bearing arms" might be "compelled personally to serve as a soldier" and suggested an amendment that protected conscientious objectors. *Id.* at 27 & n.78.

Two notable proposals concerning firearm ownership came from New Hampshire and Pennsylvania. New Hampshire proposed: "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion" along with language that mirrored the concern over a federal standing army. *See Heller*, 554 U.S. at 657 & n.22 (Stevens, J., dissenting). The Pennsylvania proposal stated:

> [T]he people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.

*Id.* at 658 (Stevens, J., dissenting) (quoting Proposition 7, "Right to Bear Arms," The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents (Dec. 18, 1787)).[11]

---

[11] This proposal was not adopted by the Pennsylvania convention but was later issued as a minority report. *See Kanter*, 919 F.3d at 454-56 (Barrett, J., dissenting) (discussing the Pennsylvania Minority Report).

James Madison, as primary draftsman of the Constitution and Second Amendment, "could draw upon all of this material." BLOCHER & MILLER at 28. Madison's first draft of what became the Second Amendment pulled from Virginia's, Maryland's, and New York's proposals. Notably, he did not draw from Pennsylvania's minority proposal that included more explicit limitations for "crimes committed." His first draft was as follows:

> The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person.

THE COMPLETE BILL OF RIGHTS at 263. The "religiously scrupulous" clause was abandoned after Senate debate; one theory is that the founders worried the language might be misconstrued to permit a government to "declare who are those religiously scrupulous, and prevent them from bearing arms." BLOCHER & MILLER at 28 (citing Representative Elbridge Gerry's concerns during House debates, located in 1 ANNALS OF CONGRESS 749-50 (Joseph Gales ed., 1834)).

In several respects, the Second Amendment reflects an intent to break away from the English common law traditions of monarchical rulers disarming political dissidents as a tool for despotic control. Indeed, there are notable differences between the Second Amendment and the English Bill of Rights. The Second Amendment the framers agreed upon expressed a stronger affirmative right. *Compare* U.S. CONST. amend. II ("[T]he right of the people to keep and bear Arms, *shall not be infringed*….") (emphasis added), *with* W & M, c. 2 § 7, in 3 ENG. STATE. AT LARGE 441 (1689) ("Subjects which are Protestants *may have* Arms for the Defence suitable to their Conditions *and as allowed by law*."

(emphasis added)). Additionally, contrary to the English Bill of Rights, the Second Amendment recognized a right that existed within "the people" and did not make any categorical exclusions based on an individual's status or religion. In short, the Second Amendment represented an expansion of the right to keep and bear arms, compared to the corresponding right under the English Bill of Rights. And it was adopted against a backdrop of concerns about governmental disarmament of ordinary Americans – previously by the British in the lead-up to the Revolutionary War, and going forward, by the new federal government through control over the militia and the prospect of a standing army.

However, Americans at the time of the founding and afterwards continued to embrace the British and colonial American practices of regulating the possession and use of firearms by those who demonstrated that they were dangerous, *see Rahimi*, 602 U.S. at 695-98 (discussing surety and going armed laws), and of disarming individuals who belonged to groups that were thought to pose a risk of insurrection or rebellion. In the post-founding era, the groups that were disarmed were racial minorities. *See, e.g.*, An Act Concerning Free Negroes and Mulattoes, Act of Feb. 4, 1806, LXXXIII, reprinted in A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA (Samuel Pleasants Jr., 1808); *see also* Maj. Op. at 44 n.27.

5. Treatment of Felons and Other Criminals

Under English common law, the concept of a felony crime changed over time. Although felonies historically had been associated with forfeiture of one's goods, by the time Blackstone wrote his Commentaries on the Laws of England in the 1760s, "[t]he idea of felony [was] … so generally connected with that of capital punishment that we find it

hard to separate them[.]" Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 464 (2009) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 97 (Philadelphia, J.B. Lippincott & Co. 1875)). There were nine traditional felonies under common law: murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny. *Id.* (citing FRANCIS WHARTON, TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 1 (Philadelphia, James Kay, Jun. & Brother 1846)). Many more were added in England by statute. *Id.*

In America, by the early part of the nineteenth century, the "ambiguity in the meaning of felony did not go unnoticed[.]" *Id.* at 465. As Nathan Dane, a Massachusetts lawyer and legislator, wrote in his 1823 treatise on American law: "[T]he word *felony*, in the process of many centuries, has derived so many meanings from so many parts of the common law, and so many statutes in England, and has got to be used in such a vast number of different senses, that it is impossible to know precisely in what sense we are to understand this word." *Id.* (quoting 6 NATHAN DANE, DIGEST OF AMERICAN LAW 715 (Boston, Cummings, Hilliard & Co. 1823) ("DANE")).

Although it is difficult to say with certainty what Americans at the time of the founding understood "felony" to mean, one thing is clear for our purposes: the punishments today for nonviolent felonies and felony-equivalent offenses pale in comparison to the punishment that commonly was imposed for at least some felonies in colonial America and into the nineteenth century, *i.e.*, the death penalty. *See* Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*, 49 U. OF

RICH. L. REV. 693, 695 (2015) ("For better or worse, the death penalty was a staple of criminal justice in early America; it was both widely accepted and largely uncontroversial.").[12] Thus, to determine whether modern statutes that permanently disqualify non-violent felons and felon-equivalents are relevantly similar to founding-era regulations, it is important to understand what regulations existed, if any, during the founding era with respect to disarmament of nonviolent criminals after they served their sentences.

There were no such regulations. Convicted criminals of the founding era and into the nineteenth century – if they were not executed – could repurchase arms (if they had even forfeited them at all[13]) after serving their sentences and reentering society. Thus, permanent firearms disqualification was not a standard consequence for even serious crimes. *See Range*, 124 F.4th at 231 (explaining that, in the founding era, even if a felon had forfeited a specific weapon used to commit an offense (such as poaching), the "felon could acquire arms after completing his sentence and reintegrating into society").

Moreover, founding-era militia laws did not exempt those who had been convicted of crimes from service in the militia. On May 8, 1792, Congress passed "An Act more effectually to provide for the National Defence by establishing an Uniform Militia

---

[12] As the *Range* Court explained, by the time of the founding, "many states were moving away from making felonies – including crimes akin to making false statements – punishable by death in America." *Range*, 124 F.4th at 227. But there is no doubt that, at the time of the founding and afterwards, criminals who were convicted of what were then considered to be "felonies" were often put to death.

[13] *See* DANE at 715 (in 1823, observing that "we have many felonies, not one punished with forfeiture of estate, and but a very few with death").

throughout the United States." Act of May 8, 1792, ch. 33, 1 Stat. 271 (the "Federal Militia Act"). That law provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this act." *Id.* § 1. Regarding those "excepted" from service, the Federal Militia Act provided:

> That the Vice President of the United States; the officers judicial and executive of the government of the United States; the members of both Houses of Congress, and their respective officers; all custom-house officers with their clerks; all post-officers, and stage drivers, who are employed in the care and conveyance of the mail of the post-office of the United States; all ferrymen employed at any ferry on the post road; all inspectors of exports; all pilots; all mariners actually employed in the sea service of any citizen or merchant within the United States; and all persons who now are or may hereafter be exempted by the laws of the respective states, shall be, and are hereby exempted from militia duty, notwithstanding their being above the age of eighteen, and under the age of forty-five years.

*Id.* § 2.

There was no exception in the Federal Militia Act for convicted criminals. Nor, as far as I can tell, did the states add exemptions to their militia laws for convicted criminals. For example, in Maryland, the 1793 militia law – in addition to incorporating the mandatory exemptions of the Federal Militia Act – exempted "quakers, menonists and tunkers, and persons conscientiously scrupulous of bearing arms," as well as ministers of the Gospel, from militia service. An Act to Regulate and Discipline the Militia of This State, ch. 53, §§ 2 & 11 (1798), *in* THOMAS HERTY, DIGEST OF THE ACTS OF MARYLAND

- 46 -

(1799) (the "Maryland Militia Act"). There was no exemption for men who had been convicted of any crimes, let alone nonviolent crimes.

The Federal Militia Act directed that every citizen enrolled in a state's militia was required, "within six months thereafter," to "provide himself with," among other things, "a good musket or firelock, … or with a good rifle," and with ammunition suited for his firearm. Federal Militia Act § 1. Maryland incorporated this arms requirement into its law and provided fines for commissioned officers, non-commissioned officers, and privates who appeared for service without being armed as directed by the federal law. *See* Maryland Militia Act § 15.[14]

As an example of how the militia laws applied to men with criminal records, consider the case of Baptis Irvine, the editor of the Baltimore *Whig*. In 1808, Irvine was tried for contempt of court for publishing an editorial that criticized the judges and juries of the Baltimore County Court of Oyer and Terminer.[15] Irvine was found guilty of

---

[14] Other states similarly did not exempt people previously convicted of crimes from serving in the militia or from the concomitant requirement to obtain firearms. *See, e.g.*,  An Act to Regulate the Militia, ch. 25, § 1 (1786), *in* SAMUEL AND JOHN LOUDON, LAWS OF THE STATE OF NEW-YORK, PASSED BY THE LEGISLATURE OF SAID STATE, AT THEIR NINTH SESSION; An Act for Establishing the Militia in this State, ch. 36, §§ 1 & 4 (1793), *in* PETER BRYNBERG AND SAMUEL ANDREWS, LAWS OF THE STATE OF DELAWARE; An Act for Forming and Regulating the Militia of the Provence of Pennsylvania (1757), *in* 5 JAMES T. MITCHELL AND HENRY FLANDERS, THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801.

[15] The information about Baptis Irvine comes from the Archives of Maryland (Biographical Series), available at https://perma.cc/YW4J-H7NC. One of Irvine's prosecutors wrote a contemporaneous account of his trial for contempt. A.C. HANSON, AN ACCURATE REPORT OF THE ARGUMENT, ON A MOTION OF ATTACHMENT, AGAINST BAPTIS IRVINE, EDITOR OF THE *WHIG*, FOR A CONTEMPT AGAINST THE COURT OF OYER AND

contempt, and sentenced to 30 days in prison and to pay court costs. Later in 1808, Irvine was convicted of printing libel against Edward J. Coale, the Baltimore City Register. For that offense, Irvine was fined $200 plus court costs, and received a 60-day jail sentence. (One hundred dollars of the fine was remitted by Governor Robert Wright.) Other criminal charges Irvine faced in 1808 included exhibiting the effigies of John Marshall, Chief Justice of the United States Supreme Court, and two others, with the purpose of burning them. These charges were dropped, but he was found guilty of assault.

These convictions – including Irvine's conviction for contempt of court – did not disqualify Irvine from possessing firearms. Indeed, Irvine subsequently served as a second lieutenant in the Maryland Militia during the War of 1812. As discussed, under the Maryland Militia Law, Irvine was required to obtain and possess a firearm.

-----

The above historical survey demonstrates that there has consistently been a push and pull in our Nation's history to strike a balance between the rights of individuals to own and possess firearms and the government's right to restrict conduct that is likely to upset the peace or cause harm. It also demonstrates that Americans at the founding, fresh off the heels of a deadly war to establish independence, possessed a healthy skepticism of disarmament laws as possible instruments of despotic rule. American governments at the time of the founding did not hesitate to disarm those who were considered threats to public

---

TERMINER FOR BALTIMORE COUNTY (P.K. Wagner 1808), available at https://msa.maryland.gov/megafile/msa/speccol/sc3500/sc3520/013900/013915/html/13915-0001.html.

safety. However, they did not permanently disarm individuals who committed nonviolent crimes. Indeed, there was no exemption from militia service for those who had criminal records. And members of militias – with no exception for felons or others who had served criminal sentences – were required to acquire and keep their own firearms.

### B. This Case

Mr. Fooks raises both a facial challenge and an as-applied challenge under the Second Amendment with respect to PS § 5-133(b)(2). I agree with the Majority that Mr. Fooks's facial challenge fails. However, contrary to the Majority, I would hold that Mr. Fooks's as-applied challenge has merit.

1. <u>PS § 5-133(b)(2) Is Facially Constitutional.</u>

A party who challenges the facial validity of a statute must establish that "no set of circumstances exist under which the Act would be valid." *Allmond v. Dep't of Health and Mental Hygiene*, 448 Md. 592, 615-16 (2016) (internal quotation marks and citations omitted). Because the plain text of the Second Amendment covers Mr. Fooks's conduct, "[t]he burden … shifts to the government to demonstrate that regulating [Mr. Fooks's] possession of a firearm is 'consistent with the Nation's historical tradition of firearm regulation.'" *United States v. Diaz*, 116 F.4th 458, 467 (5th Cir. 2024) (quoting *Bruen*, 597 U.S. at 24). There is at least one circumstance in which application of PS § 5-133(b)(2) would be consistent with the Nation's historical tradition of firearms regulation: where a person is disqualified based on a prior sentence for the common law offense of affray.

"Affray is the fighting together of two or more persons, either by mutual consent or otherwise, in some public place, to the terror of the people." *Nottingham v. State*, 227 Md.

App. 592, 602 (2016) (internal quotation marks and citation omitted). Thus, for a defendant to be convicted of affray, there must be a finding by the trier of fact or an admission by the defendant that the defendant has engaged in an act of violence, *i.e.*, fighting. As discussed above, our Nation's history shows a tradition of regulating the possession of firearms by those who have demonstrated that they are dangerous or who are perceived to pose a threat to public safety as members of a potential rebellion or insurrection. *See Williams*, 113 F.4th at 657 (historical analysis demonstrates that governments "may disarm individuals they believe are dangerous"); *Range*, 124 F.4th at 230 ("*Rahimi* did bless disarming (at least temporarily) physically dangerous people."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (historical evidence shows "that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety"). To the extent PS § 5-133(b)(2) disqualifies someone who has been convicted of affray, it is relevantly similar to founding-era laws that disqualified people based on demonstrated dangerousness. *See Williams*, 113 F.4th at 657-59 (holding that federal felon disqualification statute, 18 U.S.C. § 922(g)(1), is facially constitutional because in many instances it disqualifies felons who are dangerous). For this reason, Mr. Fooks's facial challenge to PS § 5-133(b)(2) fails.

2. <u>As Applied to Mr. Fooks, PS § 5-133(b)(2) Violates the Second Amendment.</u>

Mr. Fooks's as-applied challenge to PS § 5-133(b)(2) is a different story. The State has not met its burden to show that PS § 5-133(b)(2), when applied to disqualify a person based on their commission of a nonviolent common law crime, is relevantly similar to a founding-era firearms regulation.

The Majority points to repugnant founding-era laws that disqualified racial minorities from firearms possession as reflecting a historical principle that is consistent with disqualification of persons based on their convictions for nonviolent felony (and felony-equivalent) offenses. *See* Maj. Op. at 42-44.[16] The Majority observes that "categorical disarmament of individual members of [the disqualified] groups for reasons other than demonstrated dangerousness was viewed as consistent with the [Second Amendment] right." Maj. Op. at 42-43. True enough. But the Majority then leaps to the conclusion that legislatures traditionally possessed authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." Maj. Op. at 47-48 (quoting *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024)). Because someone who commits the offense of constructive criminal contempt demonstrates disrespect for legal norms of society, the Majority concludes that the disqualification of Mr. Fooks under PS § 5-133(b)(2) is consistent with the Nation's historical tradition of firearm regulation.

In my view, the Majority defines the applicable historical principle incorrectly. Although the founding-era laws to which the Majority cites disqualified individuals who had not *demonstrated* physical dangerousness (*i.e.*, people disqualified on the basis of their race), the concern that animated disqualification of these individuals was their *perceived* dangerousness, not their disrespect for legal norms of society. These individuals had not

_____

[16] As the Majority rightly notes, such laws would not stand today, as they would violate other constitutional provisions, including the Fourteenth Amendment. *See* Maj. Op. at 42.

shown any disrespect for legal norms of society. They had not committed any crimes or otherwise done anything that was contrary to any legal norms or rules. Yet they were disarmed. Why? Because founding-era lawmakers (and their colonial-era predecessors) were concerned that such individuals would band together with other members of their groups and collectively use arms to engage in acts of violence in the cause of rebellion or insurrection. *See Range*, 124 F.4th at 230 (noting that "colonial laws disarmed Loyalists for helping the British army or 'bearing arms against' the Continental Congress," which reasonably caused the colonies to fear "that Loyalists might take up arms again"); *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (explaining that disarmament of Catholics was done "'with the intent of preventing social upheavals' and 'rebellion'" but "[t]hose 'willing to swear undivided allegiance to the sovereign' were permitted to keep their arms" and that enslaved persons and Native Americans were disarmed out of fear that they would use guns to revolt or rebel) (quoting ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA 22-23 (2001)).

Tellingly, the Majority points to no founding-era law that disarmed a citizen who violated a legal norm of society but was not viewed as a threat to public safety. This exposes a gap in the Majority's analysis: it does not follow from the existence of founding-era laws disqualifying individuals who had not demonstrated dangerousness that their disqualification was due to their having violated societal legal norms. The Majority's error flows from its conflation of the two distinct historical traditions of firearms regulation discussed above: (1) regulating possession and use of firearms by individuals who have demonstrated that they are a threat to public safety by violating surety and going armed

laws; and (2) disarming groups of people who are perceived to pose a threat to public safety as members of a potential rebellion or insurrection. The Majority's effort to mix and match these traditions misses the mark.

To illustrate the point, it is helpful to consider individuals who historically *were* disarmed based on demonstrated dangerousness through the violation of a societal norm: people who were convicted of violating going armed laws. At common law, those who violated "going armed" laws were punished with "forfeiture of the arms … and imprisonment." *Rahimi*, 602 U.S. at 697 (quoting BLACKSTONE at 149). Those individuals certainly violated a legal norm of society by engaging in an armed affray, just as those who committed nonviolent crimes (like contempt of court) violated legal norms of society. For their violation of societal legal norms, nonviolent offenders were eligible to receive some of the same punishments as those who violated going armed laws, but disarmament was not one of them. *Compare* An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (Dixon, Holt, Nicholson, and Davies) (for violation of going armed law, providing for imprisonment of up to one month and "forfeit[ure] of [the offender's] armour to the Commonwealth"), *with* Judiciary Act of 1789, *cited in* JOHN FOX, THE HISTORY OF CONTEMPT OF COURT 209 (1972) (codifying federal courts' power to punish contempt by fine or imprisonment).[17] This suggests that those who were convicted of violating going

---

[17] As the Majority observes, an 1801 law gave justices of the peace the power to punish contempt committed in their presence with whipping, imprisonment, and fines. Maj. Op. at 52 n.36.

armed laws were historically disarmed because they specifically had demonstrated that they were dangerous, not because they more generally had violated a societal legal norm.

Relatedly, the Majority overlooks the Supreme Court's observation in *Bruen* that, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. That is precisely the situation here. Section 5-133(b)(2), as applied to Mr. Fooks, addresses a general societal problem that has persisted since the eighteenth century. Then, as now, lawmakers had to consider what to do about criminals who completed their sentences for nonviolent but nevertheless serious crimes (like contempt of court) and reentered society. Founding-era lawmakers chose not to disarm such citizens. The lack of a founding-era regulation disarming nonviolent criminals is relevant evidence that PS § 5-133(b)(2), as applied to a non-violent felon-equivalent like Mr. Fooks, is inconsistent with the Second Amendment.

But that is not all. As discussed above, not only did founding-era legislatures not *disqualify* convicted felons and other criminals from possessing firearms based on their convictions; militia laws *required* all qualified men (with no exemption for those with criminal records) to keep and bear firearms individually. This was also consistent with the tradition of providing firearms to indentured servants – including those with criminal records – when they completed their service. And it was consistent with colonial-era laws that required citizens to arm themselves, again with no exception for those who had committed crimes.

Which brings me back to the hypothetical with which I began. At the founding and into the nineteenth century, a large percentage of ordinary citizens armed themselves for self-defense and to be prepared for militia service. *See* KENNETT & ANDERSON at 71 ("By 1787, the armed American male had his firearm firmly clenched in his fist…. He arrived at this point in American history buoyed by the tradition of arms ownership and use, based on the colonial and revolutionary experience."); *see also id.* at 82 ("Laws were still in effect in the nineteenth century ordering every able-bodied man to be armed."). The new nation did not have so many citizens that it could afford to disarm able-bodied men who had committed nonviolent (or even violent) crimes in the event that the militias were pressed into service. And, without robust police forces to deter burglaries and other acts of crime and aggression, founding-era citizens had practical reasons to embrace Blackstone's conception of "[t]he right of self defence [as] the first law of nature." *Range*, 124 F.4th at 242 (Matey, J., concurring) (quoting 1 BLACKSTONE, COMMENTARIES, app. at 300 (St. George Tucker ed., 1803)). That is why the public at the time of the founding would have been shocked at the idea that a person like Baptis Irvine – on the basis of his nonviolent criminal convictions – would be disqualified from keeping and bearing arms for defense of himself and his property, while his neighbor would be permitted and possibly even required to keep and bear arms.[18]

---

[18] Home burglaries were not an infrequent occurrence in colonial and founding-era America. This led the citizens of Baltimore to organize a volunteer night watch in the 1770s, followed by the legislative enactment of a night watch in Baltimore in 1784. *See* Clinton McCabe, HISTORY OF THE BALTIMORE POLICE DEPARTMENT 1774-1907, at 16 (1907) ("In 1775 the good citizens of Baltimore became alarmed at the constant infractions

In this regard, it is noteworthy that founding-era legislatures *did* strip criminals of other rights. As the Majority points out, felons could be stripped of property rights and banned from voting. *See* Maj. Op. at 45-46 & nn.30-31. Thus, it is clear that legislatures did view felons or criminals as a discrete class, at least for some purposes, and placed restrictions on them that did not apply to other citizens. To the Majority, this means that founding-era legislatures also would have had the authority to enact laws disqualifying felons from firearms ownership, had they wanted to do so. As I see it, the legislative decision not to treat nonviolent criminals differently than other citizens in the particular context of firearms ownership sheds light on the meaning of the Second Amendment. Moreover, as discussed above, forfeiture of one's firearms as part of a larger forfeiture of one's estate following a felony conviction did not preclude a felon from repurchasing arms. *See Range*, 124 F.4th at 231.[19]

Nor do founding-era laws barring felons from voting support the Majority's position. It is true that felons historically could be disqualified from voting because voting

---

of the law and the disorder that prevailed, particularly after sunset, and steps were taken to organize a force of especially delegated individuals who were bound to preserve the peace and to take into custody those who violated the laws."); 1784 Md. Laws, ch. 69 (stating in the preamble to an Act that established a night watch that "the ordering and regulating a watch, and enlightening the streets, lanes and alleys, in the night time, in Baltimore-town … is of very great importance for the preservation of the persons and properties of the inhabitants thereof, and very necessary to prevent fires, burglaries, and other outrages and disorders").

[19] Moreover, forfeiture of property based on felony convictions became increasingly rare in the United States. *See* note 13 above; *see also Kanter*, 919 F.3d at 459-61 (Barrett, J., dissenting) (explaining that courts "struggled to determine how – if at all – the old concept of civil death applied to felons serving sentences for a term of years").

rights "belonged only to virtuous citizens." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). But "virtue exclusions are associated with civic rights – individual rights that require citizens to act in a collective manner for distinctly public purposes." *Id.* (cleaned up). Before *Heller*, some scholars viewed the right to bear arms as such a civic right that could permissibly be subject to a virtue exclusion. *See id.* at 462-63. But *Heller* "expressly rejects the argument that the Second Amendment protects a purely civic right[,]" and "squarely holds that 'the Second Amendment confer[s] *an individual right* to keep and bear arms[.]'" *Id.* at 463 (quoting *Heller*, 554 U.S. at 595) (emphasis added by Barrett, J.); *see also id.* at 464 ("The Second Amendment confers an individual right, intimately connected with the natural right of self-defense, and not limited to civic participation (i.e., militia service)."); *Binderup*, 836 F.3d at 371 (Hardiman, J., concurring) ("[T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a 'civic right[.]'"). The State has failed to show that virtue exclusions historically applied to individual rights. "And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment." *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting).

The Majority also points to the availability of the death penalty in the founding era for "a long list of felonies" as support for the proposition that "felons did not historically enjoy the right to keep and bear arms." Maj. Op. at 45, 46. Relatedly, the Majority relies on *Rahimi*'s observation that because "going armed laws provided for imprisonment,"

*Rahimi*, 602 U.S. at 699, "the lesser restriction of temporary disarmament [in 18 U.S.C. § 922(g)(8)] must also be permissible." Maj. Op. at 47. According to the Majority, that same reasoning applies here; that is, because founding-era legislatures made the death penalty an available punishment for many felonies, including nonviolent felonies such as forgery, those legislatures "thus 'authorized punishments that subsumed disarmament'" for such nonviolent offenses. Maj. Op. at 47 (quoting *Jackson*, 110 F.4th at 1127).

The Majority's reliance on the availability of the death penalty for founding-era felonies is misplaced for several reasons. First, many of today's felony and felony-equivalent offenses did not exist at the time of the founding or did not carry or typically result in the death penalty. Thus, the treatment of founding-era felons tells us little about how the framers and public at the time of the founding viewed disarmament of nonviolent criminals who were not classified as felons. Second, founding-era felons who were not executed did "enjoy the right to keep and bear arms." Maj. Op. at 45. As discussed, militia acts did not exempt felons from the obligation to obtain firearms. Third, as then-Judge Barrett explained in her dissent in *Kanter*, because "a felony conviction and the loss of all rights did not necessarily go hand-in-hand,"

> the argument that the severity of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided. Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law. This is not to say that felons could not lose rights under another theory. Indeed, state legislatures did explicitly exclude felons from the enjoyment of particular rights.[20] … But history confirms that the basis for the permanent

---

[20] Here, Judge Barrett was referring to the virtue-based rights to vote and to serve on juries. *See Kanter*, 919 F.3d at 462-64 (Barrett, J., dissenting).

and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class.

Even if it could be, though, one might reasonably ask: "So what?" We wouldn't draw this inference from the severity of founding-era punishment in other contexts – for example, we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.

*Kanter*, 919 F.3d at 461-62 (Barrett, J., dissenting); *see also Range*, 124 F.4th at 231 ("[T]he Founding-era practice of punishing some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue here – de facto lifetime disarmament for all felonies and felony-equivalent misdemeanors – is rooted in our Nation's history and tradition."). Fourth, *Rahimi*'s point about imprisonment for going armed violations subsuming disarmament of those who were imprisoned is inapposite. As the *Range* Court explained, the Court in *Rahimi* did not "bless[] disarmament as a lesser punishment generally…. Instead, it authorized temporary disarmament as a sufficient analogue to historic temporary imprisonment *only* to 'respond to the use of guns to threaten the physical safety of others.'" *Range*, 124 F.4th at 231 (quoting *Rahimi*, 602 U.S. at 699). As discussed above, individuals who violated going armed laws historically were subject to both imprisonment and disarmament because they had misused firearms. The disarmament of forgers who were put to death, on the other hand, was entirely incidental to their execution.

The Majority also overreads another point from *Rahimi*: the admonition in Justice Barrett's concurring opinion that courts should avoid assuming "that founding-era

legislatures maximally exercised their power to regulate," and thereby improperly adopt "a 'use it or lose it' view of legislative authority." *See* Maj. Op. at 28-29 & n.12, 44-45 n.28 (quoting *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring)). Unlike this case, *Rahimi* involved a comparison of a modern regulation and a founding-era regulation that both addressed the same societal problem: "preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 602 U.S. at 690. The disagreement between the *Rahimi* Majority and Justice Thomas in dissent was whether the modern law (18 U.S.C. § 922(g)(8)) was relevantly similar to the founding-era regulations (going armed laws and surety laws).[21] Here, as discussed above, there was no founding-era regulation that addressed the societal problem PS § 5-122(b)(2) (as applied to Mr. Fooks) targets, *i.e.*, disarming individuals based on prior nonviolent criminal convictions. And, as discussed,

---

[21] Note that the historical principle the Majority identifies as applicable here – disarming people who demonstrate disrespect for societal legal norms – could also describe what Congress accomplished in enacting 18 U.S.C. § 922(g)(8). One of the necessary elements for disqualification under § 922(g)(8) is a judicial finding that the defendant "represents a credible threat to the physical safety of [an] intimate partner or child[.]" 18 U.S.C. § 922(g)(8)(C)(i). Somone who is found to represent such a credible threat can be said to have demonstrated disrespect for a legal norm. Thus, if the Supreme Court had thought it appropriate to do so, it could have described the "general societal problem" addressed by § 922(g)(8) as preventing those who have demonstrated disrespect for societal legal norms from possessing firearms. It also could have described the going armed and surety laws as reflecting a historical principle that authorized legislatures to disarm individuals who demonstrate disrespect for legal norms of society. The Supreme Court did not describe the relevant principle so broadly. Rather, the Supreme Court looked to the specific purpose of the modern regulation, which disarmed only those who were found to pose credible threats of harm to others, and considered whether founding-era laws showed a historical tradition of disarming people who threaten others with physical harm.

- 60 -

founding-era militia laws affirmatively required all able-bodied men to obtain firearms.[22]

Recall *Bruen*'s guidance that "the lack of a distinctly similar historical regulation addressing [a general societal] problem is relevant evidence that [a] challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. In light of this observation by the *Bruen* Court, I read Justice Barrett's point about not assuming that founding-era legislatures maximally exercised their power to regulate as applying only where such legislatures regulated a general societal problem to some extent. Founding-era legislatures did not regulate the possession of firearms based on an individual's prior commission of a nonviolent crime at all.

Undoubtedly, the Second Amendment allows a government to disarm a nonviolent felon or felon-equivalent for the duration of their jail sentence, *i.e.*, temporarily. *See Range*, 124 F.4th at 249-50 (Phipps, J., concurring) ("It is as ancient as it is obvious that a person who is imprisoned or otherwise confined does not have the right to bear arms for the duration of confinement. Similarly, non-confined citizens who are still within the criminal justice system through parole or supervised release may have their freedoms, including the right to bear arms, limited if justified as a penal measure."). But temporary disqualification is not at issue here. As I have endeavored to demonstrate, there is no historical tradition of *permanent* disarmament of nonviolent criminals.

---

[22] Arguably, this suggests that felon-disqualification laws are constitutionally infirm not just as to nonviolent felons, but also as applied to violent felons. That suggestion, in my view, is incorrect. As discussed above with respect to Mr. Fooks's facial challenge, disarmament of violent criminals is consistent with the Nation's tradition of regulating the possession and use of firearms by those who have demonstrated dangerousness, as exemplified by surety and going armed laws.

The logical conclusion of the Majority's historical analysis is that the General Assembly may make infractions such as jaywalking or exceeding the posted speed limit the basis for permanent firearms disqualification by increasing the maximum penalty for those offenses to imprisonment for more than one year. After all, individuals who violate laws against jaywalking or speeding (or any other prohibition, no matter how minor) can be said to have "demonstrated disrespect for legal norms of society" and an "unwillingness to follow the law." Maj. Op. at 48-49.[23] Further, under the Majority's reasoning, the Second Amendment does not bar a legislature from basing permanent firearms disqualification on a conviction for a criminal offense that carries a maximum penalty of less than one year of imprisonment or on the violation of a statute that only carries civil penalties. Like felony and felony-equivalent offenses, less serious criminal laws and laws enforceable only through civil penalties establish "legal norms of society."[24]

---

[23] The Majority claims that I create a "strawman" (Maj. Op. at 48 n.33) when I point out that, under the Majority's reasoning, a legislature may make the violation of any "societal legal norm" the basis for permanent firearm disqualification. To be sure, the General Assembly has not made jaywalking or speeding a predicate offense for permanent firearm disqualification. But, under the Majority's reasoning, the Second Amendment does not bar the General Assembly from doing so. That observation is not a strawman, but rather a red flag that highlights a flaw in the Majority's analysis.

[24] Justice Gould's concurring opinion distinguishes between Congress's Article I power and a state's police power "to punish criminal conduct with a forfeiture of Second Amendment rights[.]" Concurring Op. of Gould, J., at 3. In my view, the incorporation of the Second Amendment against the states, *see McDonald*, 561 U.S. at 750, means that if a prosecution of Mr. Fooks for violating the federal felon disqualification statute, 18 U.S.C. § 922(g)(1), would run afoul of the Second Amendment, the same would be true with respect to his prosecution under PS § 5-133(b)(2). It is telling that, in his dissent in *McDonald*, Justice Stevens repeatedly criticized what he perceived to be the Majority opinion's undermining of states' police powers. *See McDonald*, 561 U.S. at 900-01

My concern is not assuaged by the Majority's description of Mr. Fooks's predicate conviction as "a particularly egregious flouting of legal requirements," which, the Majority says, renders Mr. Fooks's resulting disqualification "well within our Nation's historical regulation of firearms." Maj. Op. at 51, 53. This begs the question: How egregious do the circumstances of a person's prior conduct need to be for disqualification based on that conduct to be within the Nation's historical regulation of firearms? Under the Majority's reasoning, I see no way to distinguish Mr. Fooks's predicate violation from any other contempt of court or any other violation of a legal norm of society, no matter how minor.

Some might say that permanently disqualifying anyone who has committed a violation of any legal norm of society is good policy. But "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636; *see also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (cautioning courts "not to read a principle at such a high level of generality that it waters down" the Second Amendment right); *cf. Bruen*, 597 U.S. at 30-31 (recognizing historic regulations of firearms in "sensitive places," but rejecting the State's attempt to expand the category of sensitive places to all places of public congregation that are not isolated from law enforcement; doing so would define the category of sensitive places "far too broadly" and "would in effect exempt cities from the Second Amendment and … eviscerate the general right to publicly carry arms for self-defense"). The Second Amendment takes permanent

---

(Stevens, J., dissenting) (history of "intrusive regulation" of firearms by states "is not surprising given that the very text of the Second Amendment calls out for regulation, and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States' police powers") (footnote omitted).

disqualification of a citizen, based on their prior conviction for a nonviolent crime, off the table.

I would hold that when the State seeks to prosecute a person for possessing a firearm based on a prior conviction, the State meets its burden under *Bruen* and *Rahimi* if it shows that the predicate conviction was for an offense that is violent in nature. Crimes that are violent in nature are those that have as an element the use, attempted use, or threatened use of force against the person of another.[25] A categorical, elements-based approach is appropriate here because it avoids the problems associated with relitigating "past convictions in minitrials conducted long after the fact." *Moncrieffe v. Holder,* 569 U.S. 184, 200-01 (2013). Without such a categorical approach, courts (or perhaps juries) typically would have to examine documents from the underlying prosecution or receive live evidence concerning the circumstances of the predicate offense to determine whether the defendant committed the offense using violent means. For example, where the underlying crime is obstruction of justice, there might be a factual dispute years later as to whether the defendant threatened to kill a witness, or whether the defendant offered to pay the witness for her silence. But, because the defendant was guilty of obstruction of justice in either event, there was no finding at the time of the underlying conviction on that point.

---

[25] There may be other crimes that are not categorically violent but nevertheless can form the basis for firearms disqualification without violating the Second Amendment because they carry a significant threat of danger. *See, e.g.*, *Williams*, 113 F.4th at 659-60 (referring to crimes like drug trafficking which, "while not strictly crimes against the person, may nonetheless pose a significant threat of danger"). I take no position here concerning the constitutionality of a prosecution for illegal possession of a firearm based on a prior conviction for drug trafficking or a similar offense that does not have as an element the use, attempted use, or threatened use of force against the person of another.

*See Mathis v. United States*, 579 U.S. 500, 512 (2016) (noting that "[s]tatements of 'non-elemental fact' in the records of prior convictions are prone to error precisely because their proof is unnecessary"). A categorical approach thus avoids allowing inaccuracies at a plea hearing or elsewhere in the underlying case to "come back to haunt the defendant many years down the road[.]" *Id.* It also avoids the time and expense of locating and putting on witnesses who may (or may not) recall the circumstances of the underlying offense.

Mr. Fooks's predicate conviction is for constructive criminal contempt. That offense is not violent in nature. It follows that, as applied to Mr. Fooks, PS § 5-133(b)(2) violates the Second Amendment. In these circumstances, I would order a remand to the circuit court with the instruction to allow Mr. Fooks to withdraw his guilty plea and, thereafter, to dismiss Counts 4 and 7 of the Criminal Information.[26]

**Conclusion**

The Second Amendment bars the State from prosecuting Mr. Fooks under PS § 5-133(b)(2) based on his prior conviction for the nonviolent crime of constructive criminal contempt.

Respectfully, I dissent.

---

[26] As noted above, the State agreed that, if Mr. Fooks were to prevail on appeal, it would not seek to revive the theft charge. Had the State not made that representation, I would direct that additional proceedings consistent with this opinion be conducted on remand.